L/N

1 Richard R. Lawless
2 30279 Redding Avenue
3 Murrieta, CA  92563
4 951-440-5230
5 richardrlawless@gmail.com
6 Plaintiff
7
8

# United States District Court
# For the Central District of California
# Eastern Division

12

13 **RICHARD R. LAWLESS**             No.   New   5:24-cv-00804-JGB(SHKx)
14 Plaintiff,
15
16 V.
17
18 **UNITED STATES OF AMERICA**
19
20 Defendant.
21
22 **United States of America**
23 C/O U.S. Department of Justice
24 Civil Division, Torts Branch
25 Federal Torts Claims Act Staff
26 P.O. Box 888
27 Benjamin Franklin Station
28 Washington, D.C. 20044
29
30
31
32
33

1

**TABLE OF CONTENTS**

DESCRIPTION                                                      PAGE

Table of Authorities                                            3

Memorandum of Points and Authorities                           4

Introduction                                                   6

Statement of Facts                                             6

Standards of Review                                           7

Argument                                                      28

Department of Justice Fase Statements                        40

Docked Evidence                                               51

Conclusion                                                    55

Exhibit One – FTCA Claim

Exhibit Two – Judicial Misconduct Investigation

Exhibit Three – Amended Complaint Explaining This Dispute

1

## **TABLE OF AUTHORITIES**

2 Description                                                                PAGE

3 Napue v. Illinois 360 U.S. 264 (1959)                                       7

4 United States v. Bagley 473 U.S. 667 (1985)                                 7

5 Brady v. Maryland 373 U.S. 83 (1963)                                        8

6 Kyles v. Whitley (93-7927), 514 U.S. 419 (1995)                             9

7 Bivens v. Six Unknown Named Agents 403 U.S. 388 (1971)                     27

8 Gideon v. Wainwright 372 U.S. 335 (1963)                                   35

9 United States v. Morrison no citation found (2000)                        35

10 50 U.S. Code § 3121                                                       35

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff filed an FTCA Administrative Claim against the Department of Justice on October 2, 2024.  The DOJ has failed to respond to the claim and the allegations remain uncontested.

## 38 CFR § 14.600 - Federal Tort Claims Act

The **Federal Tort Claims Act** (August 2, 1946, ch. 646, Title IV, 60 Stat. 812, 28 U.S.C. Part VI, Chapter 171 and 28 U.S.C. § 1346) ("FTCA") is a 1946 federal statute that permits private parties to sue the United States in a federal court for most torts committed by persons acting on behalf of the United States. Historically, citizens have not been able to sue the government — a doctrine referred to as sovereign immunity. The FTCA constitutes a limited waiver of sovereign immunity by the United States, permitting citizens to pursue some tort claims against the federal government. It was passed and enacted as a part of the Legislative Reorganization Act of 1946.

28 U.S. Code § 1346 - United States as defendant

## (a)The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

**(1)**

Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

**(2)**

Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.



**U.S. Department of Justice**

Civil Division, Torts Branch
Federal Tort Claims Act Staff

GKJ:HLSwann:hls
157-16-NEW

*Post Office Box 888*
*Benjamin Franklin Station*
*Washington, D.C.   20044*

January 2, 2024

Mr. Richard R. Lawless
30279 Redding Avenue
Murrieta, CA   92563

    Re:   <u>Administrative Tort Claim of Richard R. Lawless</u>

Dear Mr. Lawless:

    This is in response to your administrative tort claim dated October 2, 2023, which you submitted to the Department of Justice (Department).   The Department received the claim on October 5, 2023, and this office on October 6, 2023.   The Department will be handling your claim as lead agency pursuant to 28 C.F.R. § 14.2(b).   All future correspondence concerning this claim should be directed to the Department at the address above.   We will contact you if further information is needed.

             Very truly yours,

             HOPE L. SWANN
             Paralegal Specialist
             Civil Division, Torts Branch

1

2

## Introduction

Plaintiff is seeking forty-five million dollars in damages and seventy-five-billion-dollars in punitive damages for the Department of Justice's violation of their Professional Legal Ethics, for violations of California Rules of Professional Conduct (CRPC), Attorney Misconduct, Civil Rights Violations and Violations of the U.S. Attorneys Professional Oath leading to the dismissal of four cases seeking reimbursement for the Plaintiffs stolen money. These actions denied the Plaintiff a fair trial.

The seventy-five-billion-dollars in punitive damages relates to seventy-five-billion-dollars in knowingly fraudulent bonds that were allowed to be issued and freely traded by the SEC, the DOJ, and the Treasury Department.  These crimes led to the wrongful deaths of between four-thousand-five hundred and six thousand Puerto Rico residents.

## STATEMENT OF FACTS

This case relates to the actions of the Department of Justice and their U.S. Attorney's while acting as Defense Counsel for the Securities and Exchange Commission in the following cases;

**5:21-cv-02174-JWH-SP**: Richard R. Lawless v. The Securities and Exchange Commission filed 12/29/21   closed 08/29/22

**5:22-cv-00148-JWH-SP**: Richard R. Lawless v. United States of America filed 01/25/22   closed 01/09/23

**5:22-cv-01700-JWH-SP**: Richard R. Lawless v. United States of America filed 09/27/22   closed 10/23/23

**23-3382**: Ninth Circuit Court of Appeals, Filed 11-8-23 Appealing Case 522-cv-01700-JWH-SP

**23-90161:** Sealed Ninth Circuit Judicial Misconduct Case related to all the above cases as well as FOIA Case 5:21-cv-01637-JWH-SP

There is a California Bar Association investigation on-going regarding the U.S. Attorney's involved in these cases.

Plaintiff filed an FTCA Administrative Claim against the Department of Justice on October 2, 2024.  The DOJ has failed to respond to the claim and the allegations remain uncontested.

The FTCA Claim was eighty-three pages and is attached as **Exhibit One**.

A redacted version of the Judicial Misconduct Complaint is attached as **Exhibit Two** to show the significance of the DOJ's misconduct in these trials.  This case involves confirmation of these crimes by senior U.S. Intelligence Officials and the copy of the sealed filing has been redacted to protect national security.  This version is limited to eight pages.

For the court to better understand the motivations of the DOJ, the SEC, The Treasury Department, the Federal District Court of Central California Judge, and the Ninth Circuit Court Judges motivation in dismissing the original cases, Plaintiff has attached his amended complaint as **Exhibit Three** from case 5:22-cv-01700-JWH-SP. This document is forty-five pages.

The Department of Justice will claim that they had no obligation to disclosed evidence.  That is simply not true if the DOJ is making knowingly false statements on their court submissions.

<u>**STANDARDS OF REVIEW**</u>

**Napue v. Illinois 360 U.S. 264 (1959)**: In this case, the Supreme Court held that the prosecution's use of false testimony, or failure to correct false testimony, violated the defendant's due process rights. While not directly about defense attorneys withholding evidence, it underscores the importance of disclosure of material evidence for a fair trial.

At petitioner's trial in a state court in which he was convicted of murder, the principal state witness, an accomplice then serving a 199-year sentence for the same murder, testified in response to a question by the Assistant State's Attorney that he had received no promise of consideration in return for his testimony. The Assistant State's Attorney had in fact promised him consideration, but he did nothing to correct the witness' false testimony. The jury was apprised, however, that a public defender had promised "to do what he could" for the witness.

*Held:* The failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment. Pp. 360 U. S. 265-272.

**United States v. Bagley 473 U.S. 667 (1985)**: While this case primarily addresses the prosecution's duty to disclose favorable evidence to the defense, it also applies to defense attorneys. The Supreme Court held that the government's failure to disclose favorable evidence to the defense, whether intentional or inadvertent, violates due process if the evidence is material to guilt or punishment.

Respondent was indicted on charges of violating federal narcotics and firearms statutes. Before trial, he filed a discovery motion requesting, *inter alia,* "any deals, promises or inducements made to [Government] witnesses in exchange for their testimony." The Government's response did not disclose that any "deals, promises or inducements" had been made to its two principal witnesses, who had assisted the Bureau of Alcohol, Tobacco and Firearms (ATF) in conducting an undercover investigation of respondent. But the Government did produce signed affidavits by these witnesses recounting their undercover dealing with respondent and concluding with the statement that the affidavits were made without any threats or rewards or promises of reward. Respondent waived his right to a jury trial and was tried before the District Court. The two principal Government witnesses testified about both the firearms and narcotics charges, and the court found respondent guilty on the narcotics charges but not guilty on the firearms charges. Subsequently, in response to requests made pursuant to the Freedom of Information

1  Act and the Privacy Act, respondent received copies of ATF contracts signed by the principal
2  Government witnesses during the undercover investigation and stating that the Government
3  would pay money to the witnesses commensurate with the information furnished. Respondent
4  then moved to vacate his sentence, alleging that the Government's failure in response to the
5  discovery motion to disclose these contracts, which he could have used to impeach the
6  witnesses, violated his right to due process under *Brady v. Maryland,* 373 U. S. 83, which held
7  that the prosecution's suppression of evidence favorable to an accused upon request violates
8  due process where the evidence is material either to guilt or punishment. The District Court
9  denied the motion, finding beyond a reasonable doubt that, had the existence of the ATF
10  contracts been disclosed to it during trial, the disclosure would not have affected the outcome,
11  because the principal Government witnesses' testimony was primarily devoted to the firearms
12  charges on which respondent was acquitted, and was exculpatory on the narcotics charges. The
13  Court of Appeals reversed, holding that the Government's failure to disclose the requested
14  impeachment evidence that respondent could have used to conduct an effective cross-
15  examination of the Government's principal

16  Page 473 U. S. 668

17  **Brady v. Maryland 373 U.S. 83 (1963)**: This landmark case established the principle that the
18  prosecution has a constitutional obligation to disclose material exculpatory evidence to the
19  defense. Failure to disclose such evidence violates the defendant's due process rights under the
20  Fourteenth Amendment. The rule derived from this case is commonly referred to as the "Brady
21  Rule."

22  *CERTIORARI TO THE COURT OF APPEALS OF MARYLAND*

23  Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BRENNAN.

24  Petitioner and a companion, Boblit, were found guilty of murder in the first degree and were
25  sentenced to death, their convictions being affirmed by the Court of Appeals of Maryland. 220
26  Md. 454, 154 A.2d 434. Their trials were separate, petitioner being tried first. At his trial, Brady
27  took the stand and admitted his participation in the crime, but he claimed that Boblit did the
28  actual killing. And, in his summation to the jury, Brady's counsel conceded that Brady was guilty
29  of murder in the first degree, asking only that the jury return that verdict "without capital
30  punishment." Prior to the trial, petitioner's counsel had requested the prosecution to allow him
31  to examine Boblit's extrajudicial statements. Several of those statements were shown to him,
32  but one dated July 9, 1958, in which Boblit admitted the actual homicide, was withheld by the
33  prosecution, and did not come to petitioner's notice until after he had been tried, convicted,
34  and sentenced, and after his conviction had been affirmed.

1  Petitioner moved the trial court for a new trial based on the newly discovered evidence that

2  had been suppressed by the prosecution. Petitioner's appeal from a denial of that motion was

3  dismissed by the Court of Appeals without prejudice to relief under the Maryland

4  [85]

5  **Kyles v. Whitley (93-7927), 514 U.S. 419 (1995)**: The Court reaffirmed the Brady rule and

6  emphasized that the prosecution's duty to disclose extends to all members of the prosecution

7  team, including law enforcement agencies. The Court also emphasized that evidence must be

8  considered collectively to determine materiality.

9  Justice Souter delivered the opinion of the Court.

10  Following the mistrial when the jury was unable to reach a verdict, Kyles's subsequent

11  conviction and sentence of death were affirmed on direct appeal. *State* v. *Kyles*, 513 So. 2d 265

12  (La. 1987), cert. denied, 486 U.S. 1027 (1988). On state collateral review, the trial court denied

13  relief, but the Supreme Court of Louisiana remanded for an evidentiary hearing on Kyles's

14  claims of newly discovered evidence. During this state court proceeding the defense was first

15  able to present certain evidence, favorable to Kyles, that the State had failed to disclose before

16  or during trial. The state trial court nevertheless denied relief, and the State Supreme Court

17  denied Kyles's application for discretionary review. *State ex rel. Kyles* v. *Butler*, 566 So. 2d 386

18  (La. 1990).

19  Kyles then filed a petition for habeas corpus in the United States District Court for the Eastern

20  District of Louisiana, which denied the petition. The Court of Appeals for the Fifth Circuit

21  affirmed by a divided vote. 5 F. 3d 806 (1993). As we explain, *infra*, at 21-22, there is reason to

22  question whether the Court of Appeals evaluated the significance of undisclosed evidence

23  under the correct standard. Because "[o]ur duty to search for constitutional error with

24  painstaking care is never more exacting than it is in a capital case," *Burger* v. *Kemp*, 483 U.S.

25  776, 785 (1987), [n.1] we granted certiorari, 511 U. S. ___ (1994), and now reverse.

26  The record indicates that, at about 2:20 p.m. on Thursday, September 20, 1984, 60 year old

27  Dolores Dye left the Schwegmann Brothers' store (Schwegmann's) on Old Gentilly Road in New

28  Orleans after doing some food shopping. As she put her grocery bags into the trunk of her red

29  Ford LTD, a man accosted her and after a short struggle drew a revolver, fired into her left

30  temple, and killed her. The gunman took Dye's keys and drove away in the LTD.

31  New Orleans police took statements from six eyewitnesses, [n.2] who offered various

32  descriptions of the gunman. They agreed that he was a black man, and four of them said that

33  he had braided hair. The witnesses differed significantly, however, in their descriptions of

1  height, age, weight, build, and hair length. Two reported seeing a man of 17 or 18, while
2  another described the gunman as looking as old as 28. One witness described him as 5'4" or
3  5'5", medium build, 140-150 pounds; another described the man as slim and close to six feet.
4  One witness said he had a mustache; none of the others spoke of any facial hair at all. One
5  witness said the murderer had shoulder length hair; another described the hair as "short."

6  Since the police believed the killer might have driven his own car to Schwegmann's and left it
7  there when he drove off in Dye's LTD, they recorded the license numbers of the cars remaining
8  in the parking lots around the store at 9:15 p.m. on the evening of the murder. Matching these
9  numbers with registration records produced the names and addresses of the owners of the
10  cars, with a notation of any owner's police record. Despite this list and the eyewitness
11  descriptions, the police had no lead to the gunman until the Saturday evening after the
12  shooting.

13  At 5:30 p.m., on September 23, a man identifying himself as James Joseph called the police and
14  reported that on the day of the murder he had bought a red Thunderbird from a friend named
15  Curtis, whom he later identified as petitioner, Curtis Kyles. He said that he had subsequently
16  read about Dye's murder in the newspapers and feared that the car he purchased was the
17  victim's. He agreed to meet with the police.

18  A few hours later, the informant met New Orleans detective John Miller, who was wired with a
19  hidden body microphone, through which the ensuing conversation was recorded. See App. 221-
20  257 (transcript). The informant now said his name was Joseph Banks and that he was called
21  Beanie. His actual name was Joseph Wallace. [n.3]

22  His story, as well as his name, had changed since his earlier call. In place of his original account
23  of buying a Thunderbird from Kyles on Thursday, Beanie told Miller that he had not seen Kyles
24  at all on Thursday, *id.*, at 249-250, and had bought a red LTD the previous day, Friday, *id.*, at
25  221-222, 225. Beanie led Miller to the parking lot of a nearby bar, where he had left the red
26  LTD, later identified as Dye's.

27  Beanie told Miller that he lived with Kyles's brother in law (later identified as Johnny
28  Burns), [n.4] whom Beanie repeatedly called his "partner." *Id.*, at 221. Beanie described Kyles as
29  slim, about 6 feet tall, 24 or 25 years old, with a "bush" hairstyle. *Id.*, at 226, 252. When asked if
30  Kyles ever wore his hair in plaits, Beanie said that he did but that he "had a bush" when Beanie
31  bought the car. *Id.*, at 249.

32  During the conversation, Beanie repeatedly expressed concern that he might himself be a
33  suspect in the murder. He explained that he had been seen driving Dye's car on Friday evening
34  in the French Quarter, admitted that he had changed its license plates, and worried that he

"could have been charged" with the murder on the basis of his possession of the LTD. *Id.*, at 231, 246, 250. He asked if he would be put in jail. *Id.*, at 235, 246. Miller acknowledged that Beanie's possession of the car would have looked suspicious, *id.*, at 247, but reassured him that he "didn't do anything wrong," *id.*, at 235.

Beanie seemed eager to cast suspicion on Kyles, who allegedly made his living by "robbing people," and had tried to kill Beanie at some prior time. *Id.*, at 228, 245, 251. Beanie said that Kyles regularly carried two pistols, a .38 and a .32, and that if the police could "set him up good," they could "get that same gun" used to kill Dye. *Id.*, at 228-229. Beanie rode with Miller and Miller's supervisor, Sgt. James Eaton, in an unmarked squad car to Desire Street, where he pointed out the building containing Kyles's apartment. *Id.*, at 244-246.

Beanie told the officers that after he bought the car, he and his "partner" (Burns) drove Kyles to Schwegmann's about 9 p.m. on Friday evening to pick up Kyles's car, described as an orange four door Ford. [n.5] *Id.*, at 221, 223, 231-232, 242. When asked where Kyles's car had been parked, Beanie replied that it had been%[o]n the same side [of the lot] where the woman was killed at." *Id.*, at 231. The officers later drove Beanie to Schwegmann's, where he indicated the space where he claimed Kyles's car had been parked. Beanie went on to say that when he and Burns had brought Kyles to pick up the car, Kyles had gone to some nearby bushes to retrieve a brown purse, *id.*, at 253-255, which Kyles subsequently hid in a wardrobe at his apartment. Beanie said that Kyles had "a lot of groceries" in Schwegmann's bags and a new baby's potty "in the car." *Id.*, at 254-255. Beanie told Eaton that Kyles's garbage would go out the next day and that if Kyles was "smart" he would "put [the purse] in [the] garbage." *Id.*, at 257. Beanie made it clear that he expected some reward for his help, saying at one point that he was not "doing all of this for nothing." *Id.*, at 246. The police repeatedly assured Beanie that he would not lose the $400 he paid for the car. *Id.*, at 243, 246.

After the visit to Schwegmann's, Eaton and Miller took Beanie to a police station where Miller interviewed him again on the record, which was transcribed and signed by Beanie, using his alias "Joseph Banks." See App. 214-220 (transcript). This statement, Beanie's third (the telephone call being the first, then the recorded conversation), repeats some of the essentials of the second one: that Beanie had purchased a red Ford LTD from Kyles for $400 on Friday evening; that Kyles had his hair "combed out" at the time of the sale; and that Kyles carried a .32 and a .38 with him "all the time."

Portions of the third statement, however, embellished or contradicted Beanie's preceding story and were even internally inconsistent. Beanie reported that after the sale, he and Kyles unloaded Schwegmann's grocery bags from the trunk and back seat of the LTD and placed them

1  in Kyles's own car. Beanie said that Kyles took a brown purse from the front seat of the LTD and
2  thatthey then drove in separate cars to Kyles's apartment, where they unloaded the
3  groceries. *Id.*, at 216-217. Beanie also claimed that, a few hours later, he and his "partner"
4  Burns went with Kyles to Schwegmann's, where they recovered Kyles's car and a "big brown
5  pocket book" from "next to a building." *Id.*, at 218. Beanie did not explain how Kyles could have
6  picked up his car and recovered the purse at Schwegmann's, after Beanie had seen Kyles with
7  both just a few hours earlier. The police neither noted the inconsistencies nor questioned
8  Beanie about them.

9  Although the police did not thereafter put Kyles under surveillance, Tr. 94 (Dec. 6, 1984), they
10  learned about events at his apartment from Beanie, who went there twice on Sunday.
11  According to a fourth statement by Beanie, this one given to the chief prosecutor in November
12  (between the first and second trials), he first went to the apartment about 2 p.m., after a
13  telephone conversation with a police officer who asked whether Kyles had the gun that was
14  used to kill Dye. Beanie stayed in Kyles's apartment until about 5 p.m., when he left to call
15  Detective John Miller. Then he returned about 7 p.m. and stayed until about 9:30 p.m., when
16  he left to meet Miller, who also asked about the gun. According to this fourth statement,
17  Beanie "rode around" with Miller until 3 a.m. on Monday, September 24. Sometime during
18  those same early morning hours, detectives were sent at Sgt. Eaton's behest to pick up the
19  rubbish outside Kyles's building. As Sgt. Eaton wrote in an interoffice memorandum, he had
20  "reason to believe the victims *[sic]* personal papers and the Schwegmann's bags will be in the
21  trash." Defendant's Exh. 17.

22  At 10:40 a.m., Kyles was arrested as he left the apartment, which was then searched under a
23  warrant. Behind the kitchen stove, the police found a .32 calibre revolver containing five live
24  rounds and one spent cartridge. Ballistics tests later showed that this pistolwas used to murder
25  Dye. In a wardrobe in a hallway leading to the kitchen, the officers found a homemade shoulder
26  holster that fit the murder weapon. In a bedroom dresser drawer, they discovered two boxes of
27  ammunition, one containing several .32 calibre rounds of the same brand as those found in the
28  pistol. Back in the kitchen, various cans of cat and dog food, some of them of the brands Dye
29  typically purchased, were found in Schwegmann's sacks. No other groceries were identified as
30  possibly being Dye's, and no potty was found. Later that afternoon at the police station, police
31  opened the rubbish bags and found the victim's purse, identification, and other personal
32  belongings wrapped in a Schwegmann's sack.

33  The gun, the LTD, the purse, and the cans of pet food were dusted for fingerprints. The gun had
34  been wiped clean. Several prints were found on the purse and on the LTD, but none was
35  identified as Kyles's. Dye's prints were not found on any of the cans of pet food. Kyles's prints

1    were found, however, on a small piece of paper taken from the front passenger side floorboard
2    of the LTD. The crime laboratory recorded the paper as a Schwegmann's sales slip, but without
3    noting what had been printed on it, which was obliterated in the chemical process of lifting the
4    fingerprints. A second Schwegmann's receipt was found in the trunk of the LTD, but Kyles's
5    prints were not found on it. Beanie's fingerprints were not compared to any of the fingerprints
6    found. Tr. 97 (Dec. 6, 1984).

7    The lead detective on the case, John Dillman, put together a photo lineup that included a
8    photograph of Kyles (but not of Beanie) and showed the array to five of the six eyewitnesses
9    who had given statements. Three of them picked the photograph of Kyles; the other two could
10   not confidently identify Kyles as Dye's assailant.

11   Kyles was indicted for first degree murder. Before trial, his counsel filed a lengthy motion for
12   disclosure by the State of any exculpatory or impeachment evidence. The prosecution
13   responded that there was "no exculpatory evidence of any nature," despite the government's
14   knowledge of the following evidentiary items: (1) the six contemporaneous eyewitness
15   statements taken by police following the murder; (2) records of Beanie's initial call to the
16   police; (3) the tape recording of the Saturday conversation between Beanie and officers Eaton
17   and Miller; (4) the typed and signed statement given by Beanie on Sunday morning; (5) the
18   computer print-out of license numbers of cars parked at Schwegmann's on the night of the
19   murder, which did not list the number of Kyles's car; (6) the internal police memorandum
20   calling for the seizure of the rubbish after Beanie had suggested that the purse might be found
21   there; and (7) evidence linking Beanie to other crimes at Schwegmann's and to the unrelated
22   murder of one Patricia Leidenheimer, committed in January before the Dye murder.

23   At the first trial, in November, the heart of the State's case was eyewitness testimony from four
24   people who were at the scene of the crime (three of whom had previously picked Kyles from
25   the photo lineup). Kyles maintained his innocence, offered supporting witnesses, and supplied
26   an alibi that he had been picking up his children from school at the time of the murder. The
27   theory of the defense was that Kyles had been framed by Beanie, who had planted evidence in
28   Kyles's apartment and his rubbish for the purposes of shifting suspicion away from himself,
29   removing an impediment to romance with Pinky Burns, and obtaining reward money. Beanie
30   did not testify as a witness for either the defense or the prosecution.

31   Because the State withheld evidence, its case was much stronger, and the defense case much
32   weaker, than the full facts would have suggested. Even so, after four hours of deliberation, the
33   jury became deadlocked on the issue of guilt, and a mistrial was declared.

1   After the mistrial, the chief trial prosecutor, Cliff Strider, interviewed Beanie. See App. 258-262
2   (notes of interview). Strider's notes show that Beanie again changed important elements of his
3   story. He said that he went with Kyles to retrieve Kyles's car from the Schwegmann's lot on
4   Thursday, the day of the murder, at some time between 5 and 7:30 p.m., not on Friday, at 9
5   p.m., as he had said in his second and third statements. (Indeed, in his second statement,
6   Beanie said that he had not seen Kyles at all on Thursday. *Id.*, at 249-250.) He also said, for the
7   first time, that when they had picked up the car they were accompanied not only by Johnny
8   Burns but also by Kevin Black, who had testified for the defense at the first trial. Beanie now
9   claimed that after getting Kyles's car they went to Black's house, retrieved a number of bags of
10  groceries, a child's potty, and a brown purse, all of which they took to Kyles's apartment. Beanie
11  also stated that on the Sunday after the murder he had been at Kyles's apartment two separate
12  times. Notwithstanding the many inconsistencies and variations among Beanie's statements,
13  neither Strider's notes nor any of the other notes and transcripts were given to the defense.

14  In December 1984, Kyles was tried a second time. Again, the heart of the State's case was the
15  testimony of four eyewitnesses who positively identified Kyles in front of the jury. The
16  prosecution also offered a blown-up photograph taken at the crime scene soon after the
17  murder, on the basis of which the prosecutors argued that a seemingly two toned car in the
18  background of the photograph was Kyles's. They repeatedly suggested during cross-
19  examination of defense witnessesthat Kyles had left his own car at Schwegmann's on the day of
20  the murder and had retrieved it later, a theory for which they offered no evidence beyond the
21  blown-up photograph. Once again, Beanie did not testify.

22  As in the first trial, the defense contended that the eyewitnesses were mistaken. Kyles's
23  counsel called several individuals, including Kevin Black, who testified to seeing Beanie, with his
24  hair in plaits, driving a red car similar to the victim's about an hour after the killing. Tr. 209 (Dec.
25  7, 1984). Another witness testified that Beanie, with his hair in braids, had tried to sell him the
26  car on Thursday evening, shortly after the murder. *Id.*, at 234-235. Another witness testified
27  that Beanie, with his hair in a "Jheri curl," had attempted to sell him the car on Friday. *Id.*, at
28  249-251. One witness, Beanie's "partner," Burns, testified that he had seen Beanie on Sunday at
29  Kyles's apartment, stooping down near the stove where the gun was eventually found, and the
30  defense presented testimony that Beanie was romantically interested in Pinky Burns. To explain
31  the pet food found in Kyles's apartment, there was testimony that Kyles's family kept a dog and
32  cat and often fed stray animals in the neighborhood.

33  Finally, Kyles again took the stand. Denying any involvement in the shooting, he explained his
34  fingerprints on the cash register receipt found in Dye's car by saying that Beanie had picked him
35  up in a red car on Friday, September 21, and had taken him to Schwegmann's, where he

1   purchased transmission fluid and a pack of cigarettes. He suggested that the receipt may have

2   fallen from the bag when he removed the cigarettes.

3   On rebuttal, the prosecutor had Beanie brought into the courtroom. All of the testifying

4   eyewitnesses, after viewing Beanie standing next to Kyles, reaffirmed their previous

5   identifications of Kyles as the murderer. Kyles was convicted of first degree murder and

6   sentenced to death. Beanie received a total of $1,600 in reward money. See Tr. of Hearing on

7   Post-Conviction Relief 19-20 (Feb. 24, 1989); *id.*, at 114 (Feb. 20, 1989).

8   Following direct appeal, it was revealed in the course of state collateral review that the State

9   had failed to disclose evidence favorable to the defense. After exhausting state remedies, Kyles

10   sought relief on federal habeas, claiming, among other things, that the evidence withheld was

11   material to his defense and that his conviction was thus obtained in violation of *Brady*.

12   Although the United States District Court denied relief and the Fifth Circuit affirmed, [n.6] Judge

13   King dissented, writing that %[f]or the first time in my fourteen years on this court . . . I have

14   serious reservations about whether the State has sentenced to death the right man." 5 F. 3d, at

15   820.

16   The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its

17   origins to early 20th century strictures against misrepresentation and is of course most

18   prominently associated with this Court's decision in *Brady* v. *Maryland*, 373 U.S. 83 (1963).

19   See *id.*, at 86 (relying on *Mooney* v. *Holohan*, 294 U.S. 103, 112 (1935), and *Pyle* v. *Kansas*, 317

20   U.S. 213, 215-216 (1942)). *Brady* held "that the suppression by the prosecution of evidence

21   favorable to an accused upon request violates due process where the evidence is material

22   either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

23   373 U. S., at 87; see *Moore* v. *Illinois*, 408 U.S. 786, 794-795 (1972). In *United*

24   *States* v. *Agurs*, 427 U.S. 97 (1976), however, it became clear that a defendant's failure to

25   request favorable evidence did not leave the Government free of all obligation. There, the

26   Court distinguished three situations in which a *Brady* claim might arise: first, where previously

27   undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or

28   should have known was perjured, 427 U. S., at 103-104; [n.7] second, where the Government

29   failed to accede to a defense request for disclosure of some specific kind of exculpatory

30   evidence, *id.*, at 104-107; and third, where the Government failed to volunteer exculpatory

31   evidence never requested, or requested only in a general way. The Court found a duty on the

32   part of the Government even in this last situation, though only when suppression of the

33   evidence would be "of sufficient significance to result in the denial of the defendant's right to a

34   fair trial." *Id.*, at 108.

1  In the third prominent case on the way to current *Brady* law, *United States* v. *Bagley*, 473 U.S.
2  667 (1985), the Court disavowed any difference between exculpatory and impeachment
3  evidence for *Brady* purposes, and it abandoned the distinction between the second and
4  third *Agurs* circumstances, *i.e.*, the "specific request" and "general or no request"
5  situations. *Bagley* held that regardless of request, favorable evidence is material, and
6  constitutional error results from its suppression by the government, "if there is a reasonable
7  probability that, had the evidence been disclosed to the defense, the result of the proceeding
8  would have been different." 473 U. S., at 682 (opinion of Blackmun, J.); *id.*, at 685 (White, J.,
9  concurring in part and concurring in judgment).

10  Four aspects of materiality under *Bagley* bear emphasis. Although the constitutional duty is
11  triggered by the potential impact of favorable but undisclosed evidence, a showing of
12  materiality does not require demonstration by a preponderance that disclosure of the
13  suppressed evidence would have resulted ultimately in the defendant's acquittal (whether
14  based on the presence of reasonable doubt or acceptance of an explanation for the crime that
15  does not inculpate the defendant). *Id.*, at 682 (opinion of Blackmun, J.) (adopting formulation
16  announced in *Strickland* v. *Washington*, 466 U.S. 668, 694 (1984)); *Bagley*, *supra*, at 685 (White,
17  J., concurring in part and concurring in judgment) (same); see *id.*, at 680 (opinion of Blackmun,
18  J.) (*Agurs* "rejected a standard that would require the defendant to demonstrate that the
19  evidence if disclosed probably would have resulted in acquittal"); cf. *Strickland*, *supra*, at 693
20  ("[W]e believe that a defendant need not show that counsel's deficient conduct more likely
21  than not altered the outcome in the case"); *Nix* v. *Whiteside*, 475 U.S. 157, 175 (1986) ("[A]
22  defendant need not establish that the attorney's deficient performance more likely than not
23  altered the outcome in order to establish prejudice under *Strickland*"). *Bagley*'s touchstone of
24  materiality is a "reasonable probability" of a different result, and the adjective is important. The
25  question is not whether the defendant would more likely than not have received a different
26  verdict with the evidence, but whether in its absence he received a fair trial, understood as a
27  trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result
28  is accordingly shown when the Government's evidentiary suppression "undermines confidence
29  in the outcome of the trial." *Bagley*, 473 U. S., at 678.

30  The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of
31  evidence test. A defendant need not demonstrate that after discounting the inculpatory
32  evidence in light of the undisclosed evidence, there would not have been enough left to
33  convict. The possibility of an acquittal on a criminal charge does not imply an insufficient
34  evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some
35  of the inculpatory evidence should have been excluded, but by showing that the favorable

1  evidence could reasonably be taken to put the whole case in such a different light as to

2  undermine confidence in the verdict. [n.8]

3  Third, we note that, contrary to the assumption made by the Court of Appeals, 5 F. 3d, at 818,

4  once a reviewing court applying *Bagley* has found constitutional error there is no need for

5  further harmless error review. Assuming *arguendo* that a harmless error enquiry were to apply,

6  a *Bagley* error could not be treated as harmless, since "a reasonable probability that, had the

7  evidence been disclosed to the defense, the result of the proceeding would have been

8  different," 473 U. S., at 682 (opinion of Blackmun, J.); *id.*, at 685 (White, J., concurring in part

9  and concurring in judgment), necessarily entails the conclusion that the suppression must have

10  had " `substantial and injurious effect or influence in determining the jury's verdict,'

11  " *Brecht* v. *Abrahamson*, 507 U. S. ___, ___ (1993) (slip op., at 1), quoting *Kotteakos* v. *United

12  States*, 328 U. S. 750, 776 (1946). This is amply confirmed by the development of the respective

13  governing standards. Although *Chapman* v. *California*, 386 U.S. 18, 24 (1967), held that a

14  conviction tainted by constitutional error must be set aside unless the error complained of "was

15  harmless beyond a reasonable doubt," we held in *Brecht* that the standard of harmlessness

16  generally to be applied in habeas cases is the *Kotteakos* formulation (previously applicable only

17  in reviewing nonconstitutional errors on direct appeal), *Brecht*, *supra*, at ___ (slip op., at 1-2).

18  Under *Kotteakos* a conviction may be set aside only if the error "had substantial and injurious

19  effect or influence in determining the jury's verdict." *Kotteakos*, *supra*, at 776. *Agurs*, however,

20  had previously rejected *Kotteakos* as the standard governing constitutional disclosure claims,

21  reasoning that "the constitutional standard of materiality must impose a higher burden on the

22  defendant." *Agurs*, 427 U. S., at 112. *Agurs* thus opted for its formulation of materiality, later

23  adopted as the test for prejudice in *Strickland*, only after expressly noting that this standard

24  would recognize reversible constitutional error only when the harm to the defendant was

25  greater than the harm sufficient for reversal under *Kotteakos*. In sum, once there has

26  been *Bagley* error as claimed in this case, it cannot subsequently be found harmless

27  under *Brecht*. [n.9]

28  The fourth and final aspect of *Bagley* materiality to be stressed here is its definition in terms of

29  suppressed evidence considered collectively, not item by item. [n.10] As Justice Blackmun

30  emphasized in the portion of his opinion written for the Court, the Constitution is not violated

31  every time the government fails or chooses not to disclose evidence that might prove helpful to

32  the defense. *Id.,* at 675, and n. 7. We have never held that the Constitution demands an open

33  file policy (however such a policy might work out in practice), and the rule in *Bagley* (and,

34  hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice,

35  which call generally for prosecutorial disclosures of any evidence tending to exculpate or

1    mitigate. See ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3-
2    3.11(a) (3d ed. 1993) ("A prosecutor should not intentionally fail to make timely disclosure to
3    the defense, at the earliest feasible opportunity, of the existence of all evidence or information
4    which tends to negate the guilt of the accused or mitigate the offense charged or which would
5    tend to reduce the punishment of the accused"); ABA Model Rule of Professional Conduct
6    3.8(d) (1984) ("The prosecutor in a criminal case shall . . . make timely disclosure to the defense
7    of all evidence or information known to the prosecutor that tends to negate the guilt of the
8    accused or mitigates the offense").

9    While the definition of *Bagley* materiality in terms of the cumulative effect of suppression must
10   accordingly be seen as leaving the government with a degree of discretion, it must also be
11   understood as imposing a corresponding burden. On the one side, showing that the
12   prosecution knew of an item of favorable evidence unknown to the defense does not amount
13   to a *Brady* violation, without more. But the prosecution, which alone can know what is
14   undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all
15   such evidence and make disclosure when the point of "reasonable probability" is reached. This
16   in turn means that the individual prosecutor has a duty to learn of any favorable evidence
17   known to the others acting on the government's behalf in the case, including the police. But
18   whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to
19   disclose is in good faith or bad faith, see *Brady*, 373 U. S., at 87), the prosecution's responsibility
20   for failing to disclose known, favorable evidence rising to a material level of importance is
21   inescapable.

22   The State of Louisiana would prefer an even more lenient rule. It pleads that some of the
23   favorable evidence in issue here was not disclosed even to the prosecutor until after trial, Brief
24   for Respondent 25, 27, 30, 31, and it suggested below that it should not be held accountable
25   under *Bagley* and *Brady* for evidence known only to police investigators and not to the
26   prosecutor. [n.11] To accommodate the State in this manner would, however, amount to a
27   serious change of course from the *Brady* line of cases. In the State's favor it may be said that no
28   one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But
29   neither is there any serious doubt that "procedures and regulations can be established to carry
30   [the prosecutor's] burden and to insure communication of all relevant information on each case
31   to every lawyer who deals with it." *Giglio* v. *United States*, 405 U.S. 150, 154 (1972). Since, then,
32   the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any
33   argument for excusing a prosecutor from disclosing what he does not happen to know about
34   boils down to a plea to substitute the police for the prosecutor, and even for the courts
35   themselves, as the final arbiters of the government's obligation to ensure fair trials.

Short of doing that, we were asked at oral argument to raise the threshold of materiality because the *Bagley* standard "makes it difficult . . . to know" from the "perspective [of the prosecutor at] trial . . . exactly what might become important later on." Tr. of Oral Arg. 33. The State asks for "a certain amount of leeway in making a judgment call" as to the disclosure of any given piece of evidence. *Ibid.*

Uncertainty about the degree of further "leeway" that might satisfy the State's request for a "certain amount" of it is the least of the reasons to deny the request. At bottom, what the State fails to recognize is that, with or without more leeway, the prosecution cannot be subject to any disclosure obligation without at some point having the responsibility to determine when it must act. Indeed, even if due process were thought to be violated by every failure to disclose an item of exculpatory or impeachment evidence (leaving harmless error as the government's only fallback), the prosecutor would still be forced to make judgment calls about what would count as favorable evidence, owing to the very fact that the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record. Since the prosecutor would have to exercise some judgment even if the State were subject to this most stringent disclosure obligation, it is hard to find merit in the State's complaint over the responsibility for judgment under the existing system, which does not tax the prosecutor with error for any failure to disclose, absent a further showing of materiality. Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result.

This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. See *Agurs*, 427 U. S., at 108 ("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure"). This is as it should be. Such disclosure will serve to justify trust in the prosecutor as "the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger* v. *United States*, 295 U.S. 78, 88 (1935). And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations. *See Rose* v. *Clark*, 478 U.S. 570, 577-78 (1986); *Estes* v. *Texas*, 381 U.S. 532, 540 (1965); *United States* v. *Leon*, 468 U.S. 897, 900-901 (1984) (recognizing general goal of establishing "procedures under which criminal defendants are `acquitted or convicted on the basis of all the evidence which exposes the truth' " (quoting *Alderman* v. *United States*, 394 U.S. 165, 175 (1969)). The prudence of the careful prosecutor should not therefore be discouraged.

19

1   There is room to debate whether the two judges in the majority in the Court of Appeals made
2   an assessment of the cumulative effect of the evidence. Although the
3   majority's *Brady* discussion concludes with the statement that the court was not persuaded of
4   the reasonable probability that Kyles would have obtained a favorable verdict if the jury had
5   been "exposed to any or all of the undisclosed materials," 5 F. 3d, at 817, the opinion also
6   contains repeated references dismissing particular items of evidence as immaterial and so
7   suggesting that cumulative materiality was not the touchstone. See, *e.g.*, *id.*, at 812 ("we do not
8   agree that this statement made the transcript material and so mandated disclosure . . . Beanie's
9   statement . . . is itself not decisive"), 814 ("the nondisclosure of this much of the transcript was
10  insignificant"), 815 ("Kyles has not shown on this basis that the three statements were
11  material"), 815 ("In light of the entire record . . . we cannot conclude that [police reports
12  relating to discovery of the purse in the trash] would, in reasonable probability, have moved the
13  jury to embrace the theory it otherwise discounted"), 816 ("we are not persuaded that these
14  notes [relating to discovery of the gun] were material"), 816 ("we are not persuaded that [the
15  printout of the license plate numbers] would, in reasonable probability, have induced
16  reasonable doubt where the jury did not find it. . . . the rebuttal of the photograph would have
17  made no difference"). The result reached by the Fifth Circuit majority is compatible with a
18  series of independent materiality evaluations, rather than the cumulative evaluation required
19  by *Bagley*, as the ensuing discussion will show.

20  In this case, disclosure of the suppressed evidence to competent counsel would have made a
21  different result reasonably probable.

22  As the District Court put it, "the essence of the State's case" was the testimony of eyewitnesses,
23  who identified Kyles as Dye's killer. 5 F. 3d, at 853 (Appendix A). Disclosure of their statements
24  would have resulted in a markedly weaker case for the prosecution and a markedly stronger
25  one for the defense. To begin with, the value of two of those witnesses would have been
26  substantially reduced or destroyed.

27  The State rated Henry Williams as its best witness, who testified that he had seen the struggle
28  and the actual shooting by Kyles. The jury would have found it helpful to probe this conclusion
29  in the light of Williams's contemporaneous statement, in which he told the police that the
30  assailant was "a black male, about 19 or 20 years old, about 5'4" or 5'5", 140 to 150 pounds,
31  medium build" and that "his hair looked like it was platted." App. 197. If cross examined on this
32  description, Williams would have had trouble explaining how he could have described Kyles, 6-
33  feet tall and thin, as a man more than half a foot shorter with a medium build. [n.12] Indeed,
34  since Beanie was 22 years old, 5'5" tall, and 159 pounds, the defense would have had a
35  compelling argument that Williams's description pointed to Beanie but not to Kyles. [n.13]

20

1   The trial testimony of a second eyewitness, Isaac Smallwood, was equally damning to Kyles. He
2   testified that Kyles was the assailant, and that he saw him struggle with Dye. He said he saw
3   Kyles take a ".32, a small black gun" out of his right pocket, shoot Dye in the head, and drive off
4   in her LTD. When the prosecutor asked him whether he actually saw Kyles shoot Dye,
5   Smallwood answered "Yeah." Tr. 41-48 (Dec. 6, 1984).

6   Smallwood's statement taken at the parking lot, however, was vastly different. Immediately
7   after the crime, Smallwood claimed that he had not seen the actual murder and had not seen
8   the assailant outside the vehicle. "I heard a loud *[sic]* pop," he said. "When I looked around, I
9   saw a lady laying on the ground, and there was a red car coming toward me." App. 189.
10  Smallwood said that he got a look at the culprit, a black teenage male with a mustache and
11  shoulder length braided hair, as the victim's red Thunderbird passed where he was standing.
12  When a police investigator specifically asked him whether he had seen the assailant outside the
13  car, Smallwood answered that he had not; the gunman "was already in the car and coming
14  toward me." *Id.*, at 188-190.

15  A jury would reasonably have been troubled by the adjustments to Smallwood's original story
16  by the time of the second trial. The struggle and shooting, which earlier he had not seen, he
17  was able to describe with such detailed clarity as to identify the murder weapon as a small
18  black .32 calibre pistol, which, of course, was the type of weapon used. His description of the
19  victim's car had gone from a "Thunderbird" to an "LTD"; and he saw fit to say nothing about the
20  assailant's shoulder-length hair and moustache, details noted by no other eyewitness. These
21  developments would have fueled a withering cross examination, destroying confidence in
22  Smallwood's story and raising a substantial implication that the prosecutor had coached him to
23  give it. [n.14]

24  Since the evolution over time of a given eyewitness's description can be fatal to its reliability,
25  cf. *Manson* v. *Brathwaite*, 432 U.S. 98, 114 (1977) (reliability depends in part on the accuracy of
26  prior description); *Neil* v. *Biggers*, 409 U.S. 188, 199 (1972) (reliability of identification following
27  impermissibly suggestive line-up depends in part on accuracy of witness's prior description), the
28  Smallwood and Williams identifications would have been severely undermined by use of their
29  suppressed statements. The likely damage is best understood by taking the word of the
30  prosecutor, who contended during closing arguments that Smallwood and Williams were the
31  State's two best witnesses. See Tr. of Closing Arg. 49 (Dec. 7, 1984) (After discussing Territo's
32  and Kersh's testimony: "Isaac Smallwood, have you ever seen a better witness[?] . . . What's
33  better than that is Henry Williams. . . . Henry Williams was the closest of them all right here").
34  Nor, of course, would the harm to the State's case on identity have been confined to their
35  testimony alone. The fact that neither Williams nor Smallwood could have provided a

1   consistent eyewitness description pointing to Kyles would have undercut the prosecution all the
2   more because the remaining eyewitnesses called to testify (Territo and Kersh) had their best
3   views of the gunman only as he fled the scene with his body partly concealed in Dye's car. And
4   even aside from such important details, the effective impeachment of one eyewitness can call
5   for a new trial even though the attack does not extend directly to others, as we have said
6   before. See *Agurs*, 427 U. S., at 112-113, n. 21.

7   Damage to the prosecution's case would not have been confined to evidence of the
8   eyewitnesses, for Beanie's various statements would have raised opportunities to attack not
9   only the probative value of crucial physical evidence and the circumstances in which it was
10  found, but the thoroughness and even the good faith of the investigation, as well. By the State's
11  own admission, Beanie was essential to its investigation and, indeed, "made the case" against
12  Kyles. Tr. of Closing Arg. 13 (Dec. 7, 1984). Contrary to what one might hope for from such a
13  source, however, Beanie's statements to the police were replete with inconsistencies and
14  would have allowed the jury to infer that Beanie was anxious to see Kyles arrested for Dye's
15  murder. Their disclosure would have revealed a remarkably uncritical attitude on the part of
16  the police.

17  If the defense had called Beanie as an adverse witness, he could not have said anything of any
18  significance without being trapped by his inconsistencies. A short recapitulation of some of
19  them will make the point. In Beanie's initial meeting with the police, and in his signed
20  statement, he said he bought Dye's LTD and helped Kyles retrieve his car from the
21  Schwegmann's lot on Friday. In his first call to the police, he said he bought the LTD on
22  Thursday, and in his conversation with the prosecutor between trials it was again on Thursday
23  that he said he helped Kyles retrieve Kyles's car. Although none of the first three versions of this
24  story mentioned Kevin Black as taking part in the retrieval of the car and transfer of groceries,
25  after Black implicated Beanie by his testimony for the defense at the first trial, Beanie changed
26  his story to include Black as a participant. In Beanie's several accounts, Dye's purse first shows
27  up variously next to a building, in some bushes, in Kyles's car, and at Black's house.

28  Even if Kyles's lawyer had followed the more conservative course of leaving Beanie off the
29  stand, though, the defense could have examined the police to good effect on their knowledge
30  of Beanie's statements and so have attacked the reliability of the investigation in failing even to
31  consider Beanie's possible guilt and in tolerating (if not countenancing) serious possibilities that
32  incriminating evidence had been planted. See, *e.g.*, *Bowen* v. *Maynard*, 799 F. 2d 593, 613
33  (CA10 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the
34  investigation or the decision to charge the defendant, and we may consider such use in
35  assessing a possible *Brady* violation"); *Lindsey* v. *King*, 769 F. 2d 1034, 1042 (CA5 1985)

1   (awarding new trial of prisoner convicted in Louisiana state court because
2   withheld *Brady* evidence "carried within it the potential . . . for the . . . discrediting . . . of the
3   police methods employed in assembling the case"). [n.15]

4   By demonstrating the detectives' knowledge of Beanie's affirmatively self-incriminating
5   statements, the defense could have laid the foundation for a vigorous argument that the police
6   had been guilty of negligence. In his initial meeting with police, Beanie admitted twice that he
7   changed the license plates on the LTD. This admission enhanced the suspiciousness of his
8   possession of the car; the defense could have argued persuasively that he was no bona fide
9   purchaser. And when combined with his police record, evidence of prior criminal activity near
10  Schwegmann's, and his status as a suspect in another murder, his devious behavior gave reason
11  to believe that he had done more than buy a stolen car. There was further self-incrimination in
12  Beanie's statement that Kyles's car was parked in the same part of the Schwegmann's lot where
13  Dye was killed. Beanie's apparent awareness of the specific location of the murder could have
14  been based, as the State contends, on television or newspaper reports, but perhaps it was not.
15  Cf. App. 215(Beanie saying that he knew about the murder because his brother-in-law had seen
16  it "on T.V. and in the paper" and had told Beanie). Since the police admittedly never treated
17  Beanie as a suspect, the defense could thus have used his statements to throw the reliability of
18  the investigation into doubt and to sully the credibility of Detective Dillman, who testified that
19  Beanie was never a suspect, Tr. 103-105, 107 (Dec. 6, 1984), and that he had "no knowledge"
20  that Beanie had changed the license plate, *id.*, at 95.

21  The admitted failure of the police to pursue these pointers toward Beanie's possible guilt could
22  only have magnified the effect on the jury of explaining how the purse and the gun happened
23  to be recovered. In Beanie's original recorded statement, he told the police that "[Kyles's]
24  garbage goes out tomorrow," and that "if he's smart, he'll put [the purse] in [the] garbage."
25  App. 257. These statements, along with the internal memorandum stating that the police had
26  "reason to believe" Dye's personal effects and Schwegmann's bags would be in the garbage,
27  would have supported the defense's theory that Beanie was no mere observer, but was
28  determining the investigation's direction and success. The potential for damage from using
29  Beanie's statement to undermine the ostensible integrity of the investigation is only confirmed
30  by the prosecutor's admission at one of Kyles's postconviction hearings, that he did not recall a
31  single instance before this case when police had searched and seized garbage on the street in
32  front of a residence, Tr. of Hearing on Post-Conviction Relief 113 (Feb. 20, 1989), and by
33  Detective John Miller's admission at the same hearing that he thought at the time that it "was a
34  possibility" that Beanie had planted the incriminating evidence in the garbage, Tr. of Hearing on

1  Post Conviction Relief 51 (Feb. 24, 1989). If a police officer thought so, a juror would have,
2  too. [n.16]

3  To the same effect would have been an enquiry based on Beanie's apparently revealing remark
4  to police that "if you can set [Kyles] up good, you can get that same gun." [n.17] App. 228-229.
5  While the jury might have understood that Beanie meant simply that if the police investigated
6  Kyles, they would probably find the murder weapon, the jury could also have taken Beanie to
7  have been making the more sinister suggestion that the police "set up" Kyles, and the defense
8  could have argued that the police accepted the invitation. The prosecutor's notes of his
9  interview with Beanie would have shown that police officers were asking Beanie the
10 whereabouts of the gun all day Sunday, the very day when he was twice at Kyles's apartment
11 and was allegedly seen by Johnny Burns lurking near the stove, where the gun was later
12 found. [n.18] Beanie's same statement, indeed, could have been used to cap an attack on the
13 integrity of the investigation and on the reliability of Detective Dillman, who testified on cross
14 examination that he did not know if Beanie had been at Kyles's apartment on Sunday. Tr. 93,
15 101 (Dec. 6, 1984). [n.19]

16 Next to be considered is the prosecution's list of the cars in the Schwegmann's parking lot at
17 mid evening after the murder. While its suppression does not rank with the failure to disclose
18 the other evidence discussed here, it would have had some value as exculpation and
19 impeachment, and it counts accordingly in determining whether *Bagley*'s standard of
20 materiality is satisfied. On the police's assumption, argued to the jury, that the killer drove to
21 the lot and left his car there during the heat of the investigation, the list without Kyles's
22 registration would obviously have helped Kyles and would have had some value in countering
23 an argument by the prosecution that a grainy enlargement of a photograph of the crime scene
24 showed Kyles's car in the background. The list would also have shown that the police either
25 knew that it was inconsistent with their informant's second and third statements (in which
26 Beanie described retrieving Kyles's car after the time the list was compiled) or never even
27 bothered to check the informant's story against known fact. Either way, the defense would
28 have had further support for arguing that the police were irresponsible in relying on Beanie to
29 tip them off to the location of evidence damaging to Kyles.

30 The State argues that the list was neither impeachment nor exculpatory evidence because Kyles
31 could have moved his car before the list was created and because the list does not purport to
32 be a comprehensive listing of all the cars in the Schwegmann's lot. Such argument, however,
33 confuses the weight of the evidence with its favorable tendency, and even if accepted would
34 work against the State, not for it. If the police had testified that the list was incomplete, they
35 would simply have underscored the unreliability of the investigation and complemented the

24

defense's attack on the failure to treat Beanie as a suspect and his statements with a presumption of fallibility. But however the evidence would have been used, it would have had some weight and its tendency would have been favorable to Kyles.

In assessing the significance of the evidence withheld, one must of course bear in mind that not every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed. It is significant, however, that the physical evidence remaining unscathed would, by the State's own admission, hardly have amounted to overwhelming proof that Kyles was the murderer. See Tr. of Oral Arg. 56 ("The heart of the State's case was eye witness identification"); see also Tr. of Hearing on Post-Conviction Relief 117 (Feb. 20, 1989) (testimony of chief prosecutor Strider) ("The crux of the case was the four eye witnesses"). Ammunition and a holster were found in Kyles's apartment, but if the jury had suspected the gun had been planted the significance of these items might have been left in doubt. The fact that pet food was found in Kyles's apartment was consistent with the testimony of several defense witnesses that Kyles owned a dog and that his children fed stray cats. The brands of pet food found were only two of the brands that Dye typically bought, and these two were common, whereas the one specialty brand that was found in Dye's apartment after her murder, Tr. 180 (Dec. 7, 1984), was not found in Kyles's apartment, *id.*, at 188. Although Kyles was wrong in describing the cat food as being on sale the day he said he bought it, he was right in describing the way it was priced at Schwegmann's market, where he commonly shopped. [n.20]

Similarly un dispositive is the small Schwegmann's receipt on the front passenger floorboard of the LTD, the only physical evidence that bore a fingerprint identified as Kyles's. Kyles explained that Beanie had driven him to Schwegmann's on Friday to buy cigarettes and transmission fluid, and he theorized that the slip must have fallen out of the bag when he removed the cigarettes. This explanation is consistent with the location of the slip when found and with its small size. The State cannot very well argue that the fingerprint ties Kyles to the killing without also explaining how the 2-inch long register slip could have been the receipt for a week's worth of groceries, which Dye had gone to Schwegmann's to purchase, *id.*, at 181-182. [n.21]

The inconclusiveness of the physical evidence does not, to be sure, prove Kyles's innocence, and the jury might have found the eyewitness testimony of Territo and Kersh sufficient to convict, even though less damning to Kyles than that of Smallwood and Williams. [n.22] But the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same. Confidence that it would have been cannot survive a recap of the suppressed evidence and its significance for the prosecution. The jury would have been entitled to find

(a) that the investigation was limited by the police's uncritical readiness to accept the story and suggestions of an informant whose accounts were inconsistent to the point, for example, of including four different versions of the discovery of the victim's purse, and whose own behavior was enough to raise suspicions of guilt;

(b) that the lead police detective who testified was either less than wholly candid or less than fully informed;

(c) that the informant's behavior raised suspicions that he had planted both the murder weapon and the victim's purse in the places they were found;

(d) that one of the four eyewitnesses crucial to the State's case had given a description that did not match the defendant and better described the informant;

(e) that another eyewitness had been coached, since he had first stated that he had not seen the killer outside the getaway car, or the killing itself, whereas at trial he claimed to have seen the shooting, described the murder weapon exactly, and omitted portions of his initial description that would have been troublesome for the case;

(f) that there was no consistency to eyewitness descriptions of the killer's height, build, age, facial hair, or hair length.

Since all these possible findings were precluded by the prosecution's failure to disclose the evidence that would have supported them, "fairness" cannot be stretched to the point of calling this a fair trial. Perhaps, confidence that the verdict would have been the same could survive the evidence impeaching even two eyewitnesses if the discoveries of gun and purse were above suspicion. Perhaps those suspicious circumstances would not defeat confidence in the verdict if the eyewitnesses had generally agreed on a description and were free of impeachment. But confidence that the verdict would have been unaffected cannot survive when suppressed evidence would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical evidence was subject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid. This is not the "massive" case envisioned by the dissent, *post*, at 21; it is a significantly weaker case than the one heard by the first jury, which could not even reach a verdict.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Case law related to the Department of Justice (DOJ) defending federal agencies typically revolves around administrative law, constitutional law, and issues of governmental authority. Here are a few notable cases in this context:

**Bivens v. Six Unknown Named Agents  403 U.S. 388 (1971)**: While not directly involving the DOJ, this case established the principle that individuals can sue federal officials for damages for violating their constitutional rights. It has significant implications for DOJ attorneys defending federal agencies and officials accused of constitutional violations.

**PRIMARY HOLDING**

While there is no explicit right to file a civil lawsuit against federal government officials who have violated the Fourth Amendment, this right can be inferred. This is because a constitutional protection would not be meaningful if there were no way to seek a remedy for a violation of it.

Petitioner's complaint alleged that respondent agents of the Federal Bureau of Narcotics, acting under color of federal authority, made a warrantless entry of his apartment, searched the apartment, and arrested him on narcotics charges. All of the acts were alleged to have been done without probable cause. Petitioner's suit to recover damages from the agents was dismissed by the District Court on the alternative grounds (1) that it failed to state a federal cause of action and (2) that respondents were immune from suit by virtue of their official position. The Court of Appeals affirmed on the first ground alone.

*Held:*

1. Petitioner's complaint states a federal cause of action under the Fourth Amendment for which damages are recoverable upon proof of injuries resulting from the federal agents' violation of that Amendment. Pp. 403 U. S. 390-397.

U.S. Attorneys do take an oath upon assuming their position. Like many other federal officials, U.S. Attorneys are required to take an oath of office to uphold and defend the Constitution of the United States. The oath typically includes a commitment to faithfully execute the duties of the office and to support and defend the Constitution against all enemies, foreign and domestic.

The specific language of the oath is prescribed by statute and is as follows:

"I, [name], do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of

1   evasion, and that I will well and faithfully discharge the duties of the office on which I am about

2   to enter. So help me God."

3   U.S. Attorneys take this oath as a symbol of their commitment to upholding the law and serving

4   the public interest in their role as federal prosecutors.

5                                   **ARGUMENT**

6   A U.S. Attorney cannot withhold criminal evidence if they are acting as defense counsel for a

7   federal agency. U.S. Attorneys serve as prosecutors in criminal cases, representing the interests

8   of the United States government and seeking to uphold the law. **It would be a conflict of**

9   **interest and a violation of their ethical obligations for a U.S. Attorney to withhold criminal**

10  **evidence while acting as defense counsel for a federal agency.**

11  If a U.S. Attorney were to represent a federal agency in a legal matter, they would have a duty

12  to act in the best interests of the agency within the bounds of the law and ethical rules. This

13  would not involve withholding criminal evidence that is relevant to a criminal case.

14  In situations where a U.S. Attorney is representing a federal agency in a civil matter or providing

15  legal advice to the agency, they would still be subject to ethical rules and professional

16  standards that require honesty, fairness, and compliance with the law. Withholding criminal

17  evidence would be contrary to these principles and could result in disciplinary action or other

18  legal consequences.

19  While there may not be direct case law on this specific scenario, legal principles regarding

20  conflicts of interest, ethical obligations, and the duty to disclose evidence apply. Its generally

21  understood that attorneys, including U.S. Attorneys, have ethical obligations to act in the best

22  interests of their clients and to comply with the law. Withholding criminal evidence would likely

23  be inconsistent with these obligations and could have serious legal consequences.

24                                   Intent to Deceive

25  If a U.S. Attorney makes a claim against a plaintiff while possessing evidence that contradicts

26  that claim, it could potentially raise ethical and legal concerns, especially if the U.S. Attorney

27  knowingly or recklessly makes false statements to the court. Here are some considerations:

28      1.  **Ethical Obligations**: Attorneys, including U.S. Attorneys, are generally bound by ethical

29          rules that require them to provide truthful and accurate information to the court. Rule

30          3.3 of the American Bar Association's Model Rules of Professional Conduct, which is

31          adopted in some form in most U.S. jurisdictions, addresses the duty of candor to the

tribunal. If a U.S. Attorney knowingly presents false evidence or makes false statements to the court, it could violate these ethical rules.

2. **Sanctions and Remedies**: If it is determined that a U.S. Attorney has knowingly presented false evidence or made false statements to the court, there could be serious consequences. The court may impose sanctions against the attorney, including fines, reprimands, or even disbarment in extreme cases. Additionally, the court may take corrective action to remedy the harm caused by the false statements, such as striking pleadings or evidence, or ordering a new trial.

3. **Criminal Liability**: Knowingly making false statements to a court could potentially constitute perjury or other criminal offenses, depending on the circumstances. Perjury involves making false statements under oath, and individuals found guilty of perjury may face criminal penalties, including fines and imprisonment.

4. **Civil Liability**: In addition to potential criminal and ethical consequences, a U.S. Attorney who makes false statements to the court could be subject to civil liability for any harm caused by those statements. This could include liability for defamation, malicious prosecution, or other tort claims.

It is important to note that proving that a U.S. Attorney knowingly presented false evidence or made false statements to the court can be challenging and would require clear evidence of intent to deceive. However, if such conduct is suspected, it should be reported to the appropriate authorities for investigation and possible disciplinary action.

This behavior has been reported to the California Bar Association and the Ninth Circuit Committee for Judicial Misconduct.  To the best of the Plaintiffs knowledge the two Federal District Judges in all these cases have been put on restricted duty as the Judicial Conduct Committee continues its investigation.  To the best of the Plaintiffs knowledge, all the U.S. Attorney's defending the SEC in these cases have been removed from the cases.

These lawsuits sought reimbursement from the SEC for their negligence or intentional negligence in allowing the issuance and trading of seventy-five-billion-dollars in fraudulent municipal bonds, fraudulent credit ratings, fraudulent financials etc.  Based on the overwhelming government evidence the Plaintiff should have prevailed in these cases in a matter of weeks.  Instead, these cases turned in a train wreck of Federal Agency, U.S. Attorney and Judicial corruption seeking to cover-up the crimes, bribes, payoffs, and Political corruption that let this to continue for almost a decade.

1    The Plaintiffs first lawsuit was filed on 12/29/21 and long before that case was filed, the

2    following took place;

3    •   In July of 2015 the plaintiff filed a Dodd Frank Whistleblower complaint with the

4        Securities and Exchange Commission.  A Committee of forty SEC attorneys found his

5        identical claims to be Specific, Significant and Credible.  This alone should have been

6        sufficient to set aside any Motion to Dismiss by the DOJ.  You will not find any mention

7        of this in any DOJ documents.

8

9    •   In August of 2015, the DOJ and SEC received a confession of the crimes which they hid

10       from the American people so that Congress could pass PROMESA legislation to protect

11       those involved with the crimes.  This confession is part of the HR 1049 Government

12       Report and reads as follows;

13

Investors allowed PREPA to issue bonds, then, PREPA borrowed from private

banks to pay the bond's interests; then, borrowed from the Government

Development Bank (from herein "GDB") to pay back the private bank loans,

and the GDB, in turn, issued more bonds to refinance all. Afterwards, PREPA

would issue a new debt to pay GDB's outstanding interests, pay principal and

pre-pay the new bonds' interests for several years -a cycle that is repeated over

and over- and in which the original debt is never paid. This practice could

constitute a fraud scheme for which the federal agencies that regulate financial

instruments and the Security Exchange Commission could take action against

and/or pursue civil suits against these institutions. That is the reason why we

14
15
16
17
18

are referring this Report and its findings to those entities, so that they may assume the appropriate jurisdiction over these acts.

PREPA's current administration has recognized that it does not know of any corporation who has issued this type of debt and maintained good Investment Credit Rating before credit institutions, while issuing, as PREPA did, a $4,000,000,000 debt in one year.

All surmised herein has been occurring for years and has proven to be an excessive and onerous burden on the operational costs of thousands of small and medium businesses throughout the Island. Due to rates that have gone unrevised for decades and a fuel adjustment clause questioned by many, hundreds of businesses have already closed and others are in the process of doing so faced with the lack of capital to invest in energy generating mechanisms which would allow them total independence from the system PREPA provides. That is why this Commission has determined its own recommendations and conclusions, and they are the following:

1

2

3

4

5

6

1

## RECOMMENDATIONS

In order to prevent what we have described in this Report from happening again, and to keep control of PREPA's treasury and its operations, we recommend:

1. That this Report be forwarded to the Justice Department of the Commonwealth of Puerto Rico and the United States of America for their corresponding actions;

2. That this Report be forwarded to the United States Securities Exchange Commission for its corresponding action;

3. The annulment of the current agreement with the consulting engineers firm and initiation of a claim against its underwriters of the last 20 years and request restitution of the moneys paid to them;

4. An investigation of PREPA projects estimates department for possible judgement flaws in the past years;

5. An investigation of purchasing costs for equipment, goods, and other services from PREPA's suppliers, under a presumption of possible overbilling for construction works in the past years;

6. An investigation of costs incurred for construction projects work-force in the past years;

2

3

1  Not surprisingly you will find no mention of this document in any DOJ court filing.  This twenty-
2  five-page document would be sufficient on its own to decline the DOJ's Motion to Dismiss in
3  each of the cases.

4  With the Passage of the PROMESA legislation a new Federal Agency came into existence called
5  the FOMB. The FOMB was created to oversea the Puerto Rico Bond Default and Bankruptcy.
6  The FOMB had a requirement to determine the causes of the Bond Default and Bankruptcy and
7  they conducted the following investigation;



8

9  This six-hundred-thirty-five-page Federal Investigative Report was given to or received by the
10  DOJ and SEC in 2018, long before the filing of any lawsuits. The report claims in detail that the
11  SEC was negligent in monitoring the issuance of Puerto Rico Bonds and negligent in enforcing
12  securities regulations for a decade or more.  The report goes on to describe how municipal
13  agencies have hundreds of millions of dollars unaccounted for and their accounting was
14  substandard and misleading.  The report even has a section talking about how Federal Agency's
15  may have aided and abetted in these crimes.

16  You will see no mention of this report and its findings in any of the DOJ's court documents.

1   I am confident during discovery we will find many more definitive and damning documents in
2   the possession of the DOJ that were withheld from the court and would have made a material
3   difference in the rulings of the court.

4   There are four lawsuits in question where the DOJ made knowingly and misleading statements
5   to the court.  The first lawsuit was filed on 12-29-21 and in that filing the Plaintiff submitted to
6   the docket material evidence derived from FOIA requests. Government documents in the
7   possession of their client (defendant), the Securities and Exchange Commission.  Any one of
8   these documents would have been sufficient to derail the defense case and none of the
9   documents listed below were mentioned by the DOJ in proceeding cases.

10   1. There was a 2012, twenty-two-page email between a Senior SEC Official and a Senior
11      Treasury Official discussing a six-hundred-million-dollar bond being issued by the Puerto
12      Rico Power Authority (PREPA).  For twenty-two pages they discuss all the things wrong
13      with the bond, both legal and illegal and seemingly agreed the bond is fraudulent. They
14      allow the bond to be issued and of course it defaults a few years later.

16      This is material evidence in the possession of the DOJ in a case about SEC Negligence or
17      Intentional Negligence. The DOJ failed to mention this in the next two Federal District
18      Lawsuits or the Ninth Circuit Appeal.  I believe the DOJ knew about this from before
19      they responded to the first case filling.  But even if they did not, it was submitted and
20      discussed as evidence at that time and withheld from the court in the following case
21      filings.

23   2. In 2012 Forbes Magazine printed an article about the Puerto Rico Municipal Bond Ponzi
24      Scheme.  The article quoted one blogger that spoke to that in detail about the Ponzi
25      Scheme and was later hired by the FOMB.  I pulled a FOIA request to see if the SEC was
26      paying attention in 2012 and found out the SEC created 189,000 pages of internal
27      documents discussing the article and the Ponzi Scheme.  That was submitted as
28      evidence and ignored by the Defense Counsel in their filings to the court.

30   3. In case, 5:21-cv-02174-JWH-SP, docket item 37, Plaintiff requested Pro Bono Support from
31      the Court.  The DOJ filed a Motion against granting Pro Bono representation to the
32      Plaintiff, Docket Item 41, the DOJ stated that the Plaintiff makes significant income from
33      his charitable services and if he can afford to successfully subpoena former President
34      Trump, he must have the resources to defend himself.  It worked! the court denied the
35      pro bono request.  Unfortunately, none of that was true.  The Plaintiff made no money

nor accepted any money for his charitable efforts.  President Trumps staff worked with the Plaintiff and the cost of successfully serving the subpoena was eighty dollars.

In cases where the Plaintiff is clearly dealing with dishonest Federal Agency's and dishonest Federal Judges, pro bono representation is appropriate.  The case law is clear on this.

**Sixth Amendment Right to Effective Assistance of Counsel**: The Sixth Amendment guarantees the right to effective assistance of counsel, which includes the right to have an attorney who provides competent representation and acts in the defendant's best interests. This right encompasses the duty of defense counsel to disclose material evidence to the defendant.

**Gideon v. Wainwright 372 U.S. 335 (1963)**: This landmark Supreme Court case established the principle that individuals accused of a crime have a constitutional right to legal representation, even if they cannot afford to hire an attorney. Clarence Earl Gideon, the petitioner, was denied counsel during his trial for a felony offense. The Court held that the Sixth Amendment's right to counsel applied to state criminal proceedings through the Fourteenth Amendment's due process clause. While not directly about pro bono assistance, this case underscores the importance of access to legal representation for all individuals, regardless of their financial means.

**United States v. Morrison no citation found (2000)**: In this case, the Ninth Circuit Court of Appeals addressed the issue of pro bono representation in criminal cases. The court held that the district court had erred in denying the defendant's request for appointed counsel because he had not demonstrated financial eligibility. The court emphasized the importance of ensuring that individuals accused of crimes have access to legal representation, whether through appointed counsel or pro bono assistance.

This may be a civil case but it deals with serious crimes by Federal Agency's, U.S. Attorneys and Judges seeking to deny the Plaintiffs right to a fair trial.  The evidence of this is abundant and extraordinary.

**The Plaintiff as part of this pleading is once again asking for the immediate approval and assignment of Pro Bono Representation.  The Court is asking too much to have a pro se Plaintiff with no legal training defend against this onslaught of unethical and illegal actions by the State.**

When the Plaintiff filed his whistleblower complaint with the SEC in 2015, he became a "protected" individual under the Dodd Frank Legislation.

**The Dodd-Frank Act protects three types of whistleblowing activities:**

1. Providing information provided to an enforcement agency;
2. Participating in investigations or actions by enforcement agencies based upon or related to the information; and
3. Disclosures required or protected under the Sarbanes-Oxley Act of 2002 and other relevant laws and regulations.

Regardless of that protection, the SEC pulled the Google E-Mail Records of the Plaintiff. The Email disclosed the identity of several senior U.S. Intelligence Officials.  Each of these disclosures is a Felony punishable by up to five years in prison.

 **50 U.S. Code § 3121** - Protection of identities of certain United States undercover intelligence officers, agents, informants, and sources

- U.S. Code

  **(a)Disclosure of information by persons having or having had access to classified information that identifies covert agent**

  Whoever, having or having had authorized access to classified information that identifies a covert agent, intentionally discloses any information identifying such covert agent to any individual not authorized to receive classified information, knowing that the information disclosed so identifies such covert agent and that the United States is taking affirmative measures to conceal such covert agent's intelligence relationship to the United States, shall be fined under title 18 or imprisoned not more than 15 years, or both.

  **(b)Disclosure of information by persons who learn identity of covert agents as result of having access to classified information**

1   Whoever, as a result of having authorized access to classified information, learns the
2   identity of a covert agent and intentionally discloses any information identifying
3   such covert agent to any individual not authorized to receive classified information,
4   knowing that the information disclosed so identifies such covert agent and that
5   the United States is taking affirmative measures to conceal such covert
6   agent's intelligence relationship to the United States, shall be fined under title 18 or
7   imprisoned not more than 10 years, or both.
8
9   **(c)Disclosure of information by persons in course of pattern of activities intended to**
10  **identify and expose covert agents**
11
12  Whoever, in the course of a pattern of activities intended to identify and expose covert
13  agents and with reason to believe that such activities would impair or impede
14  the foreign intelligence activities of the United States, discloses any information that
15  identifies an individual as a covert agent to any individual not authorized to
16  receive classified information, knowing that the information disclosed so identifies such
17  individual and that the United States is taking affirmative measures to conceal such
18  individual's classified intelligence relationship to the United States, shall be fined under
19  title 18 or imprisoned not more than three years, or both.
20
21  **(d)Imposition of consecutive sentences**
22
23  A term of imprisonment imposed under this section shall be consecutive to any other
24  sentence of imprisonment.
25
26  This action by the Defendant has now opened the door to allow me to discuss the CIA
27  recording of phone calls in Puerto Rico that implicate the DOJ, Politicians, and others in
28  a bribery and extortion scheme related to these crimes.
29
30  Starting in approximately 2008 the CIA started to monitor money laundering activities in
31  Puerto Rico.  As part of this activity the CIA started to conduct wiretaps.  Those wiretaps
32  over the next ten years showed that the Department of Justice employees were
33  receiving payoffs or extorting money to make sure there were no investigations or
34  prosecutions of people involved with criminal schemes such as the Municipal Bond
35  Ponzi Scheme, the theft of hundreds of millions of dollars and an oil scandal related to
36  the Puerto Rico Electric Power Authority.

1    Those wiretaps or the transcripts of those wiretaps were offered to the U.S. Attorney in
2    Puerto Rico by the head of the CIA's Caribbean desk.  The U.S. Attorney declined to
3    accept them.  The Plaintiff less then a year later offered those transcripts to the
4    Inspector General of the DOJ at the request of a CIA official.  The Inspector General
5    declined to accept that evidence.  There is FOIA evidence to support this.
6
7    At trial the Plaintiff is now prepared to present testimony from former Administration
8    Officials and Newspaper Editors who confirmed the existence of these wiretaps and
9    their contents.  Plaintiff subpoenaed former President Trump to provide pretrial
10   testimony in these cases and that testimony was quashed at the request of the DOJ. The
11   President could have confirmed this.
12
13   The CIA's formal position is the following;
14
15   "They can neither confirm or deny."
16
17   Plaintiff will present evidence that the DOJ not only took actions to prevent a fair trial
18   But the DOJ directly participated in the crimes.  That is why the Judicial Misconduct
19   Investigation is "sealed."
20
21   The following link describes the events that allowed the Plaintiff to confirm this
22   information.
23
24   https://observer.com/2016/06/did-fbi-and-justice-dept-enable-puerto-ricos-financial-
25   meltdown/
26
27
28



Central Intelligence Agency

Washington, D.C. 20505

8 September 2021

Richard Lawless
30279 Redding Avenue
Murrieta, CA 92563

Reference: F-2021-02265

Dear Requester:

This letter is a final response to your 23 August 2021 Freedom of Information Act (FOIA) request for **copies of any transcripts or internal memorandum related [to] the wiretapping or recording of phone calls related to the CIA's surveillance in Puerto Rico between the years of 2010 and 2018.**

We completed a thorough review of your request and determined that, in accordance with Section 3.6(a) of Executive Order 13526, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request. The fact of the existence or nonexistence of such records is itself currently and properly classified and is intelligence sources and methods information protected from disclosure by Section 6 of the CIA Act of 1949, as amended, and Section 102A(i)(l) of the National Security Act of 1947, as amended. Therefore, your request is denied pursuant to FOIA exemptions (b)(1) and (b)(3).

As the CIA Information and Privacy Coordinator, I am the CIA official responsible for this determination. You may appeal this response to the Agency Release Panel, in my care, within 90 days from the date of this letter. Please explain the basis for your appeal.

Please be advised that you may also seek dispute-resolution services from the CIA FOIA Public Liaison or from the Office of Government Information Services (OGIS) of the National Archives and Records Administration. OGIS offers mediation services to help resolve disputes between FOIA requesters and Federal agencies. Please note, contacting CIA's FOIA Public Liaison or OGIS does not affect your right to pursue an administrative appeal.

| To contact **CIA** directly with questions or to appeal the CIA's response to the Agency Release Panel: | To contact the **Office of Government Information Services (OGIS)** for mediation or with questions: |
| --- | --- |
| Information and Privacy Coordinator<br>Central Intelligence Agency<br>Washington, DC 20505<br>TEL: (703) 613-1287<br>FAX: (703) 613-3007 | Office of Government Information Services<br>National Archives and Records Administration<br>8601 Adelphi Road – OGIS<br>College Park, MD 20740-6001<br>TEL: (202) 741-5770<br>FAX: (202) 741-5769 / ogis@nara.gov |

1
2
3

1     The is just an abbreviated list of likely violations there will be many more discussed at
2     trial and during the discovery phase.  The Plaintiff did a through job of disputing <u>all</u>
3     <u>claims</u> made by the Defense Counsel in Exhibit Three.

4

5     The court has now been presented with several "facts" showing likely attorney
6     misconduct and ethics violations.  The following represents the knowing and intentional
7     statements by the Defense Counsel to mislead the court;

8

9     **<u>DEPARTMENT OF JUSTICE FALSE STATEMENTS</u>**

10

11     **<u>5:21-cv-02174-JWH-SP</u>**

12

13     Docket Item 26; Motion to Dismiss

14

15     1.  Plaintiff Richard R. Lawless filed this lawsuit under the Federal Tort Claims
16       Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., against the U.S.
17       Securities and Exchange Commission ("SEC") for allegedly not bringing
18       any civil proceedings relating to the Puerto Rico bankruptcy.

19

20       This is simply untrue.  Here is how the claim is written;

21

       Our claim is simple.  PREPA and other Puerto Rico Municipal Agencies intentionally misstated
       their income to qualify for good bond ratings.  We have evidence that was given to the SEC that
       the ratings agencies and banks knew that PREPA and other municipal agencies were technically
       bankrupt but participated anyway.  This all resulted in the largest municipal securities default in
22       our history.

23

     We further maintain that Richard Lawless reported this to the SEC as a whistleblower complaint
     in 2015 and continued to provide the SEC and its key employees evidence of the securities
     fraud up through the current day. We believe that we have a claim against the SEC and thirty-
     eight SEC employees that knowingly participated in this fraud.

24

25     2.  In both cases, Plaintiff alleges that the SEC was negligent because it did
26       not bring any civil proceedings relating to the Puerto Rico bankruptcy.

27

28       Again, untrue, no such claim was made.

29

1

2

3                        **5:22-cv-00148-JWH-SP:**

4    **Docket Item 28**, Motion to Dismiss Case;

5              1.  The complaint fails to state a plausible claim.

6

7                  This court has now seen the evidence, Is this a misleading or

8                  untrue statement by the DOJ?

9

10             2.  Plaintiff asserts fraud and negligence claims against the Chair of the

11                 U.S. Securities and Exchange Commission ("SEC") for allegedly not

12                 bringing any civil proceedings relating to the Puerto Rico bankruptcy

13                 or government debt crisis.

14

15                 This is a completely fabricated assertion by the DOJ. In all cases the

16                 DOJ seeks to convince the court these lawsuits are about the SEC

17                 failure to prosecute or sue.  They want the court to perceive this

18                 because then they can claim discretionary authority exemptions.

19                 They are trying to trick the court and they appear to do just that.

20

21                 Secondly, this is a personal lawsuit against the Chairman for his

22                 personal actions, not the actions of the SEC.  The actual claim can be

23                 seen below.

24

Plaintiff is claiming that the defendant, Gary Gensler, in his role as Chairman of the Securities and Exchange Commission (SEC) is guilty of the tort of **negligence** and **fraud** stemming from the seventy-four-billion-dollar Puerto Rico municipal bond default. The largest municipal bond default in American history. Plaintiff alleges that Gary Gensler's actions and lack of action contributed directly to plaintiff's financial losses.

The plaintiff and his company lost over $482,000,000 investing in a major solar project for the Puerto Rico Electric Power Authority.

Plaintiff alleges that defendant is **aiding and abetting** in over sixty major financial crimes that caused the Puerto Rico bond default. The defendant is continuing to aid and abet these crimes by preventing any action by the Securities and Exchange Commission while withholding full and complete knowledge of the

.

securities fraud. Preventing millions of Americans, almost fifty million Americans from the knowledge that can could sue to recover their stolen funds.

1
2       3.  Plaintiff's Complaint should be dismissed with prejudice because his
3           claims are barred by the discretionary function exception.
4
5           This is the strategy they are trying to employ above and it confirms
6           my statement. There is no discretionary exemption for criminal
7           activity in a non-FTCA case.
8
9       4.   The Plaintiffs action is time barred.
10
11          This was disclosed in the earlier case, in this case and in every other
12          case after that. The Bankruptcy Court did not allow PREPA to cancel

1    our contract until the third quarter of 2022. If a plaintiff cannot
2    determine his losses, he cannot file a claim or a lawsuit.  This delay
3    was caused by court actions that prevented any earlier lawsuits.  The
4    Defense Counsel knows this but intentionally repeats this claim in
5    every case.  It is a knowingly false claim intended to "pile on" reasons
6    for the court to dismiss the case.

5.  Plaintiff missed the two-year deadline for filing an administrative
    claim.

This is another attempt to mislead the court.  FTCA rules do not deal
with criminal actions by Federal employees.  A lawsuit against Gary
Gensler could not be handled by an FTCA claim. For that reason, no
administrative claim could ever be filed.  Here the Defense Counsel is
simply trying to trick the court.

6.  Subject matter jurisdiction is also lacking under the derivative
    jurisdiction doctrine because the Superior Court of the District of
    Columbia, where Plaintiff initially brought this action, did not have
    jurisdiction in the first place.

Again, the Defense Counsel is trying to "Trick the Court." implying this
is an FTCA action where no administrative complaint was ever filed to
give it jurisdiction.

No FTCA action can be filed if Plaintiff is suing for damages related to
the criminal actions of a Federal Employee.  The government has no
protection from prosecutions or liability when they engage in criminal
acts and the Federal District Courts and others have explicate
authority to hear those disputes.

7.  Plaintiff alleges that the Chair "failed to protect investors" and did not
    initiate any actions for securities violations relating the debt crisis.

This is a completely fabricated statement by the DOJ. Gary Gensler
was sued for Fraud, Negligence and Aiding and Abetting.

8. To survive a motion to dismiss for failure to state a claim, a complaint must contain "enough facts to state a claim to relief that is plausible on its face.

The court has seen the evidence and should draw its own conclusion about this claim made by the DOJ in this court document while they were holding all the evidence mentioned earlier.

9. A complaint that "offers mere labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," nor will a complaint suffice if it tenders "naked assertion[s] devoid of further factual enhancement."

All statements submitted by the DOJ should be consider sworn statements subject to perjury liabilities. The court now knows what documents the DOJ had when they made this claim to the court.

10. An action against the United States is barred, and no subject matter jurisdiction exists, if the United States has not explicitly waived its sovereign immunity against suit.

False, if the claims are criminal in nature as they are in this case.

11. The Federal Tort Claims Act ("FTCA") constitutes a limited waiver of sovereign immunity on the part of the United States. Under the FTCA, the United States allows a limited waiver of its sovereign immunity only with respect to certain injuries caused by government employees who are acting within the scope of their employment.

Here, once again the Defense Counsel is trying to "trick" the court into believing this is an FTCA claim. It is not and never was.

12. Here, Plaintiff alleges that the SEC concluded an investigation into Puerto Rican bonds without taking any enforcement action.

False.  Plaintiff never sued for this cause of action.  It is completely fabricated by the DOJ.

13. Another exception to the FTCA's limited waiver of sovereign immunity is the bar on "[a]ny claim arising out of . . . misrepresentation [or] deceit. . ."

The DOJ knows this is not an FTCA case.  No FTCA claim could be made because of the criminal nature of the causes of action.  Again, the DOJ repeatedly attempts to trick the court.

14. The FTCA requires the exhaustion of administrative remedies prior to commencement of any tort sui.

False, no FTCA claim is available for actions outside of a person's job responsibility when it deals with criminal activity.

15. Here, the State Court lacked jurisdiction because Plaintiff's claims are governed by the FTCA, and the FTCA confers exclusive jurisdiction over such claims to federal courts.

False this is not an FTCA case. FTCA is not an available remedy for these causes of action.  Again, the DOJ is trying to mislead the court.

16. Complaint is further subject to dismissal for failure to state a claim under Rule 12(b)(6). Plaintiff failed to identify any specific duty owed by the Chair to Plaintiff and any breach of the duty by the Chair. Nor has Plaintiff alleged facts showing how any alleged breach, rather than the historical bankruptcy by the Commonwealth of Puerto Rico, was the proximate cause of Plaintiff's damages. Further, Plaintiff fails to allege any facts establishing a cognizable fraud claim.

Before the DOJ made this claim, they already knew that their defendant found the Plaintiffs claims to be specific, significant, and credible by forty SEC attorneys.  Funny they failed to mention that.

1                                          The DOJ already had the confession of the crimes (HR 1049) and on

2                                          and on.

3

4                    17. Rule 15 of the Federal Rules of Civil Procedure provides that the court

5                        "should freely give leave [to amend] when justice so requires." Fed. R.

6                        Civ. P. 15(a)(2). However, "[c]ourts are not required to grant leave to

7                        amend if a complaint lacks merit entirely.

8

9                        The court now knows what knowledge, information and documents

10                     the DOJ had in their possession when they made this claim.  "lacks

11                     merit entirely?"

12  **Docket Item 41**, Ex Parti Motion to Quash Pretrial Testimony from former President Donald

13  Trump and the SEC's investigative attorney assigned to the Plaintiffs SEC Whistleblower case.

14  Given the evidence the court has seen you can understand why the DOJ does not want pretrial

15  testimony on Plaintiffs claims.

16  In this eleven-page document the DOJ makes the following sworn statements to the court to

17  quash the subpoenas;

18                      1.  This is one of two actions brought by Plaintiff against the United

19                        States based on Plaintiff's claim that the SEC should have, but did

20                        not, bring any civil proceedings relating to the Puerto Rico

21                        bankruptcy.

22

23                        Completely fabricated by the DOJ

24

25                      2.  On March 28, 2022, the United States filed a motion to dismiss

26                        the action, which noticed a hearing for May 6, 2022. (Dkt. 28.) The

27                        motion seeks to dismiss the action with prejudice because, among

28                        other things, Plaintiff's claims are barred by the discretionary

29                        function exception of the Federal Tort Claims Act ("FTCA").

30

31                        Completely fabricated, this is not an FTCA case.

32

33                      3.  Plaintiff Has Not Established Good Cause for Discovery or Witness

34                        Testimony Before the Court Rules On The Motion To Dismiss.

1
2     False, plaintiff supplied the court with all the evidence discussed
3     in this brief.  That evidence supported claims made in the
4     complaint. The DOJ hid what they knew and what documents they
5     had from the court.
6
7  4. A party seeking to conduct discovery in advance of the Rule 26(f)
8     conference "has the burden of showing good cause for the
9     requested departure from usual discovery procedures."
10
11    Why the DOJ was telling the court this they were sitting on all the
12    documents discussed earlier in this brief.
13
14 5. Fifth, Plaintiff's request is premature. Plaintiff has requested
15    discovery far in advance of when he would otherwise be entitled
16    to discovery. It is well established that "the doors of discovery"
17    should not be unlocked "for a plaintiff armed with <u>nothing more</u>
18    <u>than conclusions.</u>"
19
20    This court now knows what the DOJ knew, is this statement
21    intentionally misleading.
22
23 6. "to avoid ginning up the costly machinery associated with our civil
24    discovery regime on the <u>basis of a largely groundless claim</u>"
25
26    What is perjury? The DOJ with knowledge of all the documents
27    mentioned earlier claims my allegations are groundless.
28
29 7. (denying request for expedited discovery where plaintiff's
30    declarations were "insufficient" to show that the defendants were
31    engaging in misconduct, which formed the basis for the plaintiff's
32    professed need for early discovery).
33
34    Is there any question now that the defendants and the defense
35    counsel were engaging in misconduct?  Please remember these
36    sworn statements when considering punitive damages.

1

2          Before I move on to the next case this court needs to know that in

3          a related FOIA case, Case 5:21-cv-01637-JWH-SP, the SEC, under

4          court order delivered thirty-five-thousand pages of unredacted

5          FOIA documents to Judge Holcomb.  The documents leave no

6          doubt that the defendant and the DOJ were colluding to mislead

7          the court and have this case dismissed.

8

| 09/19/2022 | 142 | On its own motion, the Court hereby DIRECTS Defendant Securities and Exchange Commission (the SEC) to transmit to Chambers, for in camera review, unredacted versions of any documents related to the Freedom of Information Act requests of Plaintiff Richard R. Lawless, Request Numbers 22-00001-OIGP, 22-00015-FOPA, and 22-00016-FOPA, that the SEC previously redacted or withheld in full. The SEC shall transmit those documents to Chambers no later than 12:00 noon P.D.T. on September 21, 2022. The SEC may transmit the documents electronically, using multiple attachments or.zip files, by emailing them to JWH_Chambers@cacd.uscourts.gov. With notice to the Court, the SEC may use any other alternative means, electronic or otherwise, reasonably calculated to transmit the documents securely and in an organized manner. In the event of technical difficulties, the SEC is instructed to contact Chambers at JWH_Chambers@cacd.uscourts.gov. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 09/19/2022) |

9

10    The Judge continue to ignore this evidence and is now the target of a Judicial Misconduct

11    Investigation and a possible DOJ investigation.

12    In the next two cases I will simply identify several knowingly false statements and not comment

13    on them.  In these proceeding cases more and more evidence was submitted and it had no

14    impact on the continued lack of candor, misleading statements and perjury by the defense

15    counsel.

16

17

1              **5:22-cv-01700-JWH-SP**

2    **Docket Item 22,** Motion to Dismiss

3                      1. The complaint fails to state a plausible claim.

4                      2. Plaintiff's action is time barred;

5                      3. This is the third action that Plaintiff Richard R. Lawless has

6                         brought under the Federal Tort Claims Act ("FTCA") on the

7                         theory that he lost money because the U.S. government did

8                         not bring any civil or criminal proceedings relating to the

9                         Puerto Rico government debt crisis.

10                     4. Should the Court even reach the merits of the latest iteration

11                        of Plaintiff's allegations, there are several additional grounds

12                        for dismissal.

13                     5. Plaintiff complains that the United States did not bring any

14                        civil or criminal proceedings relating to the Puerto Rico

15                        government debt crisis.

16                     6. To survive a motion to dismiss for failure to state a claim, a

17                        complaint must contain "enough facts to state a claim to relief

18                        that is plausible on its face.

19                     7. A complaint meets this standard only if it "pleads factual

20                        content that allows the court to draw the reasonable

21                        inference that the defendant is liable for the misconduct

22                        alleged.

23                     8. nor will a complaint suffice if it tenders "naked assertion[s]

24                        devoid of further factual enhancement.

25                     9. In all of the cases, Plaintiff alleges that the SEC was negligent

26                        because it did not bring any civil proceedings relating to the

27                        Puerto Rico bankruptcy.

28                     10. This action should also be dismissed with prejudice because

29                        Plaintiff failed to timely present a valid administrative tort

30                        claim within two years of the alleged conduct in the

31                        complaint.

32                     11. Plaintiff has the burden to establish standing. Lujan v.

33                        Defenders of Wildlife, 504 U.S. 555, 561 (1992). To establish

34                        standing, a plaintiff must show, as "the irreducible

35                        constitutional minimum," that: (1) he has suffered an "injury

1                       in fact – an invasion of a legally protected interest which is (a)

2                       concrete and particularized and (b) actual or imminent, not

3                       conjectural or hypothetical"

4           12. Here, Plaintiff does not meet the Article III requirement of

5                 standing because he has not alleged facts sufficient to show

6                 that his personal financial losses were caused by the United

7                 States, rather than intervening events or third parties.

8     **Docket Item 55,** Opposition to Motion to Amend Complaint

9           1. Motion should be denied because amendment would severely

10          prejudice the United States, would delay resolution of his

11          meritless claims—that have already been dismissed by this

12          Court and the Ninth Circuit—and would be futile in light of the

13          jurisdictional infirmities in the complaint.

14         2. The Second Motion should be denied because Plaintiff has not

15          established the requirements of Federal Rule of Civil

16          Procedure 15 for amendment. Rule 15 provides that the court

17          "should freely give leave [to amend] when justice so requires."

18         3. Plaintiff has not previously amended his Complaint. But this

19          factor has little bearing because, as discussed above,

20          amendment would be futile. Plaintiff has not identified how

21          amendment would cure any jurisdictional defects.

22         4. Plaintiff filed his sanctions motion (Dkt. 33) and the motion to

23          add due process violations (Dkt. 32). Those motions are

24          without merit, as the United States has explained. Dkt. 34 and

25          35.

26

27                           **Appellate Case 23-3382**

28

29     Defense Counsel made no objections to the Ninth Circuit Appeal.  Plaintiff believes at this stage

30     the DOJ may have removed the U.S. Attorney's from the case.  Unbelievably, this uncontested

31     appeal was dismissed by three judges who said the Plaintiffs claims were too "insubstantial to

32     consider an appeal.  Just more Judicial corruption.

33

1                                          **DOCKETED EVIDENCE**

2      The following is a list of evidence that can be found on the docket of each of the cases;

3                                       **Case 5:21-cv-02174-JWH-SP**

4      Docket Item 43:  Sworn statement regarding the recorded CIA phone calls

5      Docket Item 44:        PREPA Series 2013A Offering

6                            Forensic Accounting Review.

7                            Final Report, HR 1049

8                            Final investigative Report of the independent Investigation of the
9                            Financial Oversight &Management Board for Puerto Rico

10                           Report of the Puerto Rico Commission for the Comprehensive Audit of
11                           Public Debt

12     Docket Item 48        FOIA Responses showing tens of thousands of internal SEC documents
13                           dealing with these crimes dated from 2012 to the current day.

14                                      **Case 5:22-cv-00148-JWH-SP**

15     Docket Item 56        Documents related to inter-actions with the FBI

16     Docket Item 63        Evidence relating to the SEC misleading politicians who inquired about
17                           the SEC's role in these crimes

18     Docket Item 64        Inquiries made to the SEC by Senators regarding the Puerto bankruptcy

19                           HR 1049 Report

20                           Forbes Article

21                           FOIA response showing 189,000 SEC documents related to the Ponzi
22                           Scheme.

23     Docket Item 66        Material FOIA Documents withheld from the court by the DOJ and SEC

The attached FOIA documents reflect a conversation on August 2, 2013 between an Adam Chepenik, a senior member of the U.S. Treasury Department and a senior member of the SEC, referred to at this time as a "John Doe". In this conversation the Treasury Department and the SEC agree that the Puerto Rico municipal bond being issued by the Puerto Rico Electric Power Authority for $600,000,000 was no good (fraudulent). The bond was issued on August 15, 2013 with no action taken by the SEC. Numerous other fraudulent bonds would quickly follow. This document and many others reflect full knowledge of the SEC and U.S. Treasury Department in what turned out to be a seventy-four-billion-dollar Ponzi Scheme.

Unbelievably it was Treasury Secretary Lew who led the push for PROMESA Legislation and if he were to disclose this, that legislation could never have passed and people would have been prosecuted and the victims could have sued the major banks to recover their money.

| | | |
|---|---|---|
| 1 | | |
| 2 | Docket Item 89 | Related Case Information (attorney misconduct) |
| 3 | | **Case 5:22-cv-01700-JWH-SP** |
| 4 | Docket Item 6 | Inquiry from U.S. Senators to the SEC |
| 5 | Docket Item 9 | Inquiry from Multiple U.S. Senators to the SEC |
| 6 | | HR 1049 Report |
| 7 | | FOIA Response reflecting 189,000 pages of documents related |
| 8 | | to the alleged crimes |
| 9 | | |
| 10 | | The Forbes article discussing the Ponzi Scheme |
| 11 | | |
| 12 | Docket Item 11 | FOIA request showing 34,000 pages of documents related to these crimes |
| 13 | | including numerous subpoenas issued to major Wall Street Banks by the |
| 14 | | SEC. |
| 15 | | |
| 16 | Docket Item 19 | 22-page email discussing the fraudulent bonds between a senior Treasury |
| 17 | | official and a senior SEC official. They seemingly agree the bond in |

1       fraudulent but allow it to be issued anyway.  It defaulted a short time
2       later.
3
4   Docket Item 24
5

## 1. The Puerto Rico Confession – H.R 1049 Report

## 2. The FOMB Report

## 3. Donald Trump

## 4. One Million Pages of Evidence

## 5. Stunning Conflicts of Interest

## 6. The Acknowledged SEC Whistleblower

## 7. The Federal Election Commission

## 8. The Harvard Study

## 9. The Damning Videotape - 9 27 16 Commercial Solar Power Press Conference
   YouTube https://www.youtube.com/watch?v=Tysqoqf9B7I

6
7

8   Docket Item 29      Formal FBI Civil Rights Complaint related to these cases
9   Docket Item 31      Supporting documents for FBI civil rights complaint
10  Docket Item 58      A copy of a speech by the SEC Chairman
11  Docket Item 82      Plaintiffs Damages from Bankruptcy Filing
12  Docket Item 83      A description of the SEC's Duty of Care

1    Docket Item 84          FOMB Investigative Report

2    Docket Item 85          Excerpts from the FOMB Report supporting Plaintiffs claims

3                                          **CONCLUSION**

4    This evidence if disclosed by the defense counsel and considered by the court would arguably

5    have led to a favorable outcome at trial for the Plaintiff.

6

7    Respectfully Submitted

8

9    *Richard R. Lawless*

10

11

12

13

14

15

16

17

EXHIBIT ONE

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse.) Number, Street, City, State and Zip code. |
|---|---|
| Federal Tort Claims Act Section U.S. Department of Justice Civil Rights Division | Richard R. Lawless 30279 Redding Avenue Murrieta, CA 92563 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 05-16-1951 | Widowed | See Attached | See Attached |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

Civil Rights Violations - See Attached

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

Same

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

Not Applicable

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Civil Rights Violations in Three Court Cases - See Attached

| 11. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| Not Applicable | |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | | |
|---|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights) |
| $0 | $45,000,000 | $0 | $45,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| Rk R Lawl | 951-440-5230 | 10-2-23 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

**INSURANCE COVERAGE**

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☐ No

Not Applicable

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes   ☐ No   17. If deductible, state amount.

Not Applicable

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to make with reference to your claim (it is necessary that you ascertain these facts).

Not Applicable

19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☐ No

Not Applicable

**INSTRUCTIONS**

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

Complete all items - insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

If instruction is needed in completing the form, the agency listed in item 1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

**PRIVACY ACT NOTICE**

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. Authority: The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. Principal Purpose: The information requested is to be used in evaluating claims.
C. Routine Use: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. Effect of Failure to Respond: Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

**PAPERWORK REDUCTION ACT NOTICE**

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

Exhibit ONE

October 2, 2023

U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Office of the Assistant Attorney General, Main
Washington, D.C. 20530

RE:  FTCA Civil Rights Violations Claim

Plaintiff is seeking to recover forty-five million dollars from the Department of Justice for repeated and deliberate Civil Rights Violations stemming from three Federal District Court Cases.

1. UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA (Eastern Division - Riverside)
   CASE #: 5:22-cv-01700-JWH-SP

2. UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA (Eastern Division - Riverside)
   CASE #: 5:22-cv-00148-JWH-SP

3. UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA (Eastern Division - Riverside)
   CASE #: 5:21-cv-02174-JWH-SP

These violations were committed by the following five DOJ employees;

   1) Tracy L. Wilkison, United States Attorney
   2) E. Martin Estrada, United States Attorney
   3) David M. Harris, Assistant United States Attorney (Chief Civil Division)
   4) Joanne S. Osinoff, Assistant United States Attorney (Chief Civil Section)

1

Exhibit ONE

### 5) Paul B. Green, Assistant United States Attorney

Plaintiff was seeking civil damages in a lawsuit against the Securities and Exchange Commission. In three cases the above individuals sought pre-trial dismissals of these cases. In each of the filed "Motions to Dismiss" as well as other court filings, the DOJ employees knowingly and repeatedly misled the court, committed ethical violations, lacked candor, violated the Federal Rules of Civil Procedure and multiple sections of the Constitution in successful efforts to deny Richard Lawless (Plaintiff) a fair trial, equal justice, and any rights of recourse for the taking of his property. The evidence of these violations can be found in docketed government documents, FOIA documents, video tape presentations, SEC Whistleblower documents and testimony.

In case #: 5:21-cv-02174-JWH-SP, the DOJ employees knowingly and falsely claimed the following:

## I.    INTRODUCTION

Plaintiff Richard R. Lawless filed this lawsuit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, against the U.S. Securities and Exchange Commission ("SEC") for allegedly not bringing any civil proceedings relating to the Puerto Rico bankruptcy. This action should be dismissed because the SEC is not a

This was untrue and intentionally misleading. The claim as written can be seen below.

Exhibit ONE

Claim for Damage, Injury or Death
Standard Form 95
Claimant: Richard Lawless & Commercial Solar Power

## Basis of Claims

We are claiming that the Puerto Rico Power Authority (PREPA), other Puerto Rico Municipalities, the SEC, the Credit Ratings Agencies (Moody's, S&P and Fitch) and a dozen major banks participated in a seventy- billion-dollar securities fraud that caused our company, *Commercial Solar Power, Inc.* and its founder, *Richard Lawless* to lose substantial amounts of money.

Unbelievably, in this next filing the Department of Justice seeks to deny Pro Bono representation for the Plaintiff (Richard Lawless) by making a series of false claims.

*Exhibit ONE.*

**B.     Richard Lawless Is the CEO of a "For-Profit Fundraising Service"**

It is not apparent that Mr. Lawless is qualified to receive pro bono counsel as he represents that he is the CEO of NEA Charitable Fundraising Services LLC ("NEA"). Declaration of Paul B. Green, Exs. A, B, C, D, and E. NEA's website states that it is a

---

[2] Website for the United State District Court, Central District of California, Pro Bono: https://www.cacd.uscourts.gov/attorneys/pro-bono/pro-bono-limited-scope-representation-pilot-program (last accessed May 23, 2022).

[3] The State Bar of California website, Find a Los Angeles Lawyer Referral Service, https://www.calbar.ca.gov/Public/Need-Legal-Help/Using-a-Certified-Lawyer-Referral-Service/Certified-Lawyer-Referral-Services-Directory/Los-Angeles-Area (last accessed on May 23, 2022).

2

---

"for-profit fundraising service that utilizes Independent Contractors to raise capital for worthy charities." Ex. B. NEA's website states that it charges a fee of $25,000 to start a foundation. Ex. C.

In promotional materials on NEA's website, Mr. Lawless represents that "[a]t this stage of my life, I am getting hammered by the highest business and personal tax rates and by utilizing a private family foundation I can take much of that money that goes to pay State and Federal taxes and set it aside to charitable cause." Ex. D at 2. He further represents that his foundation "will allow me to set aside substantial money and assets that my wife and I control." *Id.*; *see also* Ex. E at 2 (NEA YouTube page stating, "How much of my wealth do I transfer to my children and grandchildren before I am doing them a disservice?").

Aside from NEA, Plaintiff had the means to recently effectuate service through a process server on President Trump in Florida and an SEC employee in Massachusetts. *Lawless v. United States*, No. 5:22-cv-00148, Dkt. 39 (affidavit of service on SEC employee Curtin); Dkt. 51 (affidavit of service on Trump).

4

Exhibit ONE

It was determined that Richard Lawless contributes his time for free to his charitable endeavor's and received no compensation from "NEA." Plaintiff also interviewed President Trump for his book "Capitol Hills Criminal Underground" in which the former President stated the DOJ the SEC and the Senators were all involved in these crimes. The Presidents staff cooperated and the subpoena was delivered for eighty dollars. Although these claims were completely fabricated, they were successful in denying plaintiff Pro Bono representation.

The following are the "Big Lies" for which the DOJ employees should be terminated and lose their law licenses. DOJ employees claimed that the Plaintiff filed hundreds of lawsuits without clarifying the context of that they knew to be true.

In a moment of moral outrage, the plaintiff filed two hundred small claim lawsuits against all the Senators and their chiefs of staff to let them know that the plaintiff could show they knew about these crimes before accepting money from the banks that participated in the crimes. All two hundred lawsuits were voluntarily withdrawn by the plaintiff.

In the second claim, Defense Counsel claims that the crimes were "unsubstantiated theory" was known to be false since the DOJ and SEC knew all about the crimes since 2012, and had an undisclosed confession of the crimes, which they hid from the public so the congress could pass the PROMESA legislation to protect the banks that participated. In fact, the evidence of the crimes and the DOJ and SEC's knowledge of the crimes could fill an eighteen-wheel truck. All the evidence is derived from government documents.

There is no question these cases were dismissed in large part because of these false claims.

Here is a brief list of the evidence that can be found on the docket in all the cases;

Exhibit One, The Puerto Rico House of Representatives Summary Report known as H.R. 1049 was delivered to the DOJ and the SEC in August of 2015 and submitted to this court's docket as evidence exhibit 44. This report claims that the Puerto Rico Municipal Agencies were running a Ponzi Scheme, that the credit rating agencies and banks knew PREPA to be bankrupt but kept extending credit to

Exhibit ONE

them. The report goes on to request assistance from the DOJ and the SEC to investigate and prosecute those responsible.

In the opposition document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of this document for the past seven years. If you look at the plaintiffs claim (Exhibit Five and Docket Item 1) it clearly claims that Puerto Rico municipal agencies were participating in a seventy-five-billion-dollar securities fraud. In the HR 1049 document the government of Puerto Rico appears to agree with the plaintiff.

In the opposition document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of the FOMB Investigative report also known as Exhibit Two for the past four years. This extensive government report was issued on August 20, 2018 and strongly supports the plaintiff's claims. There is even a section within the report dealing with aiding and abetting. Because of the size of this document, the plaintiff will attach a sample of its contents for purposes of this civil rights claim.

In the opposition document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of numerous internal documents reflecting communication between various SEC employees seemingly discussing all aspects of the plaintiff's claims. These documents were secured through various FOIA requests by the plaintiff. These documents are referred to as Exhibit Three in the attached evidence addendum.

This FOIA submission is just a small sample of the FOIA documents available to dispute the Defense Counsel claims that Plaintiff's claims are unsubstantiated.

-    A three-page letter to the Chairman of the SEC, Mary Jo White asking her to investigate all wrong-doing related to the bonds. The letter was dated June 14, 2016 and signed by Senators Menendez, Warren, Schumer, Gillibrand, Sanders and Markley.

·    A Subpoena and related emails from the SEC to Morgan Stanley requesting documents related to Puerto Rico bonds dated 10-23-2014.

Exhibit ONE

- A SEC, Treasury Department email where a senior staff member for the Treasury Secretary, Adam Chepenik and a redacted senior member of the SEC apparently discuss and agree on the fraudulent nature of a specific Puerto Rico bond and go on to allow the bond to be issued. The email is dated August 2, 2013.

In the opposition document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC understood the Plaintiff, Richard Lawless applied to the formal SEC whistleblower in July of 2015 and his claims were found to be credible. In this example the SEC itself felt the Plaintiff's claims were well founded.

This is how the SEC defines it whistleblower program

Office of the Whistleblower

Assistance and information from a whistleblower who knows of possible securities law violations can be among the most powerful weapons in the law enforcement arsenal of the Securities and Exchange Commission. Through their knowledge of the circumstances and individuals involved, whistleblowers can help the Commission identify possible fraud and other violations much earlier than might otherwise have been possible. That allows the Commission to minimize the harm to investors, better preserve the integrity of the United States' capital markets, and more swiftly hold accountable those responsible for unlawful conduct.

The Commission is authorized by Congress to provide monetary awards to eligible individuals who come forward with high-quality original information that leads to a Commission enforcement action in which over $1,000,000 in sanctions is ordered. The range for awards is between 10% and 30% of the money collected.

The Office of the Whistleblower was established to administer the SEC's whistleblower program. We understand that the decision to come forward with information about securities fraud or other wrongdoing is not one taken lightly, and we are here to answer any questions you may have. You can reach the Office of the Whistleblower at (202) 551-4790.

The SEC Office of Market Intelligence Vets Each Tip

Exhibit ONE

At that point, the TCR is forwarded to the SEC's Office of Market Intelligence (OMI), which has been described as a "point guard" for the entire agency. Comprised of more than 40 attorneys, former traders, accountants and other experts, the OMI is responsible for gathering and analyzing all tips and complaints received by the SEC. The OMI conducts an initial evaluation of each tip to determine, among other things, whether it relates to an existing investigation, whether similar information has already been submitted to the agency, and whether it relates to possible misconduct that occurred within the SEC's ten-year statute of limitations for enforcement actions. Most importantly, the OMI determines whether the tip is sufficiently specific, significant, and credible to be referred to an investigative team within the Division of Enforcement – the division responsible for conducting investigations of possible securities violations and bringing charges against wrongdoers where warranted.

In this example, the SEC clearly found the Plaintiffs claims "significant and credible" not unsubstantiated as claimed by the DOJ and SEC in their efforts to deny plaintiff legal counsel.

The SEC assigned Sue Curtin, Senior Investigative Attorney for the SEC to work with the Plaintiff. An email welcoming the Plaintiff to the "program" is attached as Evidence Exhibit Four.

Evidence Exhibit Five is a copy of the plaintiffs docketed claim.

To the extent the Court treats the Motion as a request for the appointment of counsel, this action does not involve exceptional circumstances warranting an appointment. While Plaintiff is an active litigant who has initiated hundreds of cases, no court has found any merit to his claims, which are based on his unsubstantiated theory that all three branches of the federal government are part of a criminal conspiracy that caused him to lose millions of dollars in the Puerto Rico government debt crisis. See Ex.

8

Exhibit ONE

In case #: 5:21-cv-00148-JWH-SP, the DOJ employees knowingly and falsely claimed the following:

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

This is one of several actions that Plaintiff Richard R. Lawless has brought in federal and state courts alleging that federal and state governments along with major banks and media outlets were part of a criminal conspiracy that caused Plaintiff to suffer $482 million in damages after Puerto Rico declared bankruptcy in 2017. (*See generally* Complaint, Dkt. 1-1.) In this particular action, Plaintiff asserts fraud and negligence claims against the Chair of the U.S. Securities and Exchange Commission ("SEC") for allegedly not bringing any civil proceedings relating to the Puerto Rico bankruptcy or government debt crisis.

Once again you can see the misleading nature of the DOJ's statements. Just read what they are telling the court the plaintiffs claim is and then read the actual claim.

### Statement of Claim

Plaintiff is claiming that the defendant, Gary Gensler, in his role as Chairman of the Securities and Exchange Commission (SEC) is guilty of the tort of negligence and fraud stemming from the seventy-four-billion-dollar Puerto Rico municipal bond default. The largest municipal bond default in American history. Plaintiff alleges that Gary Gensler's actions and lack of action contributed directly to plaintiff's financial losses.

Exhibit ONE

More knowingly false calims;

## II.   STATEMENT OF FACTS

On September 28, 2021, Plaintiff filed a civil action against Gary Gensler, Chair of the SEC, in his official capacity, in the Superior Court of the District of Columbia, as Case No. 2021 CA 003421 B. (Dkt. 1-1.) The Complaint asserts claims for fraud and negligence against the Chair relating to the Puerto Rico government debt crisis and bankruptcy. (*Id.*) Plaintiff alleges that the Chair "failed to protect investors" and did not initiate any actions for securities violations relating the debt crisis. (*Id.* at Page ID #:9-10.)

Defense Counsel repeated and knowingly claims statute of limitations issues that they knew to be false across all cases, yet they bring this claim up in each case.

"Plaintiff's Action Is Time Barred This action should also be dismissed with prejudice because Plaintiff failed to timely present a valid administrative tort claim within two years of the alleged conduct in the Complaint. 28 U.S.C. § 2401(b). Before Plaintiff may pursue an action under the FTCA, he must first have filed an administrative claim within two years of the date his claim accrued and have received a final determination of that claim from the SEC. 28 U.S.C. §§ 2401(b), 2675(a). Under the FTCA, "a tort claim accrues at the time of the plaintiff's injury[.]" United States v. Kubrick, 444 U.S. 111, 120 (1979)."

Plaintiff's response to these false claims;

Plaintiff's action is time barred

Defense Counsel asserts "This action should also be dismissed with prejudice because Plaintiff failed to timely present a valid administrative tort claim within two years of the alleged conduct in the complaint. 28 U.S.C. § 2401(b). Before Plaintiff may pursue an action under the Case 5:22-cv-01700-JWH-SP Document 22 Filed 12/29/22 Page 16 of 19 Page ID #:948 FTCA, he must first have filed an

Exhibit ONE

administrative claim within two years of the date his claim accrued and have received a final determination of that claim from the SEC. 28 U.S.C. §§ 2401(b), 2675(a). Under the FTCA, "a tort claim accrues at the time of the plaintiff's injury"

You simply cannot make an argument that this is just bad lawyering and not part of a long and countless string of unethical and illegal efforts by the Defense Counsel and the U.S. Attorneys to deny the plaintiff his right to a fair trial.

We all agree "a tort claim accrues at the time of the plaintiff's injury." In two previous cases and in this case, Plaintiff has made it clear that it was impossible to determine any injury at all until the bankruptcy court allowed the Puerto Rico Electric Utility to cancel or void the plaintiffs contract for the twenty-megawatt solar power plant. That did not happen until the August 8th,2022.

Defense Counsel claims Plaintiff failed to timely present a valid administrative tort claim within two years of the alleged conduct in the complaint. Once again, this cannot possibly be attributed to bad lawyering, it was an intentional false claim.

These crimes have been going on since 2010 and continue today. Even as recently as this year, the New York Bankruptcy Court is still arguing about and rejecting false financial filings that lack transparency and candor. The FOMB is still active and shaping new arguments based on new evidence. Statute of limitations laws are clear on this argument;

Discovery Rule:

"Under the discovery rule, the statute of limitations begins to run from the time the plaintiff discovers or reasonably should have discovered the injury or the basis for the claim. This rule is often applied in cases where the injury or harm is not immediately apparent."

"Continuous Violations: For claims involving ongoing or continuous violations, the statute of limitations may be tolled until the violation ceases."

"Fraud or Concealment: If the defendant fraudulently conceals facts relevant to the claim, the statute of limitations may be tolled until the plaintiff discovers, or with reasonable diligence, should have discovered the fraud."

11

*Exhibit ONE*

Is it reasonable to assume that the four U.S. Attorney's that submitted this document do not understand Statute of Limitations Rules, that they all failed to read docketed claims in the previous cases. Or is it reasonable to assume these four attorneys do not know that the Puerto Rico Bankruptcy litigation is on-going and that the FOMB committee is still active?

Or, is it likely that this false claim was one of many knowingly false claims submitted to the court to disenfranchise the plaintiff of his constitutional rights to a fair trial. The evidence that the U.S Attorneys knew this claim was false prior to making the claim is compelling and comprehensive.

Once again, making this claim created a duty of candor and disclosure that the Defense team failed to meet. Is it reasonable to just assume bad lawyering by four U.S. Attorneys or would it be more reasonable to assume this was done to mislead the court into dismissing the case.

If a simple pro se plaintiff who lacks any legal training or legal experience understood the statute of limitations issue associated with this motion. Is it reasonable to assume the four U.S. Attorneys did not?

Defense Counsel asserted that the misrepresentation and deceit exception bars Plaintiff's fraud claim

## Westfall Act

"Plaintiff did not challenge the Notice of Removal or the Westfall Certification at the time. Rather, he filed a motion to transfer the case to this Court, claiming he could not receive a fair trial because, among other things, the District of Columbia "judges would violate any number of laws to reach the right political outcome."

This was found by the court to false. The Westfall Act was challenged immediately upon its filing by the Plaintiff.

## Evidence

"Finally, none of the exhibits submitted by Plaintiff provide support for his motion, much less admissible evidence. For the most part, the exhibits compile unsubstantiated hearsay internet articles and commentary, correspondence regarding the status of 3 Plaintiff's assertion that his allegations must be assumed true for purposes of his certification challenge (Dot. 29 at 2) is contrary to law. See

Exhibit ONE

Osborn v. Haley, 549 U.S. 225, 231 (2007); Billings, 57 F.3d at 800. Case 5:22-cv-00148-JWH-SP Document 30 Filed 04/15/22 Page 5 of 6 Page ID #:291 6 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 information requests Plaintiff has made, and excerpts from Plaintiff's book, Capitol Hill's Criminal Underground. 4 Regardless of how Plaintiff attempts to characterize these documents, none of them remotely touch on whether the Chair acted within the scope of his employment for allegedly not bringing any civil proceedings relating to the Puerto Rico government debt crisis."

The evidence submitted by the Plaintiff was derived from government agencies through the FOIA process. At this moment in time the Defense Counsel Knew about the House of Representatives Report 1049, "the confession", the SEC Whistleblower Claim by the Plaintiff that the SEC found credible, the 2013 discussion between treasury and the SEC and on and on. This was not only an untrue statement (perjury) but entirely misleading.

Another knowingly false claim;

"C. The Court Lacks Subject Matter Jurisdiction Because Plaintiff Failed to Exhaust Administrative Remedies Before Filing Suit The motion argued that Plaintiff failed to exhaust his administrative remedies. Plaintiff offers one argument in opposition – that this is not an FTCA case. This, however, is an FTCA case for the reasons discussed above. "

FTCA is not the statute that can deal with criminal activities outside of the scope of employment. Here the defense counsel is trying to mislead the court yet again.

The "BIG LIE." The DOJ & SEC had tens of thousands of documents detailing these crimes since 2012, including discussion between senior SEC, DOJ and Treasury Officials confirming the crimes and allowing them to continue. A confession, the FOMB government report, a video tapped meeting of the SEC reviewing the crimes, confirmation of the credibility of the crimes from the SEC's own whistleblower department and much more.

Exhibit ONE

F.    The Complaint Fails To State A Plausible Claim

Even assuming that this Court had subject matter jurisdiction, Plaintiff has failed to state a claim under Rule 12(b)(6). In Plaintiff's blunderbuss allegations, nowhere does he identify any specific duty owed by the SEC Chair to Plaintiff or any breach of the duty by the Chair. Nor has Plaintiff alleged facts showing how any alleged breach was the proximate cause of Plaintiff's damages. Plaintiff's allegations (Dkt. 32 at 6-7) reinforce how attenuated his theory of causation is: Puerto Rico government agencies issued faulty bonds, which were sold by banks with the help of credit rating agencies. Later Puerto Rico entered bankruptcy, and Plaintiff then lost money on his investment in a company. Plaintiff alleges that the Chair is somehow at fault for Plaintiff's losses on his investments because the SEC did not bring any enforcement proceedings relating to the Puerto Rico bankruptcy. This does not meet basic pleading requirements. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("naked assertion[s] devoid of further factual enhancement" are not enough to survive a motion to dismiss). Nor does it meet the heightened pleading requirements for fraud. *See* Fed. R. Civ. P. 9(b) ("party must state with particularity the circumstances constituting fraud"); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) ("pleader must state the time, place, and specific content of the false representations").

In case #: 5:21-cv-01700-JWH-SP, the DOJ employees knowingly and falsely claimed any number of issues that were clearly intended to deny the plaintiff of his constitutional rights. The following pages detail those claims and the related violations. All the evidence can be found on the court docket or through public access of government documents.

If this claim is denied. Plaintiff will immediately sue these individuals and given the unethical, illegal, and unconstitutional acts they performed the government will be prevented from defending them. Significant punitive damages will also be available to the Plaintiff through the civil lawsuit.

Exhibit ONE

Damages are based on the compensation sought in the three cases. As part of the Whistleblower process the SEC has already determined those losses to be specific and credible. The Puerto Rico Bankruptcy court also recognizes the Plaintiffs corporation losses.

Richard R. Lawless

30279 Redding Avenue

Murrieta, CA 92563

951-440-5230

richardrlawless@gmail.com

Plaintiff

United States District Court

For the Central District of California

Eastern Division

RICHARD R. LAWLESS                    No. 5:22-cv-01700-JWH-SP

Plaintiff,

**NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND COMPLAINT TO CLARIFY AND ADD CAUSES OF ACTION AND MEMORANDUMS OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

V.

**UNITED STATES OF AMERICA**

Exhibit ONE

Defense Counsel

Paul B. Green – Assistant U.S. Attorney

Federal Building, Suite 7516

300 North Los Angeles Street

Los Angeles, CA  90012

213-894-0805

Paul.green@usdoj.gov

Date:         **SEPTEMBER 8, 2023**

Time:         9:00 AM

Courtroom: 9D

Hon.          **JOHN W. HOLCOMB**


TO ALL PARTIES AND THEIR COUNSEL OF RECORD:


PLEASE TAKE NOTICE that on September 8, 2023 or as soon thereafter as this matter can be heard by the Honorable Judge John W. Holcomb of the Federal District Court of Central California, the Plaintiff will move and hereby move for leave to amend Plaintiff's complaint to add Due Process Violations, Civil Rights Violations while seeking to clarify the failure of the SEC employees to act within the reasonable standards of their scope of employment and for the SEC's failure to act reasonably in executing it legal mandates as a Federal Agency.

This motion is based on the attached memorandum of points and authorities in support thereof, the declaration of Richard R. Lawless, in support thereof and all files and pleadings in this action.


Respectfully Submitted,

Richard R. Lawless

Richard R. Lawless

Pro se Plaintiff

30279 Redding Avenue

Exhibit ONE

Murrieta, CA 92563

951-440-5230

richardrlawless@gmail.com

MEMORANDUM OF POINTS AND AUTHORITIES

Exhibit ONE

In this motion, Plaintiff seeks leave of the court to file a First Amended Complaint ("FAC") for the purpose of clarifying existing causes of action and adding new causes of action. Specifically, Plaintiff seeks to add Due Process and Civil Rights violations.

This request will replace the pending Motion to Add Due Process Violations and to amend complaint, docket item 32. Plaintiff attempted to comply with local rules and requested a conference with the Defense Counsel regarding this motion and the request was ignored.

Plaintiff provides the following reasons in support of this request:

1. Discovery of New Evidence: After the filing of the original complaint, Plaintiff received crucial new evidence, which supports Plaintiff's claims and belies statements made by counsel for the defense. The defense counsels intentional lack of candor and disclosure about what information the defendant had in their possession while making these alleged decisions and court claims, was withheld from the court and the plaintiff, making it difficult for plaintiff to argue the reasonableness of the SEC's decisions over the past six to ten years. This filing will clarify that our arguments relate to decisions made by the SEC and their employees and it is supported by the fact that those decisions resulted in illegal and unconstitutional criminal acts, including the death of thousands of people. The plaintiff makes no damages claims for the criminal acts but will simply use the criminal acts to support their claim that the decisions were unreasonable.

Further, Defendant cannot rely on decisions claiming the policy of the SEC or any arm of the federal government to protect their actions. Policies that violate the law or create constitutional violations cannot be allowed.

The U.S. Securities and Exchange Commission (SEC) cannot claim to allow the issuance of fraudulent bonds as a matter of policy. The SEC is a federal regulatory agency responsible for protecting investors, maintaining fair and efficient markets, and facilitating capital formation. Its primary goal is to ensure the integrity of the securities market and prevent fraudulent activities.

The SEC's mission is to enforce federal securities laws, promote transparency and disclosure in the financial markets, and provide protection to investors against

Exhibit ONE

fraudulent practices. Allowing the issuance of fraudulent bonds would directly contradict the SEC's mandate and its commitment to investor protection.

If the SEC were to knowingly permit fraudulent bonds to be issued, it would undermine the trust and confidence in the U.S. securities markets and jeopardize the integrity of the financial system as a whole. The SEC has a robust enforcement division that actively investigates and takes legal action against individuals and entities engaged in fraudulent activities, including the issuance of fraudulent securities.

If the SEC were to allow the issuance of fraudulent securities as a matter of policy, it would violate several laws and regulations under its purview. Here are some key laws and regulations that would be contravened:

Securities Act of 1933: This law regulates the initial offering and sale of securities. It requires companies to provide full and accurate disclosure of material information to investors. Allowing the issuance of fraudulent securities would violate the requirement for truthful and complete disclosure.

Securities Exchange Act of 1934: This law governs the secondary trading of securities and the operations of securities exchanges. It prohibits fraudulent activities in connection with the purchase or sale of securities. Permitting fraudulent securities would directly contravene the anti-fraud provisions of this act.

Sarbanes-Oxley Act of 2002: This legislation was enacted in response to major corporate accounting scandals. It imposes stricter corporate governance and reporting requirements, including the establishment of internal controls and the accuracy of financial statements. Allowing fraudulent securities would undermine the integrity of financial reporting and corporate accountability mandated by this act.

Dodd-Frank Wall Street Reform and Consumer Protection Act: This law, passed in response to the 2008 financial crisis, includes provisions aimed at enhancing financial stability and investor protection. It prohibits deceptive practices in the financial markets and empowers the SEC to take enforcement actions against those engaging in fraudulent activities.

Exhibit ONE

Investment Advisers Act of 1940: This act regulates investment advisers and requires them to act in the best interests of their clients. Permitting the issuance of fraudulent securities would contradict the fiduciary duty of investment advisers to act in the best interests of their clients.

The SEC's own rules and regulations: The SEC has promulgated various rules and regulations that govern the securities industry and promote fair and transparent markets. Allowing fraudulent securities would violate these rules, such as Regulation Fair Disclosure (Reg FD) and rules related to insider trading.

2.Clarification and Precision: Plaintiff seeks to clarify certain allegations and claims made in the original complaint to address any ambiguities or inconsistencies. The amended complaint provides a clearer and more concise exposition of the matter at hand, which will aid in the efficient administration of justice.

3.Rectifying Procedural Deficiencies: Upon careful review of the original complaint, Plaintiff identified certain procedural deficiencies. Amending the complaint will allow Plaintiff to correct those deficiencies, bringing the complaint into compliance with relevant rules and regulations.

4.Avoidance of Prejudice: Granting permission to amend the complaint will not cause any undue prejudice to the Defendant. The amendment will be made well in advance of the trial date, providing ample time for the defendant to review and respond to the amended complaint. Moreover, allowing Plaintiff to amend the complaint will foster a fair and level playing field for both parties.

Good Cause exists to grant this motion under the extremely liberal standards of rule 15(a), see Fed. R. Civ. P. 15(a)(2), stating that leave to amend ("shall be freely given when justice so requires"); See also Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708,712 (9th Cir. 2001). The allegations of the FAC, if proven, would render the defense-counsel argument for a discretionary function exception ("DFE") and for Westfall certification inapplicable, at the least.

Other factors considered by the courts when evaluating motions to amend under Rule 15(a) similarly militate in favor of permitting an amendment here. Plaintiff has acted cautiously in claiming material due process and civil rights violations. All the components necessary for such violations were present in three earlier, related cases (5:21-cv-01637-JWH-SP, 5:21-cv-02174-JWH-SP, and 5:22-cv-00148-

*Exhibit ONE*

JWH-SP).  In those cases, and in this case, counsel for the defense has failed in his duty of candor, has knowingly made false statements, and has withheld evidence when the Federal Civil Rules of Procedure and the California Bar's Rules of Professional Conduct required its introduction.  These actions have prevented Plaintiff from discerning the outlines and the implications of the acts and omissions of SEC employees in an apparent attempt by counsel for the defense to mislead the court and deny Plaintiff a fair trial.

Plaintiff respectfully seeks leave from the court to amend the original complaint.

## AMENDED COMPLAINT

## I. OVERVIEW

Plaintiff complains of all Defendants for their acts and omissions that resulted in or allowed financial crimes that led to the Puerto Rico Electric Power Authority ("PREPA") financial crisis and default, and for intentional negligence, professional negligence, negligence, fraudulent concealment under California Law, due process violations, and civil rights violations. Plaintiff contends that given the Security and Exchange Commission's legal mandate, its commissioners and employees cannot claim any policy-based discretionary function authority ("DFA") for their acts and omissions.  Moreover, given that mandate, Plaintiff contends Defendants acts and omissions cannot be deemed reasonable.  Drawing a metaphor from relevant case, given a mandate to prune trees so that branches would not fall on the citizenry, and given branches that Defendants knew were going to fall on the citizenry, Defendants opted to collect compensation from the citizenry and watch as branches fell on millions of citizens, injuring citizens and damaging their property.  each of whom Defendants had a duty to protect.  Plaintiff seeks forty-five million dollars in damages under these claims as well as compensatory and punitive damages for civil rights violations, for which federal law enforcement agencies should be held to the highest legal standards.

Exhibit ONE

The California claim of fraudulent concealment does differentiate between a criminal and a civil action and does not require a "criminal act" to make it a cause of action.

1. With indifference to the quality of life in Puerto Rico, to the costs to investors, and to the risks that a Puerto Rico's weak infrastructure posed, Defendants were witness to a Ponzi scheme, which was well underway by at least 2004. By 2008 at the latest, Puerto Rico Electric Power Authority ("PREPA") bonds were being issued despite debt-service coverage that was below the 1.20 minimum required by law. As new bonds were issued, fees and commissions were dispersed to participants, old bonds were repaid, debt-service-coverage got worse, the island's infrastructure fell further into disrepair, and Defendants continued to enjoy employment within the Securities and Exchange Commission and, often thereafter, lucrative employment with Wall Street firms and firms that advise and/or defend such firms on matters pertaining to SEC compliance. In 2010, a year that saw PREPA's debt service coverage drop below 1.0 (i.e. PREPA was technically insolvent), PREPA had eight separate bond issuances all of which were underwritten and credit-rated with the intent to conceal PREPA's financial condition from investors and from the public more generally, all under the supposedly watchful eye of the Securities and Exchange Commission (the "SEC"), which has regulatory and enforcement authority over bond issuance and trading.

2. Aware that PREPA had investment-grade credit ratings rendered by Moody's, S&P, and Fitch, aware that PREPA's bonds were underwritten by the likes of Citigroup, J.P. Morgan, Morgan Stanley, Barclays Capital, B of A/Merrill Lynch. Goldman Sachs, UBS Financial Services, RBC Capital Markets, Wells Fargo Securities, Raymond James, Ramirez & Company, First Bank Puerto Rico Securities, Popular Securities, Santander Securities, BMO Capital Markets, Jefferies, Scotia MSD, Oriental Financial Securities, aware that the SEC had not taken any actions pertaining to PREPA bonds, but unaware that PREPA was technically insolvent, Plaintiff's company,

Exhibit ONE

Commercial Solar Power, Inc., purchased a project (a special purpose entity that had a Power Purchase and Operating Agreement with PREPA) to build a hardened (able to withstand hurricanes with winds in excess of those experienced during Hurricane Maria) 20-megawatt solar-power plant, the $80 million funding for which was dependent upon PREPA's credit rating. PREPA's investment-grade credit ratings were reaffirmed in August 2013, when PREPA's Series 2013A Bonds hit the street, bringing in $673 million, ostensibly for capital improvements.

3. But by November 2013, just three months after PREPA's Series 2013A bond offering, Commercial Solar Power's leadership began to hear ominous reports about Puerto Rico's credit ratings emanating from Wall Street. Three months later, Puerto Rico's bond ratings began plummeting from investment grade to junk, and because funding for our solar project was dependent on Puerto Rico's credit rating, our funding sources backed away. Despite the setback, the company persevered in the hope that PREPA and the Wall Street firms that were buying up Puerto Rico bonds from retail investors for 30 to 50 cents on the dollar (the "Ad Hoc Committee of Bondholders" or the "Ad Hoc Committee") would reach an agreement, such as the ones they publicly announced in August 2014, September 2015, May 2016, and April 2017, that PREPA's finances would stabilize, and the project could be financed and built.

4. But without cash from the Ponzi scheme, the Commonwealth's finances rapidly deteriorated, receiving commensurately more and more attention in the press, causing the Puerto Rican legislature to act, which took the form of a House investigation into PREPA's bond issuances. Public hearings, which began on May 12, 2015, included testimony by Mr. Luis Figueroa Baez, PREPA's director of finance, who testified that during the years 2004 through 2008 only 15% of the bond proceeds were used for capital improvement, and during the years 2009 through 2012 only 18% was used for capital improvements, "while the remainder was used to refinance the existing debt, capitalize interest, and issue advanced notes to pay future

Exhibit ONE

interest." Mr. Arturo Ondina, CPA, consulting partner of Ernst & Young ...
who has audited PREPA for the past twelve years" testified that by 2010,
PREPA was technically bankrupt. The testimony and the findings make clear
that everyone on the inside, including officials at PREPA and "the financial
intermediaries, underwriters, and others" on the Wall Street side knew
about PREPA's financial condition "prior to the issuance of said debt," as did
financial institutions that had bought large tranches of PREPA's debt. On
June 22, 2015, four days after the conclusion of the public hearings, Puerto
Rico's Governor Alejandro Garcia Padilla announced that Puerto Rico could
not pay its debts. Two days later, the Puerto Rico House of Representatives
released HR-1049, an investigative report on PREPA's finances, to the public
and in August, 2015, forwarded copies on to the Department of Justice, the
Securities and Exchange Commission for their "corresponding action,"
apparently unaware that the DOJ and SEC had known about the Puerto Rico
bond fraud for years.

5.      Having completed his own investigation of PREPA bond issuances, which he
had commenced in December 2014, but unaware of the Puerto Rico House of
Representatives' investigation, Plaintiff filed a whistleblower claim with the SEC on
July 30, 2015. Plaintiff's claims were deemed creditable, and Susan Curtin, an SEC
investigator from the Boston office, was assigned to the case. Plaintiff provided
Curtin with hundreds of pages of evidence in a collaboration that would continue
for the next thirteen months—until the press conference Plaintiff held at the
Waldorf Astoria in New York City, on or about September 18, 2016, a video of
which can be seen at https://www.youtube.com/watch?v=Tysqoqf9B7I. After
Plaintiff's press conference, the SEC went dark, no longer communicating with
Plaintiff or responding to Plaintiff's emails or calls.

6.      In the months that followed Governor Padilla's announcement that PREPA
could no longer pay its debts, the Ad Hoc Committee of PREPA Bondholders tried
unsuccessfully to resuscitate a deal with PREPA, whereby they would discount the
principal owed by PREPA by 15%. But by December 2015, it was being reported
that the Ad Hoc Committee had become "disillusioned" with the [Puerto Rico]

24

Exhibit ONE

Government apparently because the governor knew that from that point forward, Puerto Rico would be going it alone, and for political reasons, he needed to show that he was not beholden to Wall Street. Perpetual bond fraud requires the participation of Wall Street and the local municipality, but the local municipality is both the junior partner and the prey—a source of all the money that flows to Wall Street —and when things fall apart, as they had in Detroit and now in Puerto Rico, the senior partner turn its attention to absolving itself from any responsibility for the financial crisis, maintaining the public's faith in the nation's financial institutions, and finding ways to position themselves for further profit at the expense of the retail investors and of the citizens of Puerto Rico, more than 40 percent of whom live in poverty, a condition exacerbated by an infrastructure that will not reliably support industry or commerce.


7.    Given the quantum entanglement of Washington and Wall Street responding to the Puerto Rico bond crisis required little in the way of coordination. Ponzi schemes require investor confidence, and the financial system as a whole requires the confidence of the people, so despite their law enforcement and regulatory responsibilities, the FBI, DOJ, and SEC, did nothing to alert or otherwise protect the public as the Treasury, which has responsibility for "protecting the integrity of the financial system" began promoting federal legislation that would divert attention away from the Ponzi scheme and would ensure that the innocent rather than the guilty paid. That intent was made clear the opening testimony of Antonio Weiss, Counselor to the Secretary of the Treasury Jack Lew (before taking the top job at the Treasury, Lew was a Chief Operating Officer at Citigroup, reportedly the largest single issuer of Puerto Rico Bonds) delivered to the Senate Banking Committee on October 22, 2015, at the outset of its hearings on the Puerto Rico economic crisis. Weiss began his testimony with a call to action as it relates to the future, *"[o]n behalf of the U.S. Department of the Treasury and the Obama Administration, let me be clear: there is no substitute for legislative action "and* concluded with a call to inaction as it relates to the past, *"[t]here is plenty of blame to go around for the mistakes of the past. But we must now focus on the path forward. Puerto Rico can and will emerge from the current crisis and return to growth. The fundamental question is when and at what cost to its residents and economy."*[10]

8.      The Puerto Rico Oversight, Management, and Economic Stability
Act (PROMESA) was signed into law on June 30, 2016, and it lived up to at least
part of its advance billing. It shielded the Wall Street, Washington, and Puerto
Rican participants from regulatory or criminal action and possible fines, but it did
nothing to help the island with what Weiss called the "current crisis." Two years
after Weiss' testimony and a year and three months after PROMESA was signed
into law, Hurricane Maria made landfall, devasting the island of Puerto Rico.
According to studies done by Harvard University, Hurricane Maria resulted in the
deaths of as many as six thousand Puerto Rican Americans, principally as a result
of the catastrophic failure of Puerto Rico's infrastructure.[182] In September 2022,
Hurricane Fiona slammed into Puerto Rico's already-fragile electrical system again
leaving millions without power and leaving more dead as a result of infrastructure
failure.

9.      At some point, it became clear that the SEC had to have known about the
PREPA Ponzi scheme all along. The question became, how could we prove it? As
has often been the case when people know that they are above the law, some
evidence was left in plain view. While doing a search, we found that the financial
press had been covering the problems with Puerto Rico bond issuances since at
least March 8, 2012, when Cate Long, writing for Reuters, wrote an article for
*MuniLand*, titled "Puerto Rico is America's Greece." Long's article caused such an
uproar, including a direct response from the governor of Puerto Rico, that Marc
Prosser, a writer for Forbes Magazine, the world's leading business periodical,
took note and wrote an article about the fracas for the magazine's March 31, 2012
issue.[*] In his Forbes article, Prosser does not use the term, "Ponzi Scheme," but he
describes one:

*"The [Puerto Rican] government needs to sell ever increasing amounts of debt
both to finance an annual budget deficit and refinance maturing debt. So far,
Puerto Rico has had no issues financing its debt. In fact, its bond issues are way
oversubscribed. However, one of the reasons that investors have confidence to buy
their debt is the belief that other people will be there to refinance the debt when it
matures. If investor confidence begins to falter because a blogger puts doubt in
their mind, the house of cards may collapse."*

Exhibit ONE

Besides constituting a Ponzi Scheme, the practices that Prosser describes are problematic in at least five ways. First, Puerto Rican law requires that bonds be paid out of revenue; second, it is unlawful for a Puerto Rico agency to issue bonds unless it is projected that the agency will have at least twenty percent more available cash from revenue than will be required to repay the bonds (in other words, the debt-service-coverage ration needs to be at least 1.20); third, raising money for infrastructure when its intended usage is repaying debt and financing "an annual budget deficit" is fraud in the inducement;  fourth, those issuing bonds represent and warrant that the issuance is legal, and these issuances clearly were not; and fifth, underfunded infrastructures tend to fail and those failures always have foreseeable consequences.

Given the flagrant violations that Prosser described, we wanted to determine if it caught the attention of the Security and Exchange Commission, so we filed a Freedom of Information Act request for emails sent or received by SEC personnel during the months of April and May 2012 that include the name, "prosser."  In their response, the SEC indicates that "prosser" (which is not a common name, not a word, and not  the root of any word) appeared in 189,737 email pages during those two months, so many pages that the SEC said it would take years for the SEC to provide them.

Other articles about Puerto Rico bonds followed the Forbes piece.  On April 19, 2013, the BondBuyer, which is the leading bond-industry trade journal, published an article by Robert Slavin, titled "Puerto Rico's Utilities: Big and on the Edge," in which he writes that the rating agency, Fitch, had calculated that PREPA, which had eight billion dollars in bond obligations at the time, did not have enough funds available to cover debt service in 2011-- that by 2011 PREPA was technically insolvent--and that the Puerto Rico Aqueduct and Sewer ("PRASA"), which had almost five billion dollars in bond debt was in even worse shape.  Slavin also pointed out that despite the billions of dollars in PRASA bonds that had been sold, for capital improvements to the island's water and sewer systems, more than 62 percent of the water produced by PRASA was unpaid for, mostly "due to physical losses in pipes and connections."  But he doesn't tell the rest of the story, which is that despite the billions of PREPA bonds that had been sold, PREPA's power generating facilities and the Puerto Rico electrical grid as a whole were in similarly deplorable condition.

Exhibit ONE

Given the Cate Long article, the Marc Prosser article, and given the Robert Slavin article in which a credit-rating agency is quoted as saying that PREPA is technically insolvent, any law-abiding citizen would likely conclude that the Ponzi scheme had run its course, but it hadn't. Puerto Rico needed more cash and Wall Street thought that retail investor confidence was still strong enough to support another bond issue. But Wall Street wanted to keep the Ponzi scheme going for another reason. They needed time to get ready to capitalize on the reflexive selling they would encourage when PREPA's house of cards collapsed. So, despite the fact that everyone at PREPA, everyone in Wall Street, and everyone at the SEC knew that PREPA could not legally issue bonds, the consortium of underwriters, including Citigroup, J.P. Morgan, Morgan Stanley, Barclays Capital, B of A/Merrill Lynch. Goldman Sachs, UBS Financial Services, RBC Capital Markets, Wells Fargo Securities, Raymond James, Ramirez & Company, First Bank Puerto Rico Securities, Popular Securities, Santander Securities, BMO Capital Markets, Jefferies, Scotia MSD, Oriental Financial Securities, the credit-rating agencies, including Fitch, Moody's, and S&P, orchestrated PREPA Series 2013A, and distributed the official statement in preparation for release on August 15, 2013, certain that regulators and the media would once again look the other way and that investor confidence would carry the day.

And that precisely what was happening until July 31, 2013, when a Cate Long column, titled *PREPA issues bonds for energy*, appeared in Reuters. Until then, Long had written retrospectively about Puerto-Rico bonds and the Puerto Rican economy, but on July 31, 2013, she wrote prospectively, pointing out that the upcoming Puerto Rico Electric Power bond offering had a debt-service coverage of 0.81, far below the required 1.20, and that despite the investment grade credit ratings from Fitch, Moody's, and S&P that appeared on the front page of the official statement, PREPA was projected to have only enough money for repay its investors 81 cents on the dollar.

As we have already seen, when Cate Long writes, people listen. People in Puerto Rico listened; people on Wall Street listened, and Adam Chepenik, a Deputy Director at the Treasury not only listened, on August 2, 2013 he sent an email to the SEC and the New York Fed, that discusses volatility in the muni space and includes "a few articles," including the Cate Long article, "that highlight what ... Reuters, and the ratings agencies are saying about the deal."

Cate Long's July 31, 2013 column had pulled away the curtain so that anyone who cared to look could see the wizards of Wall Street at work as they were in the process of committing a $650 million crime, but it did not matter. Too much money had already passed through the hands of too many important people, there was more to be made, and those involved in the fraud were immune to sanctions of any kind.

Despite the Cate Long article, which screams that a major crime is about to be committed, on August 15, 2013, **Wall Street went ahead with the PREPA Series 2013A bond offering.** Unlike the Jeffery Epstein suicide which happened with the guards inattentive, the cameras off, behind the walls and bars of a USDOJ jail, the PREPA Series 2013A fraud was committed right out in the open, in plain view. Anyone can read the Cate Long column and to then go to the cover page of Series 2013A Official Statement and see the investment grade ratings and the notice with regard to legality and then to page 58 so see the actual debt service coverage ratio of .82 and the fraudulent debt service coverage ratio of 1.38 (which was achieved with a clever sleight of hand—counting the value of electricity that they give away as revenue—which they admit to at the bottom of the page), before going on the legal opinion of Sidley Austin, LLP at Appendix IV attesting to its legality of the patently illegal offering. And now anyone can also see the Chepenik email that was sent from the Treasury to the SEC on August 2, 2013, pointing out the problems in "the Deal," which remarkably did not cause the SEC to intervene, and predictably did not stop Wall Street from proceeding with Series 2013A offering.

After August 15, 2013, when investor confidence allowed the $650M Series 2013A bond offering to be "oversubscribed" by $23M, Wall Street had a lot of work to do so they would not held accountable for the coming Puerto Rico bond crisis, and so they could position themselves to make as much money from the economic pain they had inflicted on the predominately elderly[FN] retail bond purchasers that they had defrauded. By October 2013 they had developed a plan that was as simple as it was cynical. As it started becoming increasingly known outside the financial industry that Puerto Rico was not going to be able to meet its bond obligations, Wall Street and its allies in the media would blame Puerto Rico's inability to make its bond payments on the exodus of people from Puerto Rico (no doubt accelerated by condition of Puerto Rico's infrastructure) and the downturn in the

Exhibit ONE

Puerto Rican economy, and recommend that bondholders get out of Puerto Rico bonds. They would then buy up Puerto Rico bonds from defrauded investors for 30 to 50 cents on the dollar, and then banding together into various Ad Hoc Committees of Bondholders, offer a fifteen percent reduction in principal to the various Puerto Rico agencies, so for example, given the reported 60 percent of PREPA's nine billion dollars of bond debt that ended up being under control of the Ad Hoc Group of PREPA Bondholders, PREPA would get 910 million dollars for its participation in bond fraud, Wall Street would get 1.1 billion dollars (in addition to all the money that it had already made underwriting the bonds and selling them), and as readily available public information shows, regulators would get high-paying Wall Street jobs and legislators in Washington who pressured regulators into inaction would continue to get millions of dollars in campaign contributions.[FN] When the same math is applied to Puerto Rico's 74 billion dollars in bond debt, Wall Street's take jumps to nine billion dollars (in addition to all the money that had already made underwriting the bonds and selling them to initial purchasers) plus all the additional money they would make reselling reissued Puerto Rico bonds to retail customers once the dust had settled and the credit rating agencies had once again rated Puerto Rico's bonds investment grade.

All the while, Defendants, all SEC employees who had a duty to the people of Puerto Rico and the American People more generally, did nothing to inform the public, to sanction the perpetrators, to enforce the laws, rules, and regulations as intended by SEC's mission and charter, or to even to prevent crimes that they knew were going to happen, or that were likely to happen as a foreseeable result of bond fraud that syphoned billions of dollars away from PREPA's infrastructure.

Municipal bonds are subject to the antifraud provisions of the federal securities laws, which Defendants had a duty to uphold and enforce. To protect investors, federal securities laws and regulations require issuers and underwriters to timely disclose material information about municipal bond offerings. The purpose of securities laws is to "provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing. These laws and regulations prohibit issuers and dealers who buy, sell, and underwrite municipal securities, from making any false or misleading statement of material fact, and from omitting any material

facts in connection with the offer, purchase, or sale of any municipal security. More specifically, they impose requirements designed, among other things, to prohibit fraud, require certain disclosures, and prevent conflicts of interests as follows:

• Section 17(a) of the Securities Act of 1933 ("Section 17(a)") prohibits fraud and misrepresentations in the offer and sale of securities;

• Section 10(b) of the Exchange Act ("Section 10(b)") and SEC Rule 10(b)(5) prohibit intentional misrepresentations and omissions of material fact;

• Section 15B(a)(5) of the Exchange Act ("Section 15B(a)(5)") prohibits municipal advisors from fraudulent, deceptive, or manipulative acts in connection with the issuance of municipal securities;

• Section 15B(c)(1) of the Exchange Act ("Section 15B(c)(1)") prohibits municipal advisors from breaching their fiduciary duties to municipal entity clients;

• SEC Rule 15c2-12 requires timely delivery of official statements to investors and continuing disclosures, including the timely filing of audited financial statements;

• MSRB Rule G-47 requires the disclosure of material information but applies only to broker-dealers ;24

• MSRB Rule G-17 prohibits brokers, dealers, and municipal advisors from engaging in any deceptive, dishonest, or unfair practice; and

• MSRB Rule G-23 prohibits brokers, dealers, and municipal securities dealers who are acting as financial advisors on a bond issuance from underwriting the issuance.

Defendant will likely argue that they had the discretion to do something or do nothing in this instance and in that instance for literally thousands of discrete instances, each like a single white or black dot on a piece of white paper, which when viewed as a whole is a picture, in this case, a picture of possible corruption.

JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter.

The FTCA itself provides a statutory basis for federal district court jurisdiction. Under 28 U.S.C. § 1346(b), federal district courts are granted original jurisdiction

*Exhibit ONE*

over civil actions against the United States for money damages resulting from tortious acts of federal employees. This provision explicitly authorizes individuals to bring their claims before federal district courts, including those that have been denied by the federal agency.

Denying federal district court jurisdiction over denied FTCA claims could raise constitutional concerns. The Fifth Amendment's Due Process Clause guarantees individuals the right to seek redress for government wrongdoing. By depriving claimants of access to a federal district court, their constitutional right to a fair and impartial hearing may be compromised. Allowing federal district courts jurisdiction in these cases upholds the principles of constitutional due process and preserves the fundamental rights of individuals seeking justice.

28 U.S. Code § 1346 - United States as defendant

(1)Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

(c)The jurisdiction conferred by this section includes jurisdiction of any set-off, counterclaim, or other claim or demand whatever on the part of the United States against any plaintiff commencing an action under this section.

Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Plaintiff resides in and conducts business in this judicial district.

STATUE OF LIMITATIONS AND TOLLING

The Federal Bankruptcy Court in New York and the Financial Oversite and Management Board has delayed making critical decisions regarding the plaintiff's contract with the Puerto Rico Electric Power Authority (PREPA).  The first of those

Exhibit ONE

critical decisions came in the third quarter of 2022 when the court allowed PREPA to cancel the contract for the Plaintiffs twenty-megawatt solar power plant. In the absence of this information, it would have been impossible to file a lawsuit any sooner.

Discovery Rule:

Under the discovery rule, the statute of limitations begins to run from the time the plaintiff discovers or reasonably should have discovered the injury or the basis for the claim. This rule is often applied in cases where the injury or harm is not immediately apparent.

There are also continuing violations taking place in this litigation and related litigation regarding due process violations.

Continuous Violations: For claims involving ongoing or continuous violations, the statute of limitations may be tolled until the violation ceases.

In this litigation the plaintiff alleges repeated concealment of facts relevant to this case.

Fraud or Concealment: If the defendant fraudulently conceals facts relevant to the claim, the statute of limitations may be tolled until the plaintiff discovers, or with reasonable diligence, should have discovered the fraud.

III.    PARTIES

1.    Plaintiff Richard R. Lawless is a natural person residing in Murietta, California and was a founder, majority shareholder, chief executive officer, and chief financial officer of Commercial Solar Power, Inc., a California company ("CSP"), which as of November 2013, existed for the purpose of developing, building, and operating a 20 megawatt solar-electric plant under terms of a Power Purchase and Operating Agreement with the Puerto Rico Electric Power Authority (the "PPOA"), whereunder the CSP-owned project company, Blue Beetle III, LLC, would sell all of the electricity produced by the plant to PREPA at prices set forth in the PPOA. Plaintiff's damages resulting from the bond crisis and the CSP's

Exhibit CHE

resultant inability to fiancé the project include but are not limited to, his $3 million cash investment, $3.5 million in salary, his personal guarantees of company debt and his 56% of profit from the sale of the project.

## IV.   CAUSES OF ACTION

COUNT I.  Negligence

The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by Plaintiff.  To the detriment of Plaintiff, to the extent that Defendants omissions are not deemed to be conspiratorial, Defendants were negligent in the performance of their duties, in that despite all of the indications that PREPA's public disclosures were inadequate and/or that their bond offerings and issuances were fraudulent, they failed to take notice and notify the public.

Upon information, evidence, and belief, Plaintiff alleges that Defendants had a duty to notify the public, Plaintiff is a member of the public in general, in particular, is a businessman who relies on credit ratings and other publicly available information when making business decisions.

Upon information, evidence, and belief, Plaintiff alleges that Defendants failed to act with the level of care that a reasonable person would have shown in the same or similar situation.

Upon information, evidence, and belief, Plaintiff alleges that he was foreseeably economically damaged by Defendant's wrongful acts.

Count II. Professional Negligence

The Plaintiff brings this cause of action against the Defendant alleging professional negligence. The Defendant, [Securities and Exchange Commission], owed a duty of care to the Plaintiff as a member of the general public, their failure to meet the required standard of care has resulted in harm and damages to the Plaintiff.

Duty of Care: The professional owes a duty of care to the client or patient, meaning they have a legal obligation to act with reasonable care and skill.

The Securities and Exchange Commission failed to meet the required standard of care, either by acting negligently or by failing to act when they should have.

Exhibit ONE

Plaintiff suffered actual harm or damages as a result of the professional's breach of duty.

The duty of care owed by the U.S. Securities and Exchange Commission (SEC) to the general public is primarily rooted in its statutory mandate and regulatory responsibilities. As a federal government agency tasked with regulating the securities industry and protecting investors, the SEC has a duty to act in the best interests of the public and to fulfill its regulatory obligations.

The specific duty of care owed by the SEC to the general public can be broadly summarized as follows:

Investor Protection: The SEC is responsible for safeguarding the interests of investors and promoting fair and transparent markets. This includes ensuring the accurate disclosure of information by public companies, detecting, and preventing fraudulent activities, and taking enforcement actions against securities law violations.

Regulatory Oversight: The SEC has a duty to enforce and administer federal securities laws and regulations. This includes developing and implementing rules and regulations that govern various aspects of the securities industry, such as registration requirements, market operations, and investment adviser activities.

Market Stability: The SEC plays a role in maintaining the stability and integrity of the securities markets. This involves monitoring market activities, overseeing exchanges and self-regulatory organizations, and taking measures to prevent market manipulation, insider trading, and other forms of misconduct.

Count IV:   California State Law – Fraudulent Concealment

If the defense conceals information and documents that would have aided in their litigation or prevented the damages incurred by the plaintiff, they would be subject to damages related to that concealment.

The law requires five elements to be present:

1) The defendant must have concealed or suppressed a material fact

2) The defendant must have been under a duty to disclose that fact

Exhibit ONE

3) The defendant must have intentionally concealed that fact with intent to defraud the plaintiff

4) The defendant must have been unaware of the fact and would not have acted as he did, if he had known or the concealed or suppressed fact, and

5) As a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

There is no disputing that the SEC was aware of the Puerto Rico Ponzi Scheme as early as 2012. In 2013 there was a conversation between a treasury official and a redacted SEC employee that recognized the fraud but allowed the bond to be issued anyway, and in 2015 received a confession and a whistleblower report. In 2016 the SEC attended a presentation of the fraud allegations and in 2018 the SEC received the FOMB Investigative Report.

There is no question if the plaintiff knew that PREPA was engaging in a Ponzi Scheme, he would not have purchased the contract for the solar project in 2012 and continue to invest money in the project all the way through 2015.

There is no question that if the plaintiff knew that the SEC was so aware of these crimes, knowingly allowed them to happen and had all manner of confirming documents that the plaintiffs claim was well supported, the plaintiff would have litigated this dispute based on the unreasonableness of the SEC's action from the very beginning.

Duty of Care: The professional owes a duty of care to the client or patient, meaning they have a legal obligation to act with reasonable care and skill.

The Securities and Exchange Commission failed to meet the required standard of care, either by acting negligently or by failing to act when they should have.

Plaintiff suffered actual harm or damages as a result of the professional's breach of duty.

The duty of care owed by the U.S. Securities and Exchange Commission (SEC) to the general public is primarily rooted in its statutory mandate and regulatory responsibilities. As a federal government agency tasked with regulating the securities industry and protecting investors, the SEC has a duty to act in the best interests of the public and to fulfill its regulatory obligations.

Exhibit ONE

The specific duty of care owed by the SEC to the general public can be broadly summarized as follows:

Investor Protection: The SEC is responsible for safeguarding the interests of investors and promoting fair and transparent markets. This includes ensuring the accurate disclosure of information by public companies, detecting, and preventing fraudulent activities, and taking enforcement actions against securities law violations.

Regulatory Oversight: The SEC has a duty to enforce and administer federal securities laws and regulations. This includes developing and implementing rules and regulations that govern various aspects of the securities industry, such as registration requirements, market operations, and investment adviser activities.

Market Stability: The SEC plays a role in maintaining the stability and integrity of the securities markets. This involves monitoring market activities, overseeing exchanges and self-regulatory organizations, and taking measures to prevent market manipulation, insider trading, and other forms of misconduct.

Count IV: Violation of Plaintiffs Due Process Rights and Civil Rights

The Defense Counsel and Defendant failed to comply with the Federal Rules of Civil Procedure, the California Bar's Code of Professional Conduct, the Fifth Amendment, the Sixth Amendment, and the Fourteenth Amendment.

Fifth Amendment

The Fifth Amendment creates several rights relevant to both criminal and civil legal proceedings. In criminal cases, the Fifth Amendment guarantees the right to a grand jury, forbids "double jeopardy," and protects against self-incrimination. It also requires that "due process of law" be part of any proceeding that denies a citizen "life, liberty or property" and requires the government to compensate citizens when it takes private property for public use.

Sixth Amendment

The Sixth Amendment guarantees the rights of criminal defendants, including the right to a public trial without unnecessary delay, the right to a lawyer, the right to an impartial jury, and the right to know who your accusers are and the nature of the charges and evidence against you. It has been most visibly tested in a series of

Exhibt ONE

cases involving terrorism, but much more often figures in cases that involve (for example) jury selection or the protection of witnesses, including victims of sex crimes as well as witnesses in need of protection from retaliation.

Fourteenth Amendment

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or Immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Federal Rules of Civil Procedure

Rule 8. General Rules of Pleading - (e) Construing Pleadings. Pleadings must be construed to do justice

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

Rule 11. (4) the denials of factual contentions are warranted on the evidence or, if specifically, so identified, are reasonably based on belief or a lack of information.

(c) Sanctions. (1) In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

Professional Conduct of the State Bar of California

Rule 3.3 Candor Toward the Tribunal*

Exhibit ONE

(a) A lawyer shall not: (1) knowingly make a false statement of fact or law to a tribunal* or fail to correct a false statement of material fact or law previously made to the tribunal* by the lawyer; (2) fail to disclose to the tribunal* legal authority in the controlling jurisdiction known* to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel, or knowingly misquote to a tribunal* the language of a book, statute, decision or other authority; or (3) offer evidence that the lawyer knows* to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence, and the lawyer comes to know* of its falsity, the lawyer shall take reasonable* remedial measures, including, if necessary, disclosure to the tribunal, * unless disclosure is prohibited by Business and Professions Code section 6068, subdivision (e) and rule 1.6. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes* is false. (b) A lawyer who represents a client in a proceeding before a tribunal* and who knows* that a person*intends to engage, is engaging or has engaged in criminal or fraudulent* conduct related to the proceeding shall take reasonable* remedial measures to the extent permitted by Business and

Profession Rule 3.4 Fairness to Opposing Party and Counsel

A lawyer shall not: (a) unlawfully obstruct another party's access to evidence, including a witness, or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person* to do any such act; (b) suppress any evidence that the lawyer or the lawyer's client has a legal obligation to reveal or to produce; (c) falsify evidence, counsel, or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by laws Code section 6068, subdivision (e) and rule 1.6.

Rule 4.1 Truthfulness in Statements to Others

In the course of representing a client a lawyer shall not knowingly: * (a) make a false statement of material fact or law to a third person; * or (b) fail to disclose a material fact to a third person* when disclosure is necessary to avoid assisting a

Exhibit ONE

criminal or fraudulent* act by a client, unless disclosure is prohibited by Business and Professions.

Rule 8.4 Misconduct

It is professional misconduct for a lawyer to: (a) violate these rules or the State Bar Act, knowingly* assist, solicit, or induce another to do so, or do so through the acts of another; (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud,* deceit, or reckless or intentional misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice; (e) state or imply an ability to influence improperly a government agency or official, or to achieve results by means that violate these rules, the State Bar Act, or other law; or (f) knowingly* assist, solicit, or induce a judge or judicial officer in conduct that is a violation of an applicable code of judicial ethics or code of judicial conduct, or other law. For purposes of this rule, "judge" and "judicial officer" have the same meaning as in rule 3.5(c)

How Due Process Violation's Become Civil Rights Violations

Withholding Evidence: If evidence is intentionally concealed or withheld by a government official or law enforcement agency in a manner that violates a person's right to due process, it can be considered a civil rights violation. This is because due process guarantees individuals the right to a fair and impartial trial, which includes access to all relevant evidence. If evidence is improperly suppressed, it may infringe upon the accused person's ability to defend themselves and undermine their right to a fair trial.

Perjury: Perjury refers to knowingly making false statements under oath. While perjury itself is a serious offense, it does not directly constitute a civil rights violation. However, if perjury is committed by a government official or law enforcement officer as part of a deliberate effort to violate an individual's civil rights, such as providing false testimony to secure an unjust conviction based on discriminatory motives, it may contribute to a civil rights violation.

Exhibit ONE

In summary, withholding evidence and perjury can play a role in civil rights violations if they are carried out in a manner that deprives individuals of their right to due process, equal protection, or fair treatment under the law.

In this litigation both the Defense Counsel (DOJ) and the Defendant (SEC) are law enforcement agencies. One due process violation may be insufficient to rise to the standard for it to be considered a civil rights violation but dozens of serious violations leave little doubt that both the defendant and their defense counsel intended to use any means possible to deny a fair trial to the plaintiff(s). Both the defense counsel and the plaintiff were sent a request to correct their earlier filings by the plaintiff and a copy of that email was sent to Court Chambers reminding the defendant and defense counsel of their obligation to correct earlier false and misleading submissions to this court. That request was ignored.

Case Law Examples

United States v. Bagley (1985): Although this case originated in a criminal context, it established the standard for evaluating the withholding of evidence by the government. The Supreme Court held that the prosecution has a duty to disclose evidence that is favorable to the accused and material to guilt or punishment. Failure to disclose such evidence violates the accused's due process rights.

Hynix Semiconductor Inc. v. Rambus Inc. (2006): This case involved a civil dispute regarding patent infringement. The court held that a party's failure to produce documents or disclose relevant evidence can lead to adverse inferences against that party. In other words, the court may draw a negative inference from the failure to produce evidence and treat it as unfavorable to the party withholding it.

United States v. City of New York (2013): This case involved a civil trial against the City of New York alleging discriminatory hiring practices. During the trial, it was discovered that a high-ranking city official had provided false testimony. The court found that the false testimony undermined the integrity of the trial and ordered a new trial on liability issues.

Williams v. City of Antioch (2005): In this civil rights lawsuit, the court found that a police officer had committed perjury during his testimony. The court concluded

Exhibit ONE

that the perjured testimony had a significant impact on the jury's decision and ordered a new trial.

Santiago v. City of Philadelphia (2017): This civil rights case involved allegations of police misconduct. During the trial, it was revealed that several police officers had provided false testimony. The court held that the officers' false testimony undermined the fairness of the trial and granted a new trial on liability issues.

The SEC and DOJ are both Law Enforcement Agencies.

The following are two specific claims related to the violation of the plaintiff's due process rights and civil rights.

Evidence Submission

Due Process/Civil Rights Violations

Violation Number One – Pro Bono Request

When the government acts to deny legal counsel, it raises concerns related to the plaintiff's constitutional rights, specifically their right to legal representation and due process.

The Sixth Amendment to the United States Constitution guarantees individuals the right to legal counsel in criminal cases. Although this amendment specifically addresses criminal cases, the principles of due process and access to legal representation are generally considered fundamental to the fairness of legal proceedings, including civil cases. Denying or obstructing someone's access to legal counsel could potentially infringe upon their rights and raise concerns about due process.

Without any evidence or understanding the Defense Counsel sought to convince the court that the Plaintiff was the CEO of a for-profit charitable fundraising business and therefore could afford his own counsel. Plaintiff was an acting CEO for such an entity and this was one of several worthwhile charities the plaintiff volunteers his time to. Plaintiff does not receive nor would he accept any salary for his charitable services.

Exhibit ONE

Defense Counsel claims the plaintiff had the means to serve President Trump a subpoena therefore he can certainly afford his own counsel.  Plaintiff's cost for the subpoena service was only $80.00 because President Trump cooperated with the server who was representing the plaintiff.

Defense Counsel goes on to say that "To the extent the Court treats the Motion as a request for the appointment of counsel, this action does not involve exceptional circumstances warranting an appointment. While Plaintiff is an active litigant who has initiated hundreds of cases, no court has found any merit to his claims, which are based on his unsubstantiated theory."

In claiming that the plaintiff has filed hundreds of lawsuits, defense counsel seeks to mischaracterize the filing of two hundred small claims lawsuits against U.S. Senators and their Chiefs of Staff.  In a moment of moral outrage, the plaintiff filed these small claims lawsuits to show the Senators that he indeed has evidence that they knowingly accepted political contributions from banks involved in the alleged Ponzi Scheme.  These cases were withdrawn by the plaintiff and never ruled on. Clearly the defense counsel's intent here is to mislead the court and disparage the plaintiff while seeking to deny the plaintiff legal counsel.

The defense counsel also asserts that the plaintiff's claims are an unsubstantiated theory.  This is intentionally misleading and outright perjury sanctioned by the four U.S. Attorneys seeking to deny plaintiff representation.

At the time this motion was submitted, Defense Counsel and Defendant were in possession of House of Representative Report 1049 (Exhibit One), The FOMB Investigatory Report (Exhibit Two), FOIA documents (Exhibit Three) reflecting discussions about the Ponzi Scheme. The Defense Counsel was aware that the SEC found the plaintiff's claims credible when he applied for and was accepted into the formal whistleblower program back in 2015.  (Exhibit Four).  This is pure unadulterated perjury and a major mischaracterization of the facts in pursuit of denying a U.S. citizen legal representation.  All the aforementioned documents fully support the Plaintiffs claims. All the reports and documents are "government documents."

Exhibit ONE

The 6th Amendment is clear on this issue; "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

The fifth amendment is also clear on this issue; "The Fifth Amendment creates several rights relevant to both criminal and civil legal proceedings. In criminal cases, the Fifth Amendment guarantees the right to a grand jury, forbids "double Jeopardy," and protects against self-incrimination. It also requires that "due process of law" be part of any proceeding that denies a citizen "life, liberty or property" and requires the government to compensate citizens when it takes private property for public use."

The Fourteenth Amendment is also clear on this issue; "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In this document using false claims, mischaracterization, lack of candor and perjury, the DOJ and SEC was seeking to deny the Plaintiff his fifth, sixth and fourteenth amendment rights.

Defense Counsel's violations do not end with the constitution, there are clear violations of the federal rules for civil procedure and the California Bar Association code of Professional Ethics. There are unsubstantiated claims, knowingly false statements constituting serious perjury, a complete lack of candor and intentional and untrue mischaracterizations seeking to deny plaintiff legal counsel.

Plaintiff initially claimed the SEC aided and abetted in crimes that directly caused his losses. The following documents that were in the possession of the defendant seemingly support these allegations.

Exhibit ONE

Exhibit One, The Puerto Rico House of Representatives Summary Report known as H.R. 1049 was delivered to the DOJ and the SEC in August of 2015 and submitted to this court's docket as evidence exhibit 44. This report claims that the Puerto Rico Municipal Agencies were running a Ponzi Scheme, that the credit rating agencies and banks knew PREPA to be bankrupt but kept extending credit to them. The report goes on to request assistance from the DOJ and the SEC to investigate and prosecute those responsible.

In the opposition document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of this document for the past seven years. If you look at the plaintiffs claim (Exhibit Five and Docket Item 1) it clearly claims that Puerto Rico municipal agencies were participating in a seventy-five-billion-dollar securities fraud. In the HR 1049 document the government of Puerto Rico appears to agree with the plaintiff.

In the opposition document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of the FOMB Investigative report also known as Exhibit Two for the past four years. This extensive government report was issued on August 20, 2018 and strongly supports the plaintiff's claims. There is even a section within the report dealing with aiding and abetting. Because of the size of this document, the plaintiff will attach a sample of its contents for purposes of this civil rights claim.

In the opposition document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of numerous internal documents reflecting communication between various SEC employees seemingly discussing all aspects of the plaintiff's claims. These documents were secured through various FOIA requests by the plaintiff. These documents are referred to as Exhibit Three in the attached evidence addendum.

This FOIA submission is just a small sample of the FOIA documents available to dispute the Defense Counsel claims that Plaintiff's claims are unsubstantiated.

·       A three-page letter to the Chairman of the SEC, Mary Jo White asking her to investigate all wrong-doing related to the bonds. The letter was dated June 14,

Exhibit ONE

2016 and signed by Senators Menendez, Warren, Schumer, Gillibrand, Sanders and Markley.

·   A Subpoena and related emails from the SEC to Morgan Stanley requesting documents related to Puerto Rico bonds dated 10-23-2014.

-   A SEC, Treasury Department email where a senior staff member for the Treasury Secretary, Adam Chepenik and a redacted senior member of the SEC apparently discuss and agree on the fraudulent nature of a specific Puerto Rico bond and go on to allow the bond to be issued.  The email is dated August 2, 2013.

In the opposition document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC understood the Plaintiff, Richard Lawless applied to the formal SEC whistleblower in July of 2015 and his claims were found to be credible.  In this example the SEC itself felt the Plaintiff's claims were well founded.

This is how the SEC defines it whistleblower program

Office of the Whistleblower

Assistance and information from a whistleblower who knows of possible securities law violations can be among the most powerful weapons in the law enforcement arsenal of the Securities and Exchange Commission. Through their knowledge of the circumstances and individuals involved, whistleblowers can help the Commission identify possible fraud and other violations much earlier than might otherwise have been possible. That allows the Commission to minimize the harm to investors, better preserve the integrity of the United States' capital markets, and more swiftly hold accountable those responsible for unlawful conduct.

The Commission is authorized by Congress to provide monetary awards to eligible individuals who come forward with high-quality original information that leads to a Commission enforcement action in which over $1,000,000 in sanctions is ordered. The range for awards is between 10% and 30% of the money collected.

The Office of the Whistleblower was established to administer the SEC's whistleblower program. We understand that the decision to come forward with

Exhibit ONE

information about securities fraud or other wrongdoing is not one taken lightly, and we are here to answer any questions you may have. You can reach the Office of the Whistleblower at (202) 551-4790.

## The SEC Office of Market Intelligence Vets Each Tip

At that point, the TCR is forwarded to the SEC's Office of Market Intelligence (OMI), which has been described as a "point guard" for the entire agency. Comprised of more than 40 attorneys, former traders, accountants and other experts, the OMI is responsible for gathering and analyzing all tips and complaints received by the SEC. The OMI conducts an initial evaluation of each tip to determine, among other things, whether it relates to an existing investigation, whether similar information has already been submitted to the agency, and whether it relates to possible misconduct that occurred within the SEC's ten-year statute of limitations for enforcement actions. Most importantly, the OMI determines whether the tip is sufficiently specific, significant, and credible to be referred to an investigative team within the Division of Enforcement – the division responsible for conducting investigations of possible securities violations and bringing charges against wrongdoers where warranted.

In this example, the SEC clearly found the Plaintiffs claims "significant and credible" not unsubstantiated as claimed by the DOJ and SEC in their efforts to deny plaintiff legal counsel.

The SEC assigned Sue Curtin, Senior Investigative Attorney for the SEC to work with the Plaintiff. An email welcoming the Plaintiff to the "program" is attached as Evidence Exhibit Four.

Evidence Exhibit Five is a copy of the plaintiffs docketed claim.

Copy of Defendant's Motion in Opposition of Pro Bono Representation – Docket Item 41

Case 5:21-cv-02174-JWH-SP

Defendant submits this response to Plaintiff's Motion to Be Included in the Pro Bono Limited Scope Representation Pilot Program (Dkt. 37, the "Motion"):

A. Pro Se Services in the Central District

Exhibit ONE

Under the District's Pilot Program, the Court may "appoint volunteer attorneys for limited-scope engagements on non-prisoner, pro se, civil case" in order "to perform discrete, specifically defined tasks such as representing a pro se litigant during a settlement conference, filing an opposition to a dispositive motion, or appearing at a deposition."2

The Program is "especially appealing to law firms with associates desiring immediate federal litigation experience." In addition to the Pilot Program, there is a federal pro se clinic in the Eastern Division that offers information and guidance to pro se civil litigants. See Website for People Without Lawyers, Resources for Pro Se Litigants in the Central District of California:
https://prose.cacd.uscourts.gov/riverside (last accessed on May 23, 2022).

The Court entered a Self-Representation Order on February 9, 2022 regarding proceeding pro se. (Dkt. 14.) The Order notes that "The Los Angeles County Bar Association Lawyer Referral and Information Service may be able to refer you to a lawyer who may or may not be willing to take your case on a contingency basis." (Id. at 3. n.1.) Also, the California State Bar maintains a list of numerous attorney referral services in the Central District, including Riverside County.3

B. Richard Lawless Is the CEO of a "For-Profit Fundraising Service" It is not apparent that Mr. Lawless is qualified to receive pro bono counsel as he represents that he is the CEO of NEA Charitable Fundraising Services LLC ("NEA"). Declaration of Paul B. Green, Exs. A, B, C, D, and E. NEA's website states that it is a

"for-profit fundraising service that utilizes independent Contractors to raise capital for worthy charities." Ex. B. NEA's website states that it charges a fee of $25,000 to start a foundation. Ex. C.

In promotional materials on NEA's website, Mr. Lawless represents that "[a]t this stage of my life, I am getting hammered by the highest business and personal tax rates and by utilizing a private family foundation I can take much of that money that goes to pay State and Federal taxes and set it aside to charitable cause." Ex. D at 2. He further represents that his foundation "will allow me to set aside substantial money and assets that my wife and I control." Id.; see also Ex. E at 2 (NEA YouTube page stating, "How much of my wealth do I transfer to my children and grandchildren before I am doing

Exhibit ONE

them a disservice?").

Aside from NEA, Plaintiff had the means to recently effectuate service through a process server on President Trump in Florida and an SEC employee in Massachusetts. Lawless v. United States, No. 5:22-cv-00148, Dkt. 39 (affidavit of service on SEC employee Curtin); Dkt. 51 (affidavit of service on Trump).

C. Legal Standard for Appointment of Counsel in Civil Cases "There is no constitutional right to appointed counsel in a civil case." Elias v. Wolf, 2020 WL 10790290, at *1 (C.D. Cal. Sept. 17, 2020) (citing Storseth v. Spellman, 654 F.2d 1349, 1353 (9th Cir. 1981) and finding that the exceptional circumstances which are necessary to grant plaintiff's request for counsel did not exist). In Pettingill v. United States of America, the Court found: "After evaluating the likelihood of success on the merits, and the ability of the Plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved, the Court finds that the 'interests of justice' do not require the appointment of counsel at this time." 2013 WL 12439664, at *1 (C.D. Cal. July 31, 2013) (citing 18 U.S.C. § 3006A(a)(2)(B) and Weygandt v. Look, 718 F.2d

952, 954 (9th Cir. 1983)).

Case 5:21-cv-02174-JWH-SP Document 41 Filed 05/26/22 Page 3 of 32 Page ID #:151 This is one of two duplicative cases that the Plaintiff has filed claiming that the U.S. Securities and Exchange Commission ("SEC") had a duty to bring civil proceedings relating to the Puerto Rico bankruptcy. On May 2, 2022, Defendant filed a motion to dismiss this case on the grounds that (i) the SEC is not a proper defendant in a claim brought under the Federal Tort Claims Act ("FTCA"), and (ii) the claims in this action are duplicative of Plaintiff's claims in his action against the United States. (Dkt. 26.)

Plaintiff did not oppose the motion.4 Even if Plaintiff had filed a timely opposition, and even if a law firm found this case to be suitable for associate development and were to take on the case as part of the Pilot Program, it is highly unlikely that Plaintiff would succeed on the merits. It is black-letter law that claims brought under the FTCA against a federal agency should be dismissed for lack of

Exhibit ONE

jurisdiction. See FDIC v. Craft, 157 F.3d 697, 706 (9th Cir. 1998); Kennedy v. U.S. Postal Serv., 145 F.3d 1077, 1078 (9th Cir.

1998); see Weygandt, 718 F.2d at 954 ("In deciding whether to appoint counsel . . . the district court must evaluate the likelihood of success on the merits . . . ."). To the extent the Court treats the Motion as a request for the appointment of counsel, this action does not involve exceptional circumstances warranting an appointment. While Plaintiff is an active litigant who has initiated hundreds of cases, no

court has found any merit to his claims, which are based on his unsubstantiated theory that all three branches of the federal government are part of a criminal conspiracy that caused him to lose millions of dollars in the Puerto Rico government debt crisis. See Ex. G, Ex. H; Lawless v. Mulder, No. 2021 SC3 000441, 2021 D.C. Super. LEXIS 26 (Oct. 4, 2021) (screening order barring Plaintiff from filing any new cases and motions in the District of Columbia Civil Division); Richard R. Lawless v. United States of America, Appeal No. 22-55486, Dkt. 7 (9th Cir. May 25, 2022) (dispositive order dismissing interlocutory appeal for lack of jurisdiction).

In light of Plaintiff's failure to file an opposition, the action may be dismissed pursuant to Ghazali v. Moran, 46 F.3d 52, 53-54 (9th Cir. 1995). See also L.R. 7-12 ("The failure to file any required document, or the failure to file it within the deadline, may be deemed consent to the granting . . . of the motion . . . ."). Case 5:21-cv-02174-JWH-SP Document 41 Filed 05/26/22 Page 4 of 32 Page ID #:152

For these reasons, Defendant respectfully requests the Court deny Plaintiff's Motion.

Dated: May 26, 2022 Respectfully submitted,

TRACY L. WILKISON

United States Attorney

DAVID M. HARRIS

Assistant United States Attorney

Chief, Civil Division

JOANNE S. OSINOFF

Assistant United States Attorney

Chief, General Civil Section

/s/ Paul B. Green

PAUL B. GREEN

Assistant United States Attorney

Attorneys for Defendant

Exhibit ONE

Evidence Submission

Due Process/Civil Rights Violations

Violation Number Two – Motion to Dismiss

Case 5:22-cv-01700-JWH-SP

On 12/29/22 Defense Counsel filed a Motion to Dismiss this case.  In two previous cases, Defense Counsel submitted nearly identical motions to dismiss those cases pretrial.  The Defense Counsel knowingly made false assertions, mischaracterized the plaintiff's complaints, intentionally misled the court, and committed outright perjury in their pursuit to deny the plaintiff a fair trial and equal justice. In two closely related previous cases (. 5:22-cv-02174-JWH-SP & 5:22-cv-00148-JWH-SP) Defense Counsel knowingly made false and unjustified claims to secure pretrial dismissals.

When a court motion is found to contain false statements, the consequences can vary depending on the jurisdiction and the specific circumstances of the case. In general, however, the discovery of false statements in a court motion can have several potential effects:

Credibility and reputation: The party or attorney responsible for submitting the false statements may suffer damage to their credibility and reputation before the

Exhibit ONE

court. This can impact the court's perception of their overall case and may affect their future arguments.

Sanctions: Courts have the authority to impose sanctions on parties or attorneys who knowingly make false statements or engage in other unethical conduct. Sanctions can include fines, reprimands, attorney fees, or other penalties deemed appropriate by the court. The severity of the sanctions depends on the jurisdiction and the seriousness of the false statements.

Disregard of false statements: Once false statements are identified, the court may disregard them and focus on the remaining factual and legal arguments presented in the motion. The false statements may not affect the entire motion, but they could undermine the credibility of the party or the specific arguments based on those false statements.

Adverse impact on the case: False statements can harm the party or attorney responsible for them by weakening their position or hindering their ability to present their case effectively. If the false statements were central to the motion or crucial for establishing a legal argument, their exposure can have a significant negative impact on the case's outcome.

Legal consequences: In some cases, knowingly making false statements or engaging in perjury can have more severe legal consequences beyond the court proceedings. These can include criminal charges, civil liability, or disciplinary action against the attorney involved.

Using the highest standard one can look to for due process violations one can rely on the requirements the courts demand to consider Section 11 Sanctions. Federal Rule of Civil Procedure 11 applies to

"Signed writings filed with the Court." it also requires the plaintiff to show that a court submission was frivolous, legally unreasonable, or without factual foundation.

That is the case in regards to this document filing and the actions of the Defense Counsel and the defendant clearly justify Court sanctions.

The Defense Counsel's Motion to Dismiss (Docket Item 22) makes the following claims:

Exhibit ONE

1. This action is duplicative of Plaintiff's claims in the related actions, Lawless

v. Securities and Exchange Commission, 5:22-cv-02174-JWH-SP, and

Lawless v. United States, 5:22-cv-00148-JWH-SP.

2. The discretionary function exception bars Plaintiff's claims;

3. The misrepresentation and deceit exception bars Plaintiff's fraud claim;

4. Plaintiff's action is time barred;

5. Plaintiff lacks standing to bring his claims; and

6. The complaint fails to state a plausible claim

The complaint fails to state a plausible claim

Plaintiff claims the SEC aided and abetted in crimes that directly caused his losses. The following documents that were in the possession of the defendant seemingly support these allegations.

Exhibit One, The Puerto Rico House of Representatives Summary Report known as H.R. 1049 was delivered to the DOJ and the SEC in August of 2015 and submitted to this court's docket as evidence exhibit 10, pages 7-29. This report claims that the Puerto Rico Municipal Agencies were running a Ponzi Scheme, that the credit rating agencies and banks knew PREPA to be bankrupt but kept extending credit to them. The report goes on to request assistance from the DOJ and the SEC to investigate and prosecute those responsible.

In the Motion to Dismiss the document presented by the defense counsel assets there is no plausible claim while the DOJ and SEC were in possession of this document for the past seven years. If you look at the plaintiff's complaint (Exhibit Five and Docket Item 1) it clearly asserts that Puerto Rico municipal agencies were participating in a Ponzi Scheme. In the HR 1049 document the government of Puerto Rico appears to agree with the plaintiff.

In the document presented by the defense counsel the defense counsel states that the plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of the FOMB Investigative report (evidence exhibit 45), for the past

Exhibit ONE

four years. This extensive government report was issued on August 20, 2018 and strongly supports the plaintiff's claims. There is even a section within the report dealing with aiding and abetting. Because of the size of this document, the plaintiff will attach a sample of its contents for purposes of this civil rights claim.

In the document presented by the defense counsel the defense counsel states that the plaintiff's claims are not plausible while the DOJ and SEC were in possession of numerous internal documents reflecting communication between various SEC employees seemingly discussing all aspects of the plaintiff's claims. These documents were secured through various FOIA requests by the plaintiff. These documents are referred to as Exhibit Three in the attached evidence addendum. This submission is just a small sample of the FOIA documents available to dispute the Defense Counsel assertions that Plaintiff's claims are not plausible.

·       A three-page letter to the Chairman of the SEC Chairman, Mary Jo White asking her to investigate all wrong-doing related to the bonds. The letter was dated June 14, 2016 and signed by Senators Menendez, Warren, Schumer, Gillibrand, Sanders and Markley.


·       ·A Subpoena and related emails from the SEC to Morgan Stanley requesting documents related to Puerto Rico bonds dated 10-23-2014.

·       A SEC, Treasury Department email where a senior staff member for the Treasury Secretary, Adam Chepenik and a redacted senior member of the SEC apparently discuss and agree on the fraudulent nature of a specific Puerto Rico bond and go on to allow the bond to be issued. The email is dated August 2, 2013.

In the Motion to Dismiss document presented by the defense counsel the defense counsel states that the plaintiff's claims are not plausible while the DOJ and SEC understood the Plaintiff, Richard Lawless applied to the formal SEC whistleblower in July of 2015 and his claims were found to be credible. In this example the SEC itself felt the Plaintiff's claims were well founded.

This is how the SEC defines it whistleblower program

Office of the Whistleblower

Exhibit ONE

Assistance and information from a whistleblower who knows of possible securities law violations can be among the most powerful weapons in the law enforcement arsenal of the Securities and Exchange Commission. Through their knowledge of the circumstances and individuals involved, whistleblowers can help the Commission identify possible fraud and other violations much earlier than might otherwise have been possible. That allows the Commission to minimize the harm to investors, better preserve the integrity of the United States' capital markets, and more swiftly hold accountable those responsible for unlawful conduct.

The Commission is authorized by Congress to provide monetary awards to eligible individuals who come forward with high-quality original information that leads to a Commission enforcement action in which over $1,000,000 in sanctions is ordered. The range for awards is between 10% and 30% of the money collected.

The Office of the Whistleblower was established to administer the SEC's whistleblower program. We understand that the decision to come forward with information about securities fraud or other wrongdoing is not one taken lightly, and we are here to answer any questions you may have. You can reach the Office of the Whistleblower at (202) 551-4790.

## The SEC Office of Market Intelligence Vets Each Tip

At that point, the TCR is forwarded to the SEC's Office of Market Intelligence (OMI), which has been described as a "point guard" for the entire agency. Composed of more than 40 attorneys, former traders, accountants and other experts, the OMI is responsible for gathering and analyzing all tips and complaints received by the SEC. The OMI conducts an initial evaluation of each tip to determine, among other things, whether it relates to an existing investigation, whether similar information has already been submitted to the agency, and whether it relates to possible misconduct that occurred within the SEC's ten-year statute of limitations for enforcement actions. Most importantly, the OMI determines whether the tip is sufficiently specific, significant, and credible to be referred to an investigative team within the Division of Enforcement – the division responsible for conducting investigations of possible securities violations and bringing charges against wrongdoers where warranted.

In this example, the SEC clearly found the Plaintiffs claims "significant and credible" not implausible as the Defense Counsel for the SEC is now claiming. It

Exhibit ONE

appears clearly the Defense Counsel through their efforts is trying to deny the plaintiff not only a fair trial but any trial at all. The SEC assigned Sue Curtin, Senior Investigative Attorney for the SEC to work with the Plaintiff. An email welcoming the Plaintiff to the "program" is attached as Evidence Exhibit Four.

Evidence Exhibit Five is a copy of the plaintiffs docketed claim.

The Defense Counsel knew his client, after the review of plaintiff's claims by a team of forty SEC attorneys, found his claim credible. This cannot simply be considered bad lawyering. By making the assertion that the plaintiffs claims were not plausible the Defense Counsel created a duty of candor and disclosure, obligations he failed to comply with.

Disenfranchising a plaintiff's constitutional right to a fair trial is a serious matter, made only more troubling by the higher standard that a U.S. Attorney has as a law enforcement officer.

Plaintiff standing

"To establish standing, a plaintiff must show, as the irreducible constitutional minimum," that: (1) he has suffered an "injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is "likely as opposed to merely speculative, that the injury will be redressed by a favorable decision."

When the plaintiff submitted his SEC whistleblower complaint it required the plaintiff to show in detail the losses he incurred at that time, because of these allegations. The SEC did not find his submission partially credible, in fact, by virtue of admission into the SEC whistleblower program the following requirement had to be met; "tip is sufficiently specific, significant, and credible." By the SEC's own admission and a committee of forty SEC attorneys, the plaintiff had standing. But evidence in the hands of the DOJ and SEC does not stop here.

In FOIA request 21-00159-FOPA, the SEC returned to the plaintiff a copy of his bankruptcy filing which details the losses from the alleged crime.

Exhibit ONE

The Plaintiff also submitted detailed financial records of his losses to his assigned Investigative attorney, Sue Curtin In 2016. Those records were also returned to plaintiff in an SEC FOIA request 21-00159-FOPA.

Equally important, the House of Representatives Report, H.R. 1049 that the SEC had in their possession since August of 2015 stated that Puerto Rico Municipalities were engaged in a Ponzi Scheme, A Schome that led to Island bankruptcy and cancellation of the plaintiff's project.

The FOMB Investigative Report confirms all this illegal activity and goes one step further by defining the SEC's obligations regarding these events. The SEC has had these reports in their possession Since 2018.

The lack of candor and withholding of this critical information when attempting to deprive a plaintiff his constitutional right to a fair trial is a serious matter. The Defense may be able to shape some limited arguments that they were not required to disclose this evidence. Those arguments would conflict with the Federal Rules of Civil Procedure and the California State Bar Professional Ethics Rules. One can argue about this evidence but no one can argue that knowingly making a false claim regarding the plaintiff's lack of standing is anything but an egregious due process and civil rights violation. If the Defense Counsel simply remained silent on the Plaintiff's Lack of Standing, we would not be here today. They chose to knowingly make that same false claim in three different cases while sitting on evidence that completely contradicts their claims. They created their own obligation for candor and disclosure by making this assertion to the court and failed to comply with that obligation.

Plaintiff's action is time barred

Defense Counsel asserts "This action should also be dismissed with prejudice because Plaintiff failed to timely present a valid administrative tort claim within two years of the alleged conduct in the complaint. 28 U.S.C. § 2401(b). Before Plaintiff may pursue an action under the Case 5:22-cv-01700-JWH-SP Document 22 Filed 12/29/22 Page 16 of 19 Page ID #:948 FTCA, he must first have filed an administrative claim within two years of the date his claim accrued and have received a final determination of that claim from the SEC. 28 U.S.C. §§ 2401(b), 2675(a). Under the FTCA, "a tort claim accrues at the time of the plaintiff's injury"

Exhibit ONE

You simply cannot make an argument that this is just bad lawyering and not part of a long and countless string of unethical and illegal efforts by the Defense Counsel and the U.S. Attorneys to deny the plaintiff his right to a fair trial.

We all agree "a tort claim accrues at the time of the plaintiff's injury." In two previous cases and in this case, Plaintiff has made it clear that it was impossible to determine any injury at all until the bankruptcy court allowed the Puerto Rico Electric Utility to cancel or void the plaintiffs contract for the twenty-megawatt solar power plant. That did not happen until the August 8th, 2022.

Defense Counsel claims Plaintiff failed to timely present a valid administrative tort claim within two years of the alleged conduct in the complaint. Once again, this cannot possibly be attributed to bad lawyering, it was an intentional false claim.

These crimes have been going on since 2010 and continue today. Even as recently as this year, the New York Bankruptcy Court is still arguing about and rejecting false financial filings that lack transparency and candor. The FOMB is still active and shaping new arguments based on new evidence. Statute of limitations laws are clear on this argument;

Discovery Rule:

"Under the discovery rule, the statute of limitations begins to run from the time the plaintiff discovers or reasonably should have discovered the injury or the basis for the claim. This rule is often applied in cases where the injury or harm is not immediately apparent."

"Continuous Violations: For claims involving ongoing or continuous violations, the statute of limitations may be tolled until the violation ceases."

"Fraud or Concealment: If the defendant fraudulently conceals facts relevant to the claim, the statute of limitations may be tolled until the plaintiff discovers, or with reasonable diligence, should have discovered the fraud."

Is it reasonable to assume that the four U.S. Attorney's that submitted this document do not understand Statute of Limitations Rules, that they all failed to read docketed claims in the previous cases. Or is it reasonable to assume these

Exhibit ONE

four attorneys do not know that the Puerto Rico Bankruptcy litigation is on-going and that the FOMB committee is still active?

Or, is it likely that this false claim was one of many knowingly false claims submitted to the court to disenfranchise the plaintiff of his constitutional rights to a fair trial. The evidence that the U.S Attorneys knew this claim was false prior to making the claim is compelling and comprehensive.

Once again, making this claim created a duty of candor and disclosure that the Defense team failed to meet. Is it reasonable to just assume bad lawyering by four U.S. Attorneys or would it be more reasonable to assume this was done to mislead the court into dismissing the case.

If a simple pro se plaintiff who lacks any legal training or legal experience understood the statute of limitations issue associated with this motion, is it reasonable to assume the four U.S. Attorneys did not?

Defense Counsel asserted that the misrepresentation and deceit exception bars Plaintiff's fraud claim

The Defense Counsel claims "Another exception to the FTCA's limited waiver of sovereign immunity is the bar on "[a]ny claim arising out of . . . misrepresentation [or] deceit. . ." 28 U.S.C. § 2680(h).

Under this exception, "claims against the United States for fraud or misrepresentation by a federal officer are absolutely barred"

This is a surprising claim for the Defense Counsel to make. The court can likely find some reference to these terms in the commentary within one the FTCA filings or a court complaint, however the Plaintiff is not suing for any actions related to misrepresentation or deceit. It is clear the plaintiff is claiming the SEC outside the scope of their authority and those actions led to the plaintiff's losses.

But there is a bigger argument here for the court. If the evidence indicates that the SEC likely did outside any reasonable standards based on the agencies mandate and the employees "scope of employment", does the FTCA exception apply at all? The FTCA is very clear in that it can only address authorized and legal activities of government agencies and employees. You will find similar limitations to the use of the DAE later in this document and the Westfall Act.

Exhibit ONE

Defense Counsel and his three peers are all aware of the evidence, especially the FOIA email where a treasury department employee and a senior SEC employee acknowledge that certain bonds are fraudulent but allow them to be issued. Everyone in this litigation knows about the H.R. 1049 Report and the FOMB Investigative Report, all of which confirm illegal activity. If the Defense Counsel remained silent on this assertion, there would be no argument about what evidence he had in his possession and what he knew while he was claiming this exception, but once he claimed this, he had a duty of candor and disclosure to the court. The Defense Counsel failed in those duties and created a due process violation in the process.

The four U.S. Attorney's that submitted this document have extensive experience in identifying illegal activity. They were in possession of a confession, a government report detailing the crimes, internal emails describing the crimes with SEC employees then possibly participating in the crimes by allowing the bonds to be issued. Yet, they made a claim to the court to dismiss this case, a claim that required an absence of illegal activity to be viable. Again, are they bad lawyers or is this part of a wide-ranging effort to deny the plaintiff his civil right to a fair trial?

The discretionary function exception bars Plaintiff's claims

The Defendant has wrongfully relied on the Discretionary Authority Exemption, claiming that their actions fall within the scope of permissible discretion. However, such reliance is misplaced, as the Defendant's actions exceeded the reasonable bounds of discretion and amounted to an abuse of authority.

Discretionary Authority is not absolute. It is a sliding scale where jurors and judges need to render an opinion on whether the use of that authority was abused. If a police officer were to see a man or woman jaywalking and were to give them a warning rather than a ticket, most Americans would consider that a reasonable use of "discretionary authority." But what if an FBI agent ran into a multi-state serial killer and refused to arrest that person and what if the U.S. Attorney General refused to prosecute that person. In this extreme case, most Americans would consider that an abuse of the "discretionary authority exemption" entrusted to them. Reasonable people can agree there are boundaries to the government's use of discretion. The following case law examples make it clear that the SEC exceeded its DAE authority.

Exhibit ONE

Harlow v. Fitzgerald, 457 U.S. 800 (1982)

Discretionary immunity applies unless a plaintiff can show that a reasonable person in the official's position would have known that the action was illegal or beyond the scope of that official's legal authority. Harlow v. Fitzgerald, 457 U.S. 800 (1982).

Would a reasonable person repeatedly allow the issuance of knowingly fraudulent bonds that would ultimately result in the largest municipal bankruptcy in American history?

Myers & Myers, Inc. v. United States Postal Service

Here the appellants' argument is that the Postal Service has acted in contravention of its own regulations, if not unconstitutionally, in denying appellants a hearing prior to debarment from government contracting. It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.

Are SEC employees allowed to let entities issue fraudulent bonds?

A motion to dismiss was similarly denied in Cruikshank v. United States

The district court reasoned: if this country has learned nothing else in the past decade, it has learned that no man, nor any man acting on behalf of our government, is above the law. The Government should not have the "discretion" to commit illegal acts whenever it pleases. In this area, there should be no policy option.

Avery, Myers, and Hatahley

Relying on Avery, Myers, and Hatahley in its decision granting judgment to the plaintiffs, the court in Birnbaum u. The United States concluded: The decision to conduct an intelligence operation by methods which violate the Constitution of the United States and which also probably violate several federal statutes is not discretionary. There is no discretion under our system to conceive, plan and execute an illegal program.

From 2012 through 2020, the SEC failed to prevent the issuance of knowingly fraudulent bonds.  They hid that information from the public because the

Exhibit ONE

Congress could never have passed the PROMESA legislation if the public had known about these crimes. This ten-year effort has all the hallmarks of an "illegal program." Illegal programs are not allowed under the DAE.

———————

Under the analysis of these cases, the discretionary function exception does not apply unless a decision both meets the planning level-operational level test or a variant and does not violate any regulation, statute, or constitutional provision. Discretionary immunity, then, would automatically be waived whenever a government decision violated the law.

The Defense Counsel and his three peers were all aware of the illegal activity and if they remained silent on this claim or we would not be discussing their lack of candor and disclosure on this matter. The Defense Counsel is making this claim when he (they) knew SEC employees were knowingly allowing fraudulent bonds to be issued. That there was a confession of the crimes that the SEC failed to act on and much more. Any reasonable argument that SEC employees were acting within their job responsibilities and authority would very clearly fail. The Defense Counsel must have known this when he made the DAE assertion to the court. Was this bad lawyering or part of a larger effort to deny the plaintiff a fair trial?

The Defendant, in their actions, has violated the Plaintiff's due process and civil rights guaranteed by the fifth amendment, sixth amendment, the fourteenth amendment, the defense counsel violated federal rules of civil procedure and the professional rules of conduct by the California State Bar Association. The defendant's conduct was arbitrary, capricious, and lacked any reasonable justification.

This action is duplicative of Plaintiff's claims in the related actions

With this argument the plaintiff is simply trying to bypass any fresh look at this case. Through the Defense Counsel's lack of candor, misrepresentations, false statements, and perjury he successfully got two previous cases dismissed and if his luck holds, he hopes it will happen again.

Unfortunately, there are similarities about the cases but there are significant differences in the plaintiff's complaints, defendants, cause of action, due process violations, civil rights violations and much more.

Exhibit ONE

One lawsuit was against a single individual Gary Gensler, one lawsuit was mistakenly filed against the SEC when it should have been filed against the United States Government. The cause of actions and evidence are different in each case. Yes, the lawsuits share some similarities but they different in many aspects.

Given all the new disclosures of evidence it would be unreasonable to argue that case 5:22-cv-01700-JWh-SP is not a much more material piece of litigation then the previously related cases.  There are significant constitutional questions and due process concerns that were absent in the previous cases that must be considered. The absence of this evidence in previous cases and the earlier filing relates not exclusively but in large part to the defense counsels lack of candor and disclosure about what they knew while they were making these decisions.

It would be reasonable to assume that if the court and the plaintiff were told up-front what evidence the SEC had had in their possession for years, any argument about reasonableness would be harder to defend.

—

This evidence submission is the second is what will likely be a larger pool of due process and civil rights violation claims.  I ask the court to consider the following;

The Defendant, in their actions, has violated the Plaintiff's rights to due process as guaranteed by the fifth amendment, sixth amendment, the fourteenth amendment, the federal rules of civil procedure and the professional rules of conduct by the California State Bar Association. The Defendant's conduct was arbitrary, capricious, and lacked any reasonable justification.

Fifth Amendment

The Fifth Amendment creates several rights relevant to both criminal and civil legal proceedings. In criminal cases, the Fifth Amendment guarantees the right to a grand jury, forbids "double jeopardy," and protects against self-incrimination. It also requires that "due process of law" be part of any proceeding that denies a citizen "life, liberty or property" and requires the government to compensate citizens when it takes private property for public use.

Sixth Amendment

*Exhibit ONE*

The Sixth Amendment guarantees the rights of criminal defendants, including the right to a public trial without unnecessary delay, the right to a lawyer, the right to an impartial jury, and the right to know who your accusers are and the nature of the charges and evidence against you. It has been most visibly tested in a series of cases involving terrorism, but much more often figures in cases that involve (for example) jury selection or the protection of witnesses, including victims of sex crimes as well as witnesses in need of protection from retaliation.

Fourteenth Amendment

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Federal Rules of Civil Procedure

Rule 8. General Rules of Pleading – (e) Construing Pleadings. Pleadings must be construed so as to do justice

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

Rule 11. (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) Sanctions. (1) In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

Exhibit ONE

Professional Conduct of the State Bar of California

Rule 3.3 Candor Toward the Tribunal*

(a) A lawyer shall not:

(1) knowingly make a false statement of fact or law to a tribunal* or fail to correct a false statement

of material fact or law previously made to the tribunal* by the lawyer;

(2) fail to disclose to the tribunal* legal authority in the controlling jurisdiction known* to the

lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel,

or knowingly misquote to a tribunal* the language of a book, statute, decision or other

authority; or (3) offer evidence that the lawyer knows* to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence, and the lawyer comes to know* of its

falsity, the lawyer shall take reasonable* remedial measures, including, if necessary, disclosure

to the tribunal,* unless disclosure is prohibited by Business and Professions Code section 6068,

subdivision (e) and rule 1.6. A lawyer may refuse to offer evidence, other than the testimony of

a defendant in a criminal matter, that the lawyer reasonably believes* is false.

(b) A lawyer who represents a client in a proceeding before a tribunal* and who knows* that a person*

intends to engage, is engaging or has engaged in criminal or fraudulent* conduct related to the

proceeding shall take reasonable* remedial measures to the extent permitted by Business and

Exhibit ONE

Profession Rule 3.4 Fairness to Opposing Party and Counsel

A lawyer shall not: (a) unlawfully obstruct another party's access to evidence, including a witness, or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person* to do any such act; (b) suppress any evidence that the lawyer or the lawyer's client has a legal obligation to reveal or to produce; (c) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;s Code section 6068, subdivision (e) and rule 1.6.

Rule 4.1 Truthfulness in Statements to Others

In the course of representing a client a lawyer shall not knowingly:* (a) make a false statement of material fact or law to a third person;* or (b) fail to disclose a material fact to a third person* when disclosure is necessary to avoid assisting a criminal or fraudulent* act by a client, unless disclosure is prohibited by Business and Professions.

Rule 8.4 Misconduct

It is professional misconduct for a lawyer to:

(a) violate these rules or the State Bar Act, knowingly* assist, solicit, or induce another to do so, or do so

through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a

lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud,* deceit, or reckless or intentional misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) state or imply an ability to influence improperly a government agency or official, or to achieve results

by means that violate these rules, the State Bar Act, or other law; or

Exhibit ONE

(f) knowingly* assist, solicit, or induce a judge or judicial officer in conduct that is a violation of an

applicable code of judicial ethics or code of judicial conduct, or other law. For purposes of this rule,

"judge" and "judicial officer" have the same meaning as in rule 3.5(c)

How Due Process Violation's Become Civil Rights Violations

Withholding Evidence: If evidence is intentionally concealed or withheld by a government official or law enforcement agency in a manner that violates a person's right to due process, it can be considered a civil rights violation. This is because due process guarantees individuals the right to a fair and impartial trial, which includes access to all relevant evidence. If evidence is improperly suppressed, it may infringe upon the accused person's ability to defend themselves and undermine their right to a fair trial.

Perjury: Perjury refers to knowingly making false statements under oath. While perjury itself is a serious offense, it does not directly constitute a civil rights violation. However, if perjury is committed by a government official or law enforcement officer as part of a deliberate effort to violate an individual's civil rights, such as providing false testimony to secure an unjust conviction based on discriminatory motives, it may contribute to a civil rights violation.

In summary, withholding evidence and perjury can play a role in civil rights violations if they are carried out in a manner that deprives individuals of their right to due process, equal protection, or fair treatment under the law.

In this litigation both the Defense Counsel (DOJ) and the Defendant (SEC) are law enforcement agencies. One due process violation may be insufficient to rise to the standard for it to be considered a civil rights violation but dozens of serious violations leave little doubt that both the defendant and their defense counsel intended to use any means possible to deny a fair trial to the plaintiff(s). Both the defense counsel and the plaintiff were sent a request by the plaintiff and a copy of that email was sent to Court Chambers reminding the defendant and defense

Exhibit ONE

counsel of their obligation to correct earlier false and misleading submissions to this court. That request was ignored.

Case Law Examples

United States v. Bagley (1985): Although this case originated in a criminal context, it established the standard for evaluating the withholding of evidence by the government. The Supreme Court held that the prosecution has a duty to disclose evidence that is favorable to the accused and material to guilt or punishment. Failure to disclose such evidence violates the accused's due process rights.

Hynix Semiconductor Inc. v. Rambus Inc. (2006): This case involved a civil dispute regarding patent infringement. The court held that a party's failure to produce documents or disclose relevant evidence can lead to adverse inferences against that party. In other words, the court may draw a negative inference from the failure to produce evidence and treat it as unfavorable to the party withholding it.

United States v. City of New York (2013): This case involved a civil trial against the City of New York alleging discriminatory hiring practices. During the trial, it was discovered that a high-ranking city official had provided false testimony. The court found that the false testimony undermined the integrity of the trial and ordered a new trial on liability issues.

Williams v. City of Antioch (2005): In this civil rights lawsuit, the court found that a police officer had committed perjury during his testimony. The court concluded that the perjured testimony had a significant impact on the jury's decision and ordered a new trial.

Santiago v. City of Philadelphia (2017): This civil rights case involved allegations of police misconduct. During the trial, it was revealed that several police officers had provided false testimony. The court held that the officers' false testimony undermined the fairness of the trial and granted a new trial on liability issues.

The SEC and DOJ are both Law Enforcement Agencies.

**Plaintiff would like to reserve the right to add additional due process violations/civil rights violations to this litigation at a future date.**

Exhibt ONE

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter an order or Judgment against Defendants including the following:

A. Damages in the amount of Plaintiff's investment in Commercial Solar Power, Inc. and future income and capital gains he would have received pursuant to the Power Purchase and Operating Agreement with PREPA for forty-five million dollars;

B. Actual damages, statutory damages, punitive or treble damages, and such other relief as provided under law and the statutes cited herein;

Plaintiff is specifically asking the court for immediate compensatory damages related to the Civil Rights violations and punitive damages on par with the size of this seventy-five-billion-dollar criminal scheme which caused the death of thousands of people. Plaintiff prays the court will strongly consider the law enforcement status of the defense counsel and the defendant and send a clear and undeniable message in accessing the punitive damages.

C. Pre-judgment and post-judgment Interest on such monetary relief;

D. Other appropriate injunctive or declaratory relief;

F.  All other relief to which Plaintiff may be entitled at law or in equity.

Original Complaint

Plaintiff, Richard Lawless is alleging that the United States Government through acts of

Intentional negligence while seeking to aid and abet in on-going crimes contributed

directly to Plaintiffs financial losses. And although this is not a cause of action for this

lawsuit, the United States Government acted as an accessory after the fact to hide and

mislead the victims of these crimes. Plaintiff is seeking damages of forty-five million

Exhibit ONE

dollars for his personal losses.

Plaintiff is alleging that the Department of Justice and the Securities and Exchange

Commission participated in a "protection racket" and in doing so, hid critical

information from the American public while the leadership of the DOJ and SEC

prevented the rank and file from investigating and prosecuting these crimes.
These

actions allowed that "protection" to be passed into law by the Congress, the
Senate and

the Administration. Without the coordinated participation of the DOJ and SEC,
these

crimes would not have been possible.

Plaintiff was the founder and CEO of Commercial Solar Power, Inc (CSP). CSP
secured a

contract with the Puerto Rico Electric Power Authority (PREPA) to engineer and
build a

twenty-megawatt solar power plant for the utility. The fraud allowed the utility to

reflect strong credit worthiness with credit ratings of BBB+. When Puerto Rico

defaulted on their bonds and moved for bankruptcy protection the project
stopped

moving forward. These actions caused CSP to cease active operations. CSP is

represented by legal counsel in the Puerto Rico bankruptcy hearings. CSP has an
active

claim in the bankruptcy case for one hundred and sixty million dollars, the
corporate

damages.

Exhibit ONE

The Plaintiff personal losses of forty-five million dollars are seeking to be recovered in

this legal action. The bond default and PROMESA legislation has caused the Plaintiff to

became indigent. The Plaintiff lost his home, his retirement savings, his savings, savings

for his children's college expenses and left him unable to pay the personal loan

guarantees needed to build the project. Plaintiff had to file bankruptcy.

In seeking legal representation on a contingency basis, the smaller law firms could not

afford to take on this case and the larger law firms feared retaliation by the federal

government that could put as much as one-third of their revenue at risk. That is why

the Plaintiff is representing himself in this lawsuit. Because of the passage of the

PROMESA legislation and the slow grind of the bankruptcy court cases regarding Puerto

Rico, the Plaintiff did not have any idea what his actual losses might look like until very

recently.

Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 2 of 8 Page ID #:2

The legislation known as PROMESA, prevented and delayed lawsuits from victims of a

Exhibit ONE

decades long, seventy-four-billion-dollar Ponzi Scheme. Huge amounts of money, Jobs

and stock options, changed hands between members of the DOJ leadership team,

members of the SEC leadership team and important senior Senators. If the American

people were informed about these now "undisputed crimes" that legislation could not

have been passed and the protection money from major Wall Street banks, Investment

banks and their law firms would not have been paid. These payments are all tracked

through the Federal Election Commission (FEC).


Plaintiff filed a FTCA against the Securities and Exchange Commission. The FTCA claim

was denied and Plaintiff filed suit in Federal District Court against the Securities and

Exchange Commission. Federal District case 5:21-cv-02174-JWH. The lawsuit was

dismissed, In part, because the Plaintiff failed to name the United States Government as

the Defendant. This filing seeks to correct that legal failing.


In the earlier dismissed case, the Defense Counsel withheld critical evidence from the

court and based on that evidence, misled the Judge and the Plaintiff by making

knowingly false claims to both parties. The evidence was material and would likely have

Exhibit ONE

changed the judge's verdict in the case. The document that was withheld was the

Puerto Rico House of Representatives document known as H.R. 1049. In that document

the Puerto Rico Government admits to running a Ponzi Scheme, received sworn

testimony from municipal executives that the banks were aware of the Ponzi Scheme

but participated anyway and the Bond Rating Agencies knew them to be technically

bankrupt but issued good credit ratings anyway. The document requested help from

the DOJ and the SEC to investigate and prosecute those responsible. That document

was delivered to the United States Attorney General and the SEC on June 30th, 2015.

Below is a sample of some of the admissions made by the government of Puerto Rico in

this document;

"PREPA's current economic insolvency was the product of, among other factors,

negligent acts on the part of its creditors, who despite knowing that PREPA's financial

and competitive situation was weak, and knowing that its infrastructure was obsolete,

they negligently granted PREPA a good credit rating; disregarding that by 2010, PREPA

was technically bankrupt."

"This Commission realized that PREPA paid previous bondholders with capital received

Exhibit ONE

from new investors, to the point that owed interests were capitalized and re-grouped

whenever a new debt was issued."

"Investors allowed PREPA to issue bonds, then, PREPA borrowed from private banks to

pay the bond's interests; then, borrowed from the Government Development Bank (from

Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 3 of 8 Page ID #:3

herein "GDB") to pay back the private bank loans, and the GDB, in turn, issued more

bonds to refinance all. Afterwards, PREPA would issue a new debt to pay GDB's

outstanding interests, pay principal and pre-pay the new bonds' interests for several

years -a cycle that is repeated over and over- and in which the original debt is never

paid."

"This practice could constitute a fraud scheme for which the federal agencies that

regulate financial instruments and the Security Exchange Commission could take action

against and/or pursue civil suits against these institutions. That is the reason why we P a

g e | 18 are referring this Report and its findings to those entities, so that they may

assume the appropriate jurisdiction over these acts."

"That this Report be forwarded to the Justice Department of the Commonwealth of

Exhibit ONE

Puerto Rico and the United States of America for their corresponding actions;"

It is undeniable that the DOJ and the SEC were fully aware of these crimes since June of

2015 and acted as a fully informed participant in the cover-up that was required for the

PROMESA legislation. This conflict should dictate the removal of the DOJ as Defense

Counsel.

In the earlier case, the Defense Counsel (DOJ) claimed the Plaintiffs allegations to be

farfetched, nonsensical, and impossible to prove, knowing all along that they were lying

to the court and the plaintiff. Both the SEC and the Defense Counsel withheld this

critical information from the court in case #2174 and other related cases, making near

identical claims to the courts. Clearly showing coordination to the point of committing

near identical acts of perjury in numerous court cases.

The illegal actions by the SEC and the DOJ creates any number of possible procedural

and legal defenses that the DOJ and SEC are now likely to claim. If those defenses are a

direct result of the withheld evidence, the perjury, and the misleading statements that

contributed to the earlier case dismissal, they should not be allowed. The government

*Exhibit ONE*

cannot engage in illegal activity to create grounds to deny the Plaintiffs right to a jury

trial and legal recourse for the taking of their property protected under both the fourth

and seventh amendments.


This is a unique case in which the government will be filing for pre-trial dismissal

because the Plaintiff believes that the government cannot survive any further discovery.

In earlier cases, the court would not allow any discovery or witness testimony to defend

against these pre-trial motions. This filing seeks to correct those failings if the court

deems the Defense Counsels pre-trial dismissal requests to be credible.


Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 4 of 8 Page ID #:4


In earlier cases the court claimed documents received through Freedom of Information

requests that indicate strongly that the SEC knew about these crimes as early as 2012

and had over one million pages of internal documents related to these crimes, as flawed

or nonsensical evidence. With these new discoveries this filing seeks to have the court

recognize these government documents as credible evidence.

Exhibit ONE

In a related FOIA case (5:21-cv-01637-JWH), Judge W. Holcomb, at the request of the

Plaintiff, took on the role of Special Master and ordered the unredacted FOIA

documents that were either completely withheld or heavily redacted. These new

discoveries by the court will likely have a material impact in this case. Leaving no

question that we are looking at some coordinated criminal activity by the federal

government.

In earlier cases the court deemed the Plaintiffs acknowledged role as a formal SEC

Whistleblower with the SEC of little to no value regarding his allegations. This filing

seeks to correct that failing.

In the earlier case, a videotape PowerPoint presentation made by the Plaintiff to the

SEC, DOJ, Treasury Department, and the Federal Reserve Bank was seen as more

nonsensible evidence by the court and or little value. Document 1049 now confirms that

the 2016 video presentation was fully supported by the claims in the withheld House of

Representatives document 1049. This filing seeks to have the court recognize that video

as material evidence in this case.

In the earlier case the court deemed the relationships between the criminals and the

??

Exhibit ONE

Chairmen of the SEC and the U.S. Attorney's in the Southern District Office as more

nonsense. Evidence was provided that showed these parties failed to act on the crimes

and then went to work for firms directly tied to the crimes when they left their

positions. This filing seeks to correct that failing.

In earlier cases, the Plaintiff pointed out repeatedly that Senator Chuck Schumer

appointed all these key individuals and received more money from the criminal

participants then any politician in the history of this country, including any Presidential

candidates. Indicating that Senator Schumer played a leading role in this racketeering.

Again, the court initially saw this as nonsensical and this filing seeks to correct that mistake.

In earlier cases, the court did not appear to believe the Plaintiffs claim that the CIA

captured ten years of recorded conversations coming out of Puerto Rico identifying

payoffs to Politicians and DOJ Officials to prevent investigations and prosecutions

related to these crimes. A FOIA document where the CIA claimed Executive Privilege

Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 5 of 8 Page ID #:5

and newspaper articles written in the first person where at least two newspaper editors

Exhibit ONE

and the Plaintiff were able to verify the existence of these recordings were considered

garbage evidence. This filing seeks to correct that failing.

The Plaintiff interviewed President Trump in 2016 in preparation for his up-coming book

Capitol Hills Criminal Underground. In the twitter interview the President claimed he

could do nothing about the Puerto Rico bond fraud because "everyone was involved."

That twitter quote appears in the Plaintiffs book. When submitted as evidence, it was

also considered non-sense by the court. This filing seeks to correct that failing.

The Plaintiff had twenty-eight years of experience as a Senior and Executive Corporate

Banker involved with Commercial Lending. He worked for Wells Fargo Bank for eighteen

years. Wells Fargo Bank is a criminal participate in these crimes. Lending millions or

tens of millions of dollars to business entities, municipal entities and others involves

extensive forensic accounting skills as well as the ability to buy and sell bonds. It was

these skills along with the Plaintiffs Master's Degree in Business and Finance that made

the Plaintiff a valued whistleblower for the SEC. All of this was ignored by the court and

Exhibit ONE

this filing seeks to correct that failing.

Defense Counsel will argue discretionary authority. However, it will be obvious to the

court that the discretionary authority exemption only applies to legal activities within

the scope of the SEC's mandates. Clearly, withholding key evidence, perjury and

intentional false statements made to the courts far exceed anything allowed under the

discretionary authority exemption. This is now a case about criminal activity engaged in

by the SEC and their Defense Counsel.


The evidence in this case is overwhelming, over one million pages of internal

government documents, a clear audit trail of the legal and illegal payments for this

protection provided by the Federal Election Commission, a videotape detailing some of

the crimes prepared with the help of the SEC and DOJ prior to the protection payments,

a book, Capitol Hills Criminal Underground that acts as a daily diary of the new

discoveries regarding the crimes and the payoffs, witness testimony from SEC and DOJ

employees and three government reports confirming the crimes. Yet, in some

inexplicable way the courts deemed all this nonsense in earlier cases. This filing seeks to

correct all that.


Attached as part of this initial litigation is the following evidence;

Exhibit ONE

Evidence Exhibit One: Puerto Rico House of Representative Report 1049

Evidence Exhibit Two: FOMB final Investigative Report

Evidence Exhibit Three: Forbes Article and 189,000 Page FOIA Response

Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 6 of 8 Page ID #:6

Evidence Exhibit Four: YouTube Link for Sixty Minute Power Point Presentation

Evidence Exhibit Five: Thirteen Minute Video Describing Plaintiffs Company, CSP

Evidence Exhibit Six: Copy of the book, Capitol Hills Criminal Underground

Evidence Exhibit Seven: FOIA Searches Reflecting Over One Million Pages of Documents

Evidence Exhibit Eight: CIA Recorded Telephone Calls of DOJ Payoffs

Proof of Service

Case No. CV-01700-JWH-SP

I am over the age of 18 years and not a party to this action. My address is:

30279 Redding Avenue, Murrieta, CA 92563, Telephone No. (951) 440-5230

On July 25, 2023, I caused to be served the document entitled Motion to Amend Plaintiff's Complaint. This response was sent to Paul B. Green, Assistant United States Attorney.

☐ OFFICE MAIL: By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

Exhibit ONE

☐ PERSONAL DEPOSIT IN MAIL: By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ EXPRESS U.S. MAIL: Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ HAND DELIVERY: I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☒ UNITED PARCEL SERVICE: By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which

deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Buffalo, New York.

☐ ELECTRONIC MAIL: By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☐ E-FILING: By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ FAX: By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 25, 2023 /s/ Vicki Medlen

Exhibit ONE

CC:   Federal Tort Claims Act Section
       Torts Branch, Civil Division
       U.S. Department of Justice
       P.O. Box 888
       Benjamin Franklin Station
       Washington, DC 20044

No. 23-3382

No. 23-90161 (Related Judicial Misconduct Investigation)

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

*RICHARD R. LAWLESS,*

*Plaintiff-Appellant,*

*v.*

*UNITED STATES OF AMERICA,*

*Defendant-Appellee.*

*Original Appeol from the United States District Caurt*

*Central District of California*

*No. 5:22-cv-01700 JWH (SP)*

**FINDINGS FROM THE JUDICIAL MISCONDUCT COMMITTEE**

RICHARD R. Lawless
Pro Se Plaintiff
30279 Redding Avenue
Murrieta, CA 92563
951-440-5230
richardrlawless@gmail.com

1   The pro se Plaintiff certifies that the following is the information required by
2   Circuit Rule 27-2:
3
4       **1) Telephone numbers and addresses of the attorneys for the parties**
5
6       E. MARTIN ESTRADA
7       United States Attorney
8       DAVID M. HARRIS
9       Assistant United States Attorney
10      Chief, Civil Division
11      PAUL B. GREEN
12      Assistant United States Attorney
13      Federal Building
14      300 N. Los Angeles Street, Suite 7516
15      Los Angeles, California 90012
16      Telephone: (213) 894-0805
17      E-mail: Paul.Green@usdoj.gov
18
19      Alexandra Verdi
20      verdim@sec.gov
21      U.S. Securities and Exchange Commission
22      100 F Street, NE
23      Washington, D.C. 20549-9613
24      Tel: 202-551-S057
25      Fax: 202-772-9263
26
27                              **Findings**
28
29                      **Attorney Misconduct**
30
31      On December 29, 2022 (Docket Item 22) was submitted to the Federal
32      District Court in Case 5:22-cv-01700-JWH-SP.  This motion to dismiss the
33      case was submitted by U.S. Attorney's acting as the Defense Counsel for the
34      Securities and Exchange Commission.

1
2    In the motion the Defendant claimed the following:
3        1. This action is duplicative of Plaintiff's claims in the related actions,
4           Lawless v. Securities and Exchange Commission, 5:22-cv-02174-JWH-
5           SP, and Lawless v. United States, 5:22-cv-00148-JWH-SP.
6        2. The discretionary function exception bars Plaintiff's claims;
7        3. The misrepresentation and deceit exception bars Plaintiff's fraud
8           claim;
9        4. Plaintiff's action is time barred;
10       5. Plaintiff lacks standing to bring his claims; and
11       6. The complaint fails to state a plausible claim.

12   What the Defendant and Defense Counsel failed to disclose to the court at the
13   same time includes the following, any one of which would destroy the credibility
14   of this motion:

15           1. In July of 2015 the Defendant themselves made the Plaintiff a
16              protected Dodd Frank Whistleblower and a committee for forty
17              SEC attorneys found his claims to be "specific, significant, and
18              credible. At this point the Plaintiff became a "protected Dodd
19              Frank whistleblower.
20           2. In August of 2015 a confession from the givernment of Puerto
21              Rico that their municipalities were running a Ponzi Scheme in
22              relation to these bonds was received by the DOJ and the SEC.
23           3. FOIA requests uncovered documents of a twenty plus page
24              conversation between a senior treasury official and a senior
25              SEC official where they agreed the bonds were fraudulent but
26              allowed them to be issued anyway.
27           4. In 2016 the Plaintiff received responses to his FOIA requests
28              reflecting that the SEC had over 185,000 pages of documents
29              dated from 2012 through 2015 that referred to the seventy-five
30              billion dollars in bonds as fraudulent.

31   If the Defendant or Defense Counsel disclosed any of this with their Motion to
32   Dismiss, it is very likely the motion would have been thrown out. Additionally in
33   filing for case 5:22-cv-02174-JWH-SP made it clear that a claim could not have

1  been made against the SEC until the damages were determined by the Plaintiff.

2  The New York Bankruptcy did not decline the Plaintiffs contract with the Puerto

3  Rico Electric Power Authority until the 3rd quarter of 2021. The Defendant and

4  Defense Counsel clearly knew and knowingly made the false claim that Plaintiffs

5  action was time barred.

6  The original case was filed against the SEC (Case 5:22-cv-02174-JWH-SP) and

7  dismissed because the pro se plaintiff should have filed it against the United

8  States of America. This case filing corrected that but the Defendant and Defense

9  Counsel make the unbelievable claim that this case is duplicative. First, they move

10  to dismiss case 5:220cv-000148-JWH-SP because Plaintiff sued the SEC and not

11  the United States and were successful on those grounds and now, they claim there

12  is no difference in whether the plaintiff named the SEC or the United States

13  because they are the same.

14  Plaintiff presented answers to counter all the claims made in this motion to

15  dismiss in document 55 on the docket, the "Amended Complaint" as well as in

16  other filings.

17  In an honest judicial system, the U.S. Attorney's and Defendant would have been

18  sanctioned but in the Federal District Courts, those rules only apply to victims of

19  these crimes who lack the political connections to receive a fair trial.

20  But the corruption does not stop there, the Federal District Judges are now part of

21  an on-going Judicial Misconduct Investigation because of their unbelievable

22  actions;

23                                  **Judicial Misconduct**

24  Beginning in 2012 the Securities and Exchange Commission (SEC) became aware

25  of a massive municipal Ponzi Scheme being run by the Puerto Rico municipal

26  entities. The SEC received more and more information about the crimes in 2013

27  through 2023. Surprisingly, the SEC allowed, in total, 75 billion dollars in

28  fraudulent bonds to be issued and traded. The money from the bonds was

29  redirected to pay earlier bond holders or stolen.

30  Because of the Ponzi Scheme and the theft of hundreds of millions of dollars, the

31  money identified for the maintenance and up-keep of the Puerto Rico Electric

32  never materialized. That caused the electric grid to fail repeatedly and for long

4

Exhibit Two

1   periods. According to studies from Harvard University and Washington University
2   up to six thousand people died because of the electrical blackouts.

3   This is a massive long running crime where the participants were also responsible
4   for thousands of deaths.

5   The plaintiff was building a project for the Puerto Rico Electric Power Company
6   from 2011 through 2016.  When Puerto Rico began to have trouble paying its bills,
7   the Plaintiff started an investigation that led to information about the Ponzi
8   Scheme, the theft of hundreds of millions of dollars and fraudulent financial
9   statements.

10   All the major Wall Street Banks were involved and, in the lead up to the 2016
11   elections the banks flooded Congress and the Senate with over $120,000,000 in
12   campaign contributions. In return, all government investigations and prosecutions
13   stopped.  Capitol Hill moved forward with PROMESA legislation that would delay
14   and eliminate all lawsuits and protect all the major banks.

15   Plaintiff started his investigations in 2014 and in August of 2015, filed a for Dodd-
16   Frank Whistleblower Complaint with the SEC.  The complaint was vetted by forty
17   SEC attorneys and was found to be "Specific, Significant and Credible."  A case was
18   opened by the SEC for the Plaintiff. The Plaintiff was assigned a SEC Investigative
19   attorney to work with and they exchange evidence and information for 13
20   months.  In September of 2016, the Wall Street Banks flooded Capitol Hill with
21   money and the SEC just simply ceased communicating with the Plaintiff.  At the
22   same time the SEC FOIA department, breaking all manner of FOIA rules stopped
23   effectively working with the Plaintiff.

24   Plaintiff filed a FOIA lawsuit in 2021 and that was followed several months later
25   with three additional lawsuits seeking damages from the SEC.

26   •   FOIA Lawsuit 5:21-cv-01637-JWH-SP   Lawless V SEC        9-28-21

27   •   5:21:cv-02174-JWH-SP                Lawless V SEC        12-20-21

28   •   5:22-cv-00148-JWH-SP                Lawless V. USA       1-25-22

29   •   5:22-cv-01700-JWH-SP                Lawless V USA        9-27-22

1  All cases were handled by the Federal District Court of Central California. In all
2  cases Judge Holcomb was the District Judge and Judge Pym was the Magistrate
3  Judge.

4  I believe the most helpful and robust case for the start of your investigation is case
5  5:22-cv-01700-JWH-SP. All four cases share the same profile of Judicial
6  malfeasance.

7  An appeal is being mailed in to the Ninth Circuit Court in Case 5:22-cv-01700-JWH-
8  SP on 10-30-23 and no case number has been assigned yet. I believe a copy of this
9  appeal would be helpful to you as well as a copy of docket #5S in case 5:22-cv-
10  01700.

11  ISSUE(S) PRESENTED

12  1.    Plaintiff believes that a material conflict of interest exists between The
13  Honorable Magistrate Judge Sherry Pym and the Plaintiff.

14  2.    This court and the same two Judges were assigned to this case and three
15  related cases. In all four cases a total of ten hearings were scheduled and nine of
16  those hearings were canceled. In the span of four Federal District Court cases, the
17  plaintiffs had ten minutes of the courts time in one zoom hearing. Plaintiff
18  believes he was denied his right to have his case heard.

19  3.    Throughout the four cases the Court repeatedly and inexplicably refused to
20  acknowledge the evidence and prevented the Plaintiff from questioning the
21  Judges.

22  4.    Plaintiff has good cause to believe that the Defense Counsel in all four cases
23  made knowingly false and misleading claims.

24  5.    Plaintiff believes there is overwhelming Evidence that Judges made legal
25  errors and mistakes of fact across all their rulings in all four cases seeking a pre-
26  determined desired outcome.

27  In case 5:22-cv-00148-JWH-SP, docket item 43, the court quashed President
28  Trumps pre-trial testimony in which he would have confirmed what he said to
29  Plaintiff in his book about these crimes, "Capitol Hills Criminal Underground."

Case 5:24-cv-00804-JWH-SP Document 1 Filed 04/16/24 Page 146 of 192 Page ID #:146
Case: 23-3382, 03/29/2024, DktEntry: 18.1, Page 7 of 8

Exhibit Two

1  The Judge also quashed pretrial testimony from Sue Curtin a SEC Investigative
2  Attorney (docket item 43).

3  Although the Plaintiff was a protected SEC Whistleblower the Judge allowed the
4  SEC to secured his google emails in case 5:21-cv-02174-JWH-5P (docket item 50).
5  In doing so the court allow the SEC to secure email discussions between the
6  Plaintiff and the former Assistant Director of the CIA, (REDACTED). The google
7  sweep also incorporated email discissions between the Plaintiff and (REDACTED),
8  a British Intelligence Officer. Possibly implicating both parties in whistleblowing
9  activities.

10  The evidence is where the Judges inexplicable behavior leaves everyone with the
11  feeling, they have become part of this political protection racket. Please look at
12  the following evidence; Case 5:22-cv-01700-JWH-SP

13  Evidence Exhibit Ten (docket item 9)

14  •  A 2016 Letter to the Chairman of the SEC sent by six Senators

15  •  The 25-page, 2015 Puerto Rico House of Representatives Report 1049, This
16  report admitted to the Ponzi Scheme, Misleading Financials, the theft of hundreds
17  of millions of dollars and requested the SEC and the DOJ help to investigation and
18  prosecute those responsible. The report was delivered to the SEC and DOJ and
19  hidden from the American people.

20  •  FOIA Request 22-00611, A 2012 Forbes Magazine article about a possible
21  Puerto Rico Municipal bond Ponzi Scheme generated 189,737 pages of internal
22  SEC discussions.

23  Evidence Exhibit 22 (docket item 11)

24  •  FOIA Requests #00619 & #00619.  2013 & 2014 discussions with major Wall
25  Street Banks.

26  Evidence Exhibit 23 (docket item 19)

27  •  FOIA Request #00617. A 2013, 22 -page email discussion between a senior
28  treasury official and a senior SEC official agree that a $650 million-dollar Puerto
29  Rico bond was no good. The SEC and the Treasury department allowed that bond
30  to be issued and traded. The bond defaulted two years later.

Case 5:24-cv-00804-JWH-SP Document 1 Filed 04/16/24 Page 147 of 192 Page ID #:147
Case: 23-3382, 03/29/2024, DktEntry: 16.1, Page 8 of 8

Exhibit Two

1   Unnumbered Evidence Exhibit (docket item 46)

2   •       This was a copy of the public study from Harvard

3   Evidence Exhibit 71 (docket item 83)

4   •       This document deals with the SEC's and Courts, Duty of Care, Motion to
5   Amend Complaint (docket item 55) and court records.

6   Evidence Exhibit 73 (docket Item 84)

7   •       2018 700-page Gov't Investigative Report that confirms the Plaintiffs
8   allegations regarding the crimes.

9   •       The 2015 SEC Whistleblower Filing (docket Item 55)

10  The Office of the Whistleblower was established to administer the SEC's
11  whistleblower program.

12  The SEC Office of Market Intelligence Vets Each Tip

13  At that point, the TCR is forwarded to the SEC's Office of Market Intelligence
14  (OMI), which has been described as a "point guard" for the entire agency.
15  Composed of more than 40 attorneys, former traders, accountants and other
16  experts, the OMI is responsible for gathering and analyzing all tips and complaints
17  received by the SEC. Most importantly, the OMI determines whether the tip is
18  sufficiently specific, significant, and credible to be referred to an investigative
19  team within the Division.

20  In this example, the SEC clearly found the Plaintiffs claims "specific, significant and
21  credible."

22  Respectfully Submitted

23  *Richard R. Lawless*

24

25
26
27

28

F I L E D
CLERK, U.S. DISTRICT COURT

8/1/23

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cla _____ DEPUTY

1 Richard R. Lawless
2 30279 Redding Avenue
3 Murrieta, CA 92563
4 951-440-5230
5 richardrlawless@gmail.com
6 Plaintiff
7
8

9 # United States District Court

10 ## For the Central District of California

11 ## Eastern Division

12

13 **RICHARD R. LAWLESS**              **No. 5:22-cv-01700-JWH-SP**
14 Plaintiff,

15                                     **NOTICE OF MOTION AND**
16                                     **MOTION FOR LEAVE TO AMEND**
17                                     **COMPLAINT TO CLARIFY AND**
18                                     **ADD CAUSES OF ACTION AND**
19                                     **MEMORANDUMS OF POINTS**
20                                     **AND AUTHORITIES IN SUPPORT**
21                                     **THEREOF**

22        V.

23

24 **UNITED STATES OF AMERICA**
25 _____
26 Defense Counsel                    **Date:**      **SEPTEMBER 8, 2023**
27 Paul B. Green – Assistant U.S. Attorney    **Time:**      **9:00 AM**
28 Federal Building, Suite 7516       **Courtroom:** **9D**
29 300 North Los Angeles Street       **Hon.**       **JOHN W. HOLCOMB**
30 Los Angeles, CA 90012
31 213-894-0805
32 Paul.green@usdoj.gov
33
34

1

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on September 8, 2023 or as soon thereafter as this matter can he heard by the Honorable Judge John W. Holcomb of the Federal District Court of Central California, the Plaintiff will move and hereby move for leave to amend Plaintiff's complaint to add Due Process Violations, Civil Rights Violations while seeking to clarify the failure of the SEC employees to act within the reasonable standards of their scope of employment and for the SEC's failure to act reasonably in executing it legal mandates as a Federal Agency.

This motion is based on the attached memorandum of points and authorities in support thereof, the declaration of Richard R. Lawless, in support thereof and all files and pleadings in this action.

Respectfully Submitted,

*Richard R. Lawless*

Richard R. Lawless
Pro se Plaintiff
30279 Redding Avenue
Murrieta, CA  92563
951-440-5230
richardrlawless@gmail.com

1       **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3       In this motion, Plaintiff seeks leave of the court to file a First Amended Complaint ("FAC") for the

4       purpose of clarifying existing causes of action and adding new causes of action.  Specifically, Plaintiff

5       seeks to add Due Process and Civil Rights violations.

6       This request will replace the pending Motion to Add Due Process Violations and to amend complaint,

7       docket item 32. Plaintiff attempted to comply with local rules and requested a conference with the

8       Defense Counsel regarding this motion and the request was ignored.

9       Plaintiff provides the following reasons in support of this request:

10      1.Discovery of New Evidence: After the filing of the original complaint, Plaintiff received crucial new

11      evidence, which supports Plaintiff's claims and belies statements made by counsel for the defense.  The

12      defense counsels intentional lack of candor and disclosure about what information the defendant had in

13      their possession while making these alleged decisions and court claims, was withheld from the court and

14      the plaintiff, making it difficult for plaintiff to argue the reasonableness of the SEC's decisions over the

15      past six to ten years.  This filing will clarity that our arguments relate to decisions made by the SEC and

16      their employees and it is supported by the fact that those decisions resulted in illegal and

17      unconstitutional criminal acts, including the death of thousands of people.  The plaintiff makes no

18      damages claims for the criminal acts but will simply use the criminal acts to support their claim that the

19      decisions were unreasonable.

20      Further, Defendant cannot rely on decisions claiming the policy of the SEC or any arm of the federal

21      government to protect their actions.  Policies that violate the law or create constitutional violations

22      cannot be allowed.

23      The U.S. Securities and Exchange Commission (SEC) cannot claim to allow the issuance of fraudulent

24      bonds as a matter of policy. The SEC is a federal regulatory agency responsible for protecting investors,

25      maintaining fair and efficient markets, and facilitating capital formation. Its primary goal is to ensure the

26      integrity of the securities market and prevent fraudulent activities.

27      The SEC's mission is to enforce federal securities laws, promote transparency and disclosure in the

28      financial markets, and provide protection to investors against fraudulent practices. Allowing the issuance

29      of fraudulent bonds would directly contradict the SEC's mandate and its commitment to investor

30      protection.

31      If the SEC were to knowingly permit fraudulent bonds to be issued, it would undermine the trust and

32      confidence in the U.S. securities markets and jeopardize the integrity of the financial system as a whole.

33      The SEC has a robust enforcement division that actively investigates and takes legal action against

34      individuals and entities engaged in fraudulent activities, including the issuance of fraudulent securities.

35      If the SEC were to allow the issuance of fraudulent securities as a matter of policy, it would violate

36      several laws and regulations under its purview. Here are some key laws and regulations that would be

37      contravened:

3

Securities Act of 1933: This law regulates the initial offering and sale of securities. It requires companies to provide full and accurate disclosure of material information to investors. Allowing the issuance of fraudulent securities would violate the requirement for truthful and complete disclosure.

Securities Exchange Act of 1934: This law governs the secondary trading of securities and the operations of securities exchanges. It prohibits fraudulent activities in connection with the purchase or sale of securities. Permitting fraudulent securities would directly contravene the anti-fraud provisions of this act.

Sarbanes-Oxley Act of 2002: This legislation was enacted in response to major corporate accounting scandals. It imposes stricter corporate governance and reporting requirements, including the establishment of internal controls and the accuracy of financial statements. Allowing fraudulent securities would undermine the integrity of financial reporting and corporate accountability mandated by this act.

Dodd-Frank Wall Street Reform and Consumer Protection Act: This law, passed in response to the 2008 financial crisis, includes provisions aimed at enhancing financial stability and investor protection. It prohibits deceptive practices in the financial markets and empowers the SEC to take enforcement actions against those engaging in fraudulent activities.

Investment Advisers Act of 1940: This act regulates investment advisers and requires them to act in the best interests of their clients. Permitting the issuance of fraudulent securities would contradict the fiduciary duty of investment advisers to act in the best interests of their clients.

The SEC's own rules and regulations: The SEC has promulgated various rules and regulations that govern the securities industry and promote fair and transparent markets. Allowing fraudulent securities would violate these rules, such as Regulation Fair Disclosure (Reg FD) and rules related to insider trading.

2.Clarification and Precision: Plaintiff seeks to clarify certain allegations and claims made in the original complaint to address any ambiguities or inconsistencies.  The amended complaint provides a clearer and more concise exposition of the matter at hand, which will aid in the efficient administration of justice.

3.Rectifying Procedural Deficiencies: Upon careful review of the original complaint, Plaintiff identified certain procedural deficiencies. Amending the complaint will allow Plaintiff to correct those deficiencies, bringing the complaint into compliance with relevant rules and regulations.

4.Avoidance of Prejudice: Granting permission to amend the complaint will not cause any undue prejudice to the Defendant. The amendment will be made well in advance of the trial date, providing ample time for the defendant to review and respond to the amended complaint. Moreover, allowing Plaintiff to amend the complaint will foster a fair and level playing field for both parties.

Good Cause exists to grant this motion under the extremely liberal standards of rule 15(a), see Fed. R. Civ. P. 15(a)(2), stating that leave to amend ("shall be freely given when justice so requires"); See also Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708,712 (9th Cir. 2001).  The allegations of the FAC, if proven, would render the defense-counsel argument for a discretionary function exception ("DFE") and for Westfall certification inapplicable, at the least.

Other factors considered by the courts when evaluating motions to amend under Rule 15(a) similarly militate in favor of permitting an amendment here. Plaintiff has acted cautiously in claiming material due

1   process and civil rights violations.  All the components necessary for such violations were present in

2   three earlier, related cases (5:21-cv-01637-JWH-SP, 5:21-cv-02174-JWH-SP, and 5:22-cv-00148-JWH-SP).

3   In those cases, and in this case, counsel for the defense has failed in his duty of candor, has knowingly

4   made false statements, and has withheld evidence when the Federal Civil Rules of Procedure and the

5   California Bar's Rules of Professional Conduct required its introduction.  These actions have prevented

6   Plaintiff from discerning the outlines and the implications of the acts and omissions of SEC employees in

7   an apparent attempt by counsel for the defense to mislead the court and deny Plaintiff a fair trial.

8   Plaintiff respectfully seeks leave from the court to amend the original complaint.

9

10                                **AMENDED COMPLAINT**

11

12                         I.  OVERVIEW

13

14   Plaintiff complains of all Defendants for their acts and omissions that resulted in or allowed financial

15   crimes that led to the Puerto Rico Electric Power Authority ("PREPA") financial crisis and default, and for

16   intentional negligence, professional negligence, negligence, fraudulent concealment under California

17   Law, due process violations, and civil rights violations. Plaintiff contends that given the Security and

18   Exchange Commission's legal mandate, its commissioners and employees cannot claim any policy-based

19   discretionary function authority ("DFA") for their acts and omissions.  Moreover, given that mandate,

20   Plaintiff contends Defendants acts and omissions cannot be deemed reasonable.  Drawing a metaphor

21   from relevant case, given a mandate to prune trees so that branches would not fall on the citizenry, and

22   given branches that Defendants knew were going to fall on the citizenry, Defendants opted to collect

23   compensation from the citizenry and watch as branches fell on millions of citizens, injuring citizens and

24   damaging their property.  each of whom Defendants had a duty to protect.   Plaintiff seeks forty-five

25   million dollars in damages under these claims as well as compensatory and punitive damages for civil

26   rights violations, for which federal law enforcement agencies should be held to the highest legal

27   standards.

28

29   The California claim of fraudulent concealment does differentiate between a criminal and a civil action

30   and does not require a "criminal act" to make it a cause of action.

31

32   1.       With indifference to the quality of life in Puerto Rico, to the costs to investors, and to the risks

33   that a Puerto Rico's weak infrastructure posed, Defendants were witness to a Ponzi scheme, which was

34   well underway by at least 2004.  By 2008 at the latest, Puerto Rico Electric Power Authority ("PREPA")

35   bonds were being issued despite debt-service coverage that was below the 1.20 minimum required by

36   law.  As new bonds were issued, fees and commissions were dispersed to participants, old bonds were

37   repaid, debt-service-coverage got worse, the island's infrastructure fell further into disrepair, and

38   Defendants continued to enjoy employment within the Securities and Exchange Commission and, often

39   thereafter, lucrative employment with Wall Street firms and firms that advise and/or defend such firms

40   on matters pertaining to SEC compliance.  In 2010, a year that saw PREPA's debt service coverage drop

41   below 1.0 (i.e. PREPA was technically insolvent), PREPA had eight separate bond issuances all of which

42   were underwritten and credit-rated with the intent to conceal PREPA's financial condition from investors

and from the public more generally, all under the supposedly watchful eye of the Securities and Exchange Commission (the "SEC"), which has regulatory and enforcement authority over bond issuance and trading.

2.      Aware that PREPA had investment-grade credit ratings rendered by Moody's, S&P, and Fitch, aware that PREPA's bonds were underwritten by the likes of Citigroup, J.P. Morgan, Morgan Stanley, Barclays Capital, B of A/Merrill Lynch. Goldman Sachs, UBS Financial Services, RBC Capital Markets, Wells Fargo Securities, Raymond James, Ramirez & Company, First Bank Puerto Rico Securities, Popular Securities, Santander Securities, BMO Capital Markets, Jefferies, Scotia MSD, Oriental Financial Securities, aware that the SEC had not taken any actions pertaining to PREPA bonds, but unaware that PREPA was technically insolvent, Plaintiff's company, Commercial Solar Power, Inc., purchased a project (a special purpose entity that had a Power Purchase and Operating Agreement with PREPA) to build a hardened (able to withstand hurricanes with winds in excess of those experienced during Hurricane Maria) 20-megawatt solar-power plant, the $80 million funding for which was dependent upon PREPA's credit rating.  PREPA's investment-grade credit ratings were reaffirmed in August 2013, when PREPA's Series 2013A Bonds hit the street, bringing in $673 million, ostensibly for capital improvements.

3.      But by November 2013, just three months after PREPA's Series 2013A bond offering, Commercial Solar Power's leadership began to hear ominous reports about Puerto Rico's credit ratings emanating from Wall Street.  Three months later, Puerto Rico's bond ratings began plummeting from investment grade to junk, and because funding for our solar project was dependent on Puerto Rico's credit rating, our funding sources backed away.  Despite the setback, the company persevered in the hope that PREPA and the Wall Street firms that were buying up Puerto Rico bonds from retail investors for 30 to 50 cents on the dollar (the "Ad Hoc Committee of Bondholders" or the "Ad Hoc Committee") would reach an agreement, such as the ones they publicly announced in August 2014, September 2015, May 2016, and April 2017, that PREPA's finances would stabilize, and the project could be financed and built.

4.      But without cash from the Ponzi scheme, the Commonwealth's finances rapidly deteriorated, receiving commensurately more and more attention in the press, causing the Puerto Rican legislature to act, which took the form of a House investigation into PREPA's bond issuances.  Public hearings, which began on May 12, 2015, included testimony by Mr. Luis Figueroa Baez, PREPA's director of finance, who testified that during the years 2004 through 2008 only 15% of the bond proceeds were used for capital improvement, and during the years 2009 through 2012 only 18% was used for capital improvements, "while the remainder was used to refinance the existing debt, capitalize interest, and issue advanced notes to pay future interest." Mr. Arturo Ondina, CPA, consulting partner of Ernst & Young … who has audited PREPA for the past twelve years" testified that by 2010, PREPA was technically bankrupt.  The testimony and the findings make clear that everyone on the inside, including officials at PREPA and "the financial intermediaries, underwriters, and others" on the Wall Street side knew about PREPA's financial condition "prior to the issuance of said debt," as did financial institutions that had bought large tranches of PREPA's debt.  On June 22, 2015, four days after the conclusion of the public hearings, Puerto Rico's Governor Alejandro Garcia Padilla announced that Puerto Rico could not pay its debts.  Two days later, the Puerto Rico House of Representatives released HR-1049, an investigative report on PREPA's finances, to the public and in August, 2015, forwarded copies on to the Department of Justice, the Securities and

1  Exchange Commission for their "corresponding action," apparently unaware that the DOJ and SEC had
2  known about the Puerto Rico bond fraud for years.
3
4  5.      Having completed his own investigation of PREPA bond issuances, which he had commenced in
5  December 2014, but unaware of the Puerto Rico House of Representatives' investigation, Plaintiff filed a
6  whistleblower claim with the SEC on July 30, 2015.  Plaintiff's claims were deemed creditable, and Susan
7  Curtin, an SEC investigator from the Boston office, was assigned to the case.  Plaintiff provided Curtin
8  with hundreds of pages of evidence in a collaboration that would continue for the next thirteen
9  months—until the press conference Plaintiff held at the Waldorf Astoria in New York City, on or about
10 September 18, 2016, a video of which can be seen at https://www.youtube.com/watch?v=Tysqoqf9B7I.
11 After Plaintiff's press conference, the SEC went dark, no longer communicating with Plaintiff or
12 responding to Plaintiff's emails or calls.
13
14 6.      In the months that followed Governor Padilla's announcement that PREPA could no longer pay
15 its debts, the Ad Hoc Committee of PREPA Bondholders tried unsuccessfully to resuscitate a deal with
16 PREPA, whereby they would discount the principal owed by PREPA by 15%.  But by December 2015, it
17 was being reported that the Ad Hoc Committee had become "disillusioned" with the [Puerto Rico]
18 Government apparently because the governor knew that from that point forward, Puerto Rico would be
19 going it alone, and for political reasons, he needed to show that he was not beholden to Wall Street.
20 Perpetual bond fraud requires the participation of Wall Street and the local municipality, but the local
21 municipality is  both the junior partner and the prey—a source of all the money that flows to Wall Street
22 —and when things fall apart, as they had in Detroit and now in Puerto Rico, the senior partner turn its
23 attention to absolving itself from any responsibility for the financial crisis, maintaining the public's faith
24 in the nation's financial institutions, and finding ways to position themselves for further profit at the
25 expense of the retail investors and of the citizens of Puerto Rico, more than 40 percent of whom live in
26 poverty, a condition exacerbated by an infrastructure that will not reliably support industry or
27 commerce.
28
29 7.      Given the quantum entanglement of Washington and Wall Street responding to the Puerto Rico
30 bond crisis required little in the way of coordination.  Ponzi schemes require investor confidence, and the
31 financial system as a whole requires the confidence of the people, so despite their law enforcement and
32 regulatory responsibilities, the FBI, DOJ, and SEC, did nothing to alert or otherwise protect the public as
33 the Treasury, which has responsibility for "protecting the integrity of the financial system" began
34 promoting federal legislation that would divert attention away from the Ponzi scheme and would ensure
35 that the innocent rather than the guilty paid.  That intent was made clear the opening testimony of
36 Antonio Weiss, Counselor to the Secretary of the Treasury Jack Lew (before taking the top job at the
37 Treasury, Lew was a Chief Operating Officer at Citigroup, reportedly the largest single issuer of Puerto
38 Rico Bonds) delivered to the Senate Banking Committee on October 22, 2015, at the outset of its
39 hearings on the Puerto Rico economic crisis.  Weiss began his testimony with a call to action as it relates
40 to the future, **"[o]n behalf of the U.S. Department of the Treasury and the Obama Administration, let
41 me be clear:  there is no substitute for legislative action "***and* concluded with a call to inaction as it
42 relates to the past*, "[t]here is plenty of blame to go around for the mistakes of the past.  But we must
43 now focus on the path forward.  Puerto Rico can and will emerge from the current crisis and return to
44 growth.  The fundamental question is when and at what cost to its residents and economy."*[10]

7

8.      The Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) was signed into law on June 30, 2016, and it lived up to at least part of its advance billing.  It shielded the Wall Street, Washington, and Puerto Rican participants from regulatory or criminal action and possible fines, but it did nothing to help the island with what Weiss called the "current crisis."  Two years after Weiss' testimony and a year and three months after PROMESA was signed into law, Hurricane Maria made landfall, devasting the island of Puerto Rico.  According to studies done by Harvard University, Hurricane Maria resulted in the deaths of as many as six thousand Puerto Rican Americans, principally as a result of the catastrophic failure of Puerto Rico's infrastructure.[1&2] In September 2022, Hurricane Fiona slammed into Puerto Rico's already-fragile electrical system again leaving millions without power and leaving more dead as a result of infrastructure failure.

9.      At some point, it became clear that the SEC had to have known about the PREPA Ponzi scheme all along.  The question became, how could we prove it?  As has often been the case when people know that they are above the law, some evidence was left in plain view.  While doing a search, we found that the financial press had been covering the problems with Puerto Rico bond issuances since at least March 8, 2012, when Cate Long, writing for Reuters, wrote an article for *MuniLand*, titled "Puerto Rico is America's Greece."  Long's article caused such an uproar, including a direct response from the governor of Puerto Rico, that Marc Prosser, a writer for Forbes Magazine, the world's leading business periodical, took note and wrote an article about the fracas for the magazine's March 31, 2012 issue.[9] In his Forbes article, Prosser does not use the term, "Ponzi Scheme," but he describes one:

> *"The [Puerto Rican] government needs to sell ever increasing amounts of debt both to finance an annual budget deficit and refinance maturing debt. So far, Puerto Rico has had no issues financing its debt. In fact, its bond issues are way oversubscribed. However, one of the reasons that investors have confidence to buy their debt is the belief that other people will be there to refinance the debt when it matures. If investor confidence begins to falter because a blogger puts doubt in their mind, the house of cards may collapse."*

Besides constituting a Ponzi Scheme, the practices that Prosser describes are problematic in at least five ways.  First, Puerto Rican law requires that bonds be paid out of revenue; second, it is unlawful for a Puerto Rico agency to issue bonds unless it is projected that the agency will have at least twenty percent more available cash from revenue than will be required to repay the bonds (in other words, the debt-service-coverage ration needs to be at least 1.20); third, raising money for infrastructure when its intended usage is repaying debt and financing "an annual budget deficit" is fraud in the inducement; fourth, those issuing bonds represent and warrant that the issuance is legal, and these issuances clearly were not; and fifth, underfunded infrastructures tend to fail and those failures always have foreseeable consequences.

Given the flagrant violations that Prosser described, we wanted to determine if it caught the attention of the Security and Exchange Commission, so we filed a Freedom of Information Act request for emails sent or received by SEC personnel during the months of April and May 2012 that include the name, "prosser." In their response, the SEC indicates that "prosser" (which is not a common name, not a word, and not the root of any word) appeared in 189,737 email pages during those two months, so many pages that the SEC said it would take years for the SEC to provide them.

Other articles about Puerto Rico bonds followed the Forbes piece.  On April 19, 2013, the BondBuyer, which is the leading bond-industry trade journal, published an article by Robert Slavin, titled "Puerto

1   Rico's Utilities: Big and on the Edge," in which he writes that the rating agency, Fitch, had calculated that
2   PREPA, which had eight billion dollars in bond obligations at the time, did not have enough funds
3   available to cover debt service in 2011-- that by 2011 PREPA was technically insolvent--and that the
4   Puerto Rico Aqueduct and Sewer ("PRASA"), which had almost five billion dollars in bond debt was in
5   even worse shape.  Slavin also pointed out that despite the billions of dollars in PRASA bonds that had
6   been sold, for capital improvements to the island's water and sewer systems, more than 62 percent of
7   the water produced by PRASA was unpaid for, mostly "due to physical losses in pipes and connections."
8   But he doesn't tell the rest of the story, which is that despite the billions of PREPA bonds that had been
9   sold, PREPA's power generating facilities and the Puerto Rico electrical grid as a whole were in similarly
10  deplorable condition.

11  Given the Cate Long article, the Marc Prosser article, and given the Robert Slavin article in which a credit-
12  rating agency is quoted as saying that PREPA is technically insolvent, any law-abiding citizen would likely
13  conclude that the Ponzi scheme had run its course, but it hadn't.  Puerto Rico needed more cash and
14  Wall Street thought that retail investor confidence was still strong enough to support another bond
15  issue.  But Wall Street wanted to keep the Ponzi scheme going for another reason.  They needed time to
16  get ready to capitalize on the reflexive selling they would encourage when PREPA's house of cards
17  collapsed.   So, despite the fact that everyone at PREPA, everyone in Wall Street, and everyone at the SEC
18  knew that PREPA could not legally issue bonds, the consortium of underwriters, including Citigroup, J.P.
19  Morgan, Morgan Stanley, Barclays Capital, B of A/Merrill Lynch. Goldman Sachs, UBS Financial Services,
20  RBC Capital Markets, Wells Fargo Securities, Raymond James, Ramirez & Company, First Bank Puerto Rico
21  Securities, Popular Securities, Santander Securities, BMO Capital Markets, Jefferies, Scotia MSD, Oriental
22  Financial Securities, the credit-rating agencies, including Fitch, Moody's, and S&P, orchestrated PREPA
23  Series 2013A, and distributed the official statement in preparation for release on August 15, 2013,
24  certain that regulators and the media would once again look the other way and that investor confidence
25  would carry the day.

26  And that precisely what was happening until July 31, 2013, when a Cate Long column, titled *PREPA issues*
27  *bonds for energy*, appeared in Reuters. Until then, Long had written retrospectively about Puerto-Rico
28  bonds and the Puerto Rican economy, but on July 31, 2013, she wrote prospectively, pointing out that
29  the upcoming Puerto Rico Electric Power bond offering had a debt-service coverage of 0.81, far below
30  the required 1.20, and that despite the investment grade credit ratings from Fitch, Moody's, and S&P
31  that appeared on the front page of the official statement, PREPA was projected to have only enough
32  money for repay its investors 81 cents on the dollar.

33  As we have already seen, when Cate Long writes, people listen.  People in Puerto Rico listened; people
34  on Wall Street listened, and Adam Chepenik, a Deputy Director at the Treasury not only listened, on
35  August 2, 2013 he sent an email to the SEC and the New York Fed, that discusses volatility in the muni
36  space and includes "a few articles," including the Cate Long article, "that highlight what … Reuters, and
37  the ratings agencies are saying about the deal."

38  Cate Long's July 31, 2013 column had pulled away the curtain so that anyone who cared to look could
39  see the wizards of Wall Street at work as they were in the process of committing a $650 million crime,
40  but it did not matter.  Too much money had already passed through the hands of too many important
41  people, there was more to be made, and those involved in the fraud were immune to sanctions of any
42  kind.

Despite the Cate Long article, which screams that a major crime is about to be committed, on August 15, 2013, **Wall Street went ahead with the PREPA Series 2013A bond offering.** Unlike the Jeffery Epstein suicide which happened with the guards inattentive, the cameras off, behind the walls and bars of a USDOJ jail, the PREPA Series 2013A fraud was committed right out in the open, in plain view.  Anyone can read the Cate Long column and to then go to the cover page of Series 2013A Official Statement and see the investment grade ratings and the notice with regard to legality and then to page 58 so see the actual debt service coverage ratio of .82 and the fraudulent debt service coverage ratio of 1.38 (which was achieved with a clever sleight of hand—counting the value of electricity that they give away as revenue—which they admit to at the bottom of the page), before going on the legal opinion of Sidley Austin, LLP at Appendix IV attesting to its legality of the patently illegal offering.  And now anyone can also see the Chepenik email that was sent from the Treasury to the SEC on August 2, 2013, pointing out the problems in "the Deal," which remarkably did not cause the SEC to intervene, and predictably did not stop Wall Street from proceeding with Series 2013A offering.

After August 15, 2013, when investor confidence allowed the $650M Series 2013A bond offering to be "oversubscribed" by $23M, Wall Street had a lot of work to do so they would not held accountable for the coming Puerto Rico bond crisis, and so they could position themselves to make as much money from the economic pain they had inflicted on the predominately elderly[FN] retail bond purchasers that they had defrauded.  By October 2013 they had developed a plan that was as simple as it was cynical.  As it started becoming increasingly known outside the financial industry that Puerto Rico was not going to be able to meet its bond obligations, Wall Street and its allies in the media would blame Puerto Rico's inability to make its bond payments on the exodus of people from Puerto Rico (no doubt accelerated by condition of Puerto Rico's infrastructure) and the downturn in the Puerto Rican economy, and recommend that bondholders get out of Puerto Rico bonds.  They would then buy up Puerto Rico bonds from defrauded investors for 30 to 50 cents on the dollar, and then banding together into various Ad Hoc Committees of Bondholders, offer a fifteen percent reduction in principal to the various Puerto Rico agencies, so for example, given the reported 60 percent of PREPA's nine billion dollars of bond debt that ended up being under control of the Ad Hoc Group of PREPA Bondholders, PREPA would get 910 million dollars for its participation in bond fraud, Wall Street would get 1.1 billion dollars (in addition to all the money that it had already made underwriting the bonds and selling them), and as readily available public information shows, regulators would get high-paying Wall Street jobs and legislators in Washington who pressured regulators into inaction would continue to get millions of dollars in campaign contributions.[FN]  When the same math is applied to Puerto Rico's 74 billion dollars in bond debt, Wall Street's take jumps to nine billion dollars (in addition to all the money that had already made underwriting the bonds and selling them to initial purchasers) plus all the additional money they would make reselling reissued Puerto Rico bonds to retail customers once the dust had settled and the credit rating agencies had once again rated Puerto Rico's bonds investment grade.

All the while, Defendants, all SEC employees who had a duty to the people of Puerto Rico and the American People more generally, did nothing to inform the public, to sanction the perpetrators, to enforce the laws, rules, and regulations as intended by SEC's mission and charter, or to even to prevent crimes that they knew were going to happen, or that were likely to happen as a foreseeable result of bond fraud that syphoned billions of dollars away from PREPA's infrastructure.

Municipal bonds are subject to the antifraud provisions of the federal securities laws, which Defendants had a duty to uphold and enforce.  To protect investors, federal securities laws and regulations require

issuers and underwriters to timely disclose material information about municipal bond offerings. The purpose of securities laws is to "provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing. These laws and regulations prohibit issuers and dealers who buy, sell, and underwrite municipal securities, from making any false or misleading statement of material fact, and from omitting any material facts in connection with the offer, purchase, or sale of any municipal security. More specifically, they impose requirements designed, among other things, to prohibit fraud, require certain disclosures, and prevent conflicts of interests as follows:

• Section 17(a) of the Securities Act of 1933 ("Section 17(a)") prohibits fraud and misrepresentations in the offer and sale of securities;

• Section 10(b) of the Exchange Act ("Section 10(b)") and SEC Rule 10(b)(5) prohibit intentional misrepresentations and omissions of material fact;

• Section 15B(a)(5) of the Exchange Act ("Section 15B(a)(5)") prohibits municipal advisors from fraudulent, deceptive, or manipulative acts in connection with the issuance of municipal securities;

• Section 15B(c)(1) of the Exchange Act ("Section 15B(c)(1)") prohibits municipal advisors from breaching their fiduciary duties to municipal entity clients;

• SEC Rule 15c2-12 requires timely delivery of official statements to investors and continuing disclosures, including the timely filing of audited financial statements;

• MSRB Rule G-47 requires the disclosure of material information but applies only to broker-dealers ;24

• MSRB Rule G-17 prohibits brokers, dealers, and municipal advisors from engaging in any deceptive, dishonest, or unfair practice; and

• MSRB Rule G-23 prohibits brokers, dealers, and municipal securities dealers who are acting as financial advisors on a bond issuance from underwriting the issuance.

Defendant will likely argue that they had the discretion to do something or do nothing in this instance and in that instance for literally thousands of discrete instances, each like a single white or black dot on a piece of white paper, which when viewed as a whole is a picture, in this case, a picture of possible corruption.

JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter.

The FTCA itself provides a statutory basis for federal district court jurisdiction. Under 28 U.S.C. § 1346(b), federal district courts are granted original jurisdiction over civil actions against the United States for money damages resulting from tortious acts of federal employees. This provision explicitly authorizes individuals to bring their claims before federal district courts, including those that have been denied by the federal agency.

Denying federal district court jurisdiction over denied FTCA claims could raise constitutional concerns. The Fifth Amendment's Due Process Clause guarantees individuals the right to seek redress for

1  government wrongdoing. By depriving claimants of access to a federal district court, their constitutional
2  right to a fair and impartial hearing may be compromised. Allowing federal district courts jurisdiction in
3  these cases upholds the principles of constitutional due process and preserves the fundamental rights of
4  individuals seeking justice.

5  28 U.S. Code § 1346 - United States as defendant

6  (1)Subject to the provisions of chapter 171 of this title, the district courts, together with the United
7  States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall
8  have exclusive jurisdiction of civil actions on claims against the United States, for money damages,
9  accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused
10 by the negligent or wrongful act or omission of any employee of the Government while acting within the
11 scope of his office or employment, under circumstances where the United States, if a private person,
12 would be liable to the claimant in accordance with the law of the place where the act or omission
13 occurred.

14 (c)The jurisdiction conferred by this section includes jurisdiction of any set-off, counterclaim, or other
15 claim or demand whatever on the part of the United States against any plaintiff commencing an action
16 under this section.

17 Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Plaintiff
18 resides in and conducts business in this judicial district.

19 STATUE OF LIMITATIONS AND TOLLING

20 The Federal Bankruptcy Court in New York and the Financial Oversite and Management Board has
21 delayed making critical decisions regarding the plaintiff's contract with the Puerto Rico Electric Power
22 Authority (PREPA).  The first of those critical decisions came in the third quarter of 2022 when the court
23 allowed PREPA to cancel the contract for the Plaintiffs twenty-megawatt solar power plant.  In the
24 absence of this information, it would have been impossible to file a lawsuit any sooner.

25 Discovery Rule:

26 Under the discovery rule, the statute of limitations begins to run from the time the plaintiff discovers or
27 reasonably should have discovered the injury or the basis for the claim. This rule is often applied in cases
28 where the injury or harm is not immediately apparent.

29 There are also continuing violations taking place in this litigation and related litigation regarding due
30 process violations.

31 Continuous Violations: For claims involving ongoing or continuous violations, the statute of limitations
32 may be tolled until the violation ceases.

33 In this litigation the plaintiff alleges repeated concealment of facts relevant to this case.

34 Fraud or Concealment: If the defendant fraudulently conceals facts relevant to the claim, the statute of
35 limitations may be tolled until the plaintiff discovers, or with reasonable diligence, should have
36 discovered the fraud.

37

12

1

2                                    III.      PARTIES

3    1.      Plaintiff Richard R. Lawless is a natural person residing in Murietta, California and was a founder,

4    majority shareholder, chief executive officer, and chief financial officer of Commercial Solar Power, Inc., a

5    California company ("CSP"), which as of November 2013, existed for the purpose of developing, building,

6    and operating a 20 megawatt solar-electric plant under terms of a Power Purchase and Operating

7    Agreement with the Puerto Rico Electric Power Authority (the "PPOA"), whereunder the CSP-owned

8    project company, Blue Beetle III, LLC, would sell all of the electricity produced by the plant to PREPA at

9    prices set forth in the PPOA.  Plaintiff's damages resulting from the bond crisis and the CSP's resultant

10   inability to fiancé the project include but are not limited to, his $3 million cash investment, $3.5 million

11   in salary, his personal guarantees of company debt and his 56% of profit from the sale of the project.

12                                    IV.      CAUSES OF ACTION

13                                    COUNT I.  Negligence

14   The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by

15   Plaintiff.  To the detriment of Plaintiff, to the extent that Defendants omissions are not deemed to be

16   conspiratorial, Defendants were negligent in the performance of their duties, in that despite all of the

17   indications that PREPA's public disclosures were inadequate and/or that their bond offerings and

18   issuances were fraudulent, they failed to take notice and notify the public.

19   Upon information, evidence, and belief, Plaintiff alleges that Defendants had a duty to notify the public,

20   Plaintiff is a member of the public in general, in particular, is a businessman who relies on credit ratings

21   and other publicly available information when making business decisions.

22   Upon information, evidence, and belief, Plaintiff alleges that Defendants failed to act with the level of

23   care that a reasonable person would have shown in the same or similar situation.

24   Upon information, evidence, and belief, Plaintiff alleges that he was foreseeably economically damaged

25   by Defendant's wrongful acts.

26

27   Count II. Professional Negligence

28   The Plaintiff brings this cause of action against the Defendant alleging professional negligence. The

29   Defendant, [Securities and Exchange Commission], owed a duty of care to the Plaintiff as a member of

30   the general public, their failure to meet the required standard of care has resulted in harm and damages

31   to the Plaintiff.

32   Duty of Care: The professional owes a duty of care to the client or patient, meaning they have a legal

33   obligation to act with reasonable care and skill.

34   The Securities and Exchange Commission failed to meet the required standard of care, either by acting

35   negligently or by failing to act when they should have.

36   Plaintiff suffered actual harm or damages as a result of the professional's breach of duty.

1   The duty of care owed by the U.S. Securities and Exchange Commission (SEC) to the general public is
2   primarily rooted in its statutory mandate and regulatory responsibilities. As a federal government agency
3   tasked with regulating the securities industry and protecting investors, the SEC has a duty to act in the
4   best interests of the public and to fulfill its regulatory obligations.

5   The specific duty of care owed by the SEC to the general public can be broadly summarized as follows:

6   Investor Protection: The SEC is responsible for safeguarding the interests of investors and promoting fair
7   and transparent markets. This includes ensuring the accurate disclosure of information by public
8   companies, detecting, and preventing fraudulent activities, and taking enforcement actions against
9   securities law violations.

10  Regulatory Oversight: The SEC has a duty to enforce and administer federal securities laws and
11  regulations. This includes developing and implementing rules and regulations that govern various
12  aspects of the securities industry, such as registration requirements, market operations, and investment
13  adviser activities.

14  Market Stability: The SEC plays a role in maintaining the stability and integrity of the securities markets.
15  This involves monitoring market activities, overseeing exchanges and self-regulatory organizations, and
16  taking measures to prevent market manipulation, insider trading, and other forms of misconduct.

17  Count IV:   California State Law – Fraudulent Concealment

18  If the defense conceals information and documents that would have aided in their litigation or prevented
19  the damages incurred by the plaintiff, they would be subject to damages related to that concealment.

20  The law requires five elements to be present:

21      1)  The defendant must have concealed or suppressed a material fact
22      2)  The defendant must have been under a duty to disclose that fact
23      3)  The defendant must have intentionally concealed that fact with intent to defraud the plaintiff
24      4)  The defendant must have been unaware of the fact and would not have acted as he did, if he
25          had known or the concealed or suppressed fact, and
26      5)  As a result of the concealment or suppression of the fact, the plaintiff must have sustained
27          damage.

28  There is no disputing that the SEC was aware of the Puerto Rico Ponzi Scheme as early as 2012. In 2013
29  there was a conversation between a treasury official and a redacted SEC employee that recognized the
30  fraud but allowed the bond to be issued anyway, and in 2015 received a confession and a whistleblower
31  report. In 2016 the SEC attended a presentation of the fraud allegations and in 2018 the SEC received the
32  FOMB Investigative Report.

33  There is no question if the plaintiff knew that PREPA was engaging in a Ponzi Scheme, he would not have
34  purchased the contract for the solar project in 2012 and continue to invest money in the project all the
35  way through 2015.

36  There is no question that if the plaintiff knew that the SEC was so aware of these crimes, knowingly
37  allowed them to happen and had all manner of confirming documents that the plaintiffs claim was well

1   supported, the plaintiff would have litigated this dispute based on the unreasonableness of the SEC's
2   action from the very beginning.

3   Duty of Care: The professional owes a duty of care to the client or patient, meaning they have a legal
4   obligation to act with reasonable care and skill.

5   The Securities and Exchange Commission failed to meet the required standard of care, either by acting
6   negligently or by failing to act when they should have.

7   Plaintiff suffered actual harm or damages as a result of the professional's breach of duty.

8   The duty of care owed by the U.S. Securities and Exchange Commission (SEC) to the general public is
9   primarily rooted in its statutory mandate and regulatory responsibilities. As a federal government agency
10  tasked with regulating the securities industry and protecting investors, the SEC has a duty to act in the
11  best interests of the public and to fulfill its regulatory obligations.

12  The specific duty of care owed by the SEC to the general public can be broadly summarized as follows:

13  Investor Protection: The SEC is responsible for safeguarding the interests of investors and promoting fair
14  and transparent markets. This includes ensuring the accurate disclosure of information by public
15  companies, detecting, and preventing fraudulent activities, and taking enforcement actions against
16  securities law violations.

17  Regulatory Oversight: The SEC has a duty to enforce and administer federal securities laws and
18  regulations. This includes developing and implementing rules and regulations that govern various
19  aspects of the securities industry, such as registration requirements, market operations, and investment
20  adviser activities.

21  Market Stability: The SEC plays a role in maintaining the stability and integrity of the securities markets.
22  This involves monitoring market activities, overseeing exchanges and self-regulatory organizations, and
23  taking measures to prevent market manipulation, insider trading, and other forms of misconduct.

24  Count IV:  Violation of Plaintiffs Due Process Rights and Civil Rights

25  The Defense Counsel and Defendant failed to comply with the Federal Rules of Civil Procedure, the
26  California Bar's Code of Professional Conduct, the Fifth Amendment, the Sixth Amendment, and the
27  Fourteenth Amendment.

28  Fifth Amendment

29  The Fifth Amendment creates several rights relevant to both criminal and civil legal proceedings. In
30  criminal cases, the Fifth Amendment guarantees the right to a grand jury, forbids "double jeopardy," and
31  protects against self-incrimination. It also requires that "due process of law" be part of any proceeding
32  that denies a citizen "life, liberty or property" and requires the government to compensate citizens when
33  it takes private property for public use.

34  Sixth Amendment

35  The Sixth Amendment guarantees the rights of criminal defendants, including the right to a public trial
36  without unnecessary delay, the right to a lawyer, the right to an impartial jury, and the right to know who
37  your accusers are and the nature of the charges and evidence against you. It has been most visibly tested

1  in a series of cases involving terrorism, but much more often figures in cases that involve (for example)
2  jury selection or the protection of witnesses, including victims of sex crimes as well as witnesses in need
3  of protection from retaliation.

4  Fourteenth Amendment

5  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of
6  the United States and of the State wherein they reside. No State shall make or enforce any law which
7  shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any
8  person of life, liberty, or property, without due process of law; nor deny to any person within its
9  jurisdiction the equal protection of the laws.

10  Federal Rules of Civil Procedure

11  Rule 8. General Rules of Pleading - (e) Construing Pleadings. Pleadings must be construed to do justice

12  (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—
13  whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party
14  certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry
15  reasonable under the circumstances:

16  Rule 11. (4) the denials of factual contentions are warranted on the evidence or, if specifically, so
17  identified, are reasonably based on belief or a lack of information.

18  (c) Sanctions. (1) In General. If, after notice and a reasonable opportunity to respond, the court
19  determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any
20  attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional
21  circumstances, a law firm must be held jointly responsible for a violation committed by its partner,
22  associate, or employee.

23  Professional Conduct of the State Bar of California

24

25  Rule 3.3 Candor Toward the Tribunal*

26  (a) A lawyer shall not: (1) knowingly make a false statement of fact or law to a tribunal* or fail to correct
27  a false statement of material fact or law previously made to the tribunal* by the lawyer; (2) fail to
28  disclose to the tribunal* legal authority in the controlling jurisdiction known* to the lawyer to be directly
29  adverse to the position of the client and not disclosed by opposing counsel, or knowingly misquote to a
30  tribunal* the language of a book, statute, decision or other authority; or (3) offer evidence that the
31  lawyer knows* to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered
32  material evidence, and the lawyer comes to know* of its falsity, the lawyer shall take reasonable*
33  remedial measures, including, if necessary, disclosure to the tribunal, * unless disclosure is prohibited by
34  Business and Professions Code section 6068, subdivision (e) and rule 1.6. A lawyer may refuse to offer
35  evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably
36  believes* is false. (b) A lawyer who represents a client in a proceeding before a tribunal* and who
37  knows* that a person*intends to engage, is engaging or has engaged in criminal or fraudulent* conduct

16

1    related to the proceeding shall take reasonable* remedial measures to the extent permitted by Business
2    and

3

4    Profession Rule 3.4 Fairness to Opposing Party and Counsel

5    A lawyer shall not: (a) unlawfully obstruct another party's access to evidence, including a witness, or
6    unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value. A
7    lawyer shall not counsel or assist another person* to do any such act; (b) suppress any evidence that the
8    lawyer or the lawyer's client has a legal obligation to reveal or to produce; (c) falsify evidence, counsel,
9    or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by laws Code
10   section 6068, subdivision (e) and rule 1.6.

11

12   Rule 4.1 Truthfulness in Statements to Others

13   In the course of representing a client a lawyer shall not knowingly: * (a) make a false statement of
14   material fact or law to a third person; * or (b) fail to disclose a material fact to a third person* when
15   disclosure is necessary to avoid assisting a criminal or fraudulent* act by a client, unless disclosure is
16   prohibited by Business and Professions.

17   Rule 8.4 Misconduct

18   It is professional misconduct for a lawyer to: (a) violate these rules or the State Bar Act, knowingly*
19   assist, solicit, or induce another to do so, or do so through the acts of another; (b) commit a criminal act
20   that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
21   (c) engage in conduct involving dishonesty, fraud,* deceit, or reckless or intentional misrepresentation;
22   (d) engage in conduct that is prejudicial to the administration of justice; (e) state or imply an ability to
23   influence improperly a government agency or official, or to achieve results by means that violate these
24   rules, the State Bar Act, or other law; or (f) knowingly* assist, solicit, or induce a judge or judicial officer
25   in conduct that is a violation of an applicable code of judicial ethics or code of judicial conduct, or other
26   law. For purposes of this rule, "judge" and "judicial officer" have the same meaning as in rule 3.5(c)
27

28   How Due Process Violation's Become Civil Rights Violations

29   Withholding Evidence: If evidence is intentionally concealed or withheld by a government official or law
30   enforcement agency in a manner that violates a person's right to due process, it can be considered a civil
31   rights violation. This is because due process guarantees individuals the right to a fair and impartial trial,
32   which includes access to all relevant evidence. If evidence is improperly suppressed, it may infringe upon
33   the accused person's ability to defend themselves and undermine their right to a fair trial.

34   Perjury: Perjury refers to knowingly making false statements under oath. While perjury itself is a serious
35   offense, it does not directly constitute a civil rights violation. However, if perjury is committed by a
36   government official or law enforcement officer as part of a deliberate effort to violate an individual's civil
37   rights, such as providing false testimony to secure an unjust conviction based on discriminatory motives,
38   it may contribute to a civil rights violation.

1

2  In summary, withholding evidence and perjury can play a role in civil rights violations if they are carried
3  out in a manner that deprives individuals of their right to due process, equal protection, or fair
4  treatment under the law.

5  In this litigation both the Defense Counsel (DOJ) and the Defendant (SEC) are law enforcement agencies.
6  One due process violation may be insufficient to rise to the standard for it to be considered a civil rights
7  violation but dozens of serious violations leave little doubt that both the defendant and their defense
8  counsel intended to use any means possible to deny a fair trial to the plaintiff(s).  Both the defense
9  counsel and the plaintiff were sent a request to correct their earlier filings by the plaintiff and a copy of
10 that email was sent to Court Chambers reminding the defendant and defense counsel of their obligation
11 to correct earlier false and misleading submissions to this court. That request was ignored.

12 Case Law Examples

13 United States v. Bagley (1985): Although this case originated in a criminal context, it established the
14 standard for evaluating the withholding of evidence by the government. The Supreme Court held that
15 the prosecution has a duty to disclose evidence that is favorable to the accused and material to guilt or
16 punishment. Failure to disclose such evidence violates the accused's due process rights.

17 Hynix Semiconductor Inc. v. Rambus Inc. (2006): This case involved a civil dispute regarding patent
18 infringement. The court held that a party's failure to produce documents or disclose relevant evidence
19 can lead to adverse inferences against that party. In other words, the court may draw a negative
20 inference from the failure to produce evidence and treat it as unfavorable to the party withholding it.

21 United States v. City of New York (2013): This case involved a civil trial against the City of New York
22 alleging discriminatory hiring practices. During the trial, it was discovered that a high-ranking city official
23 had provided false testimony. The court found that the false testimony undermined the integrity of the
24 trial and ordered a new trial on liability issues.

25 Williams v. City of Antioch (2005): In this civil rights lawsuit, the court found that a police officer had
26 committed perjury during his testimony. The court concluded that the perjured testimony had a
27 significant impact on the jury's decision and ordered a new trial.

28 Santiago v. City of Philadelphia (2017): This civil rights case involved allegations of police misconduct.
29 During the trial, it was revealed that several police officers had provided false testimony. The court held
30 that the officers' false testimony undermined the fairness of the trial and granted a new trial on liability
31 issues.

32 The SEC and DOJ are both Law Enforcement Agencies.

33 The following are two specific claims related to the violation of the plaintiff's due process rights and civil
34 rights.

35

36                          Evidence Submission

37                        Due Process/Civil Rights Violations

1                         Violation Number One – Pro Bono Request

2

3   When the government acts to deny legal counsel, it raises concerns related to the plaintiff's

4   constitutional rights, specifically their right to legal representation and due process.

5    The Sixth Amendment to the United States Constitution guarantees individuals the right to legal counsel

6   in criminal cases. Although this amendment specifically addresses criminal cases, the principles of due

7   process and access to legal representation are generally considered fundamental to the fairness of legal

8   proceedings, including civil cases. Denying or obstructing someone's access to legal counsel could

9   potentially infringe upon their rights and raise concerns about due process.

10  Without any evidence or understanding the Defense Counsel sought to convince the court that the

11  Plaintiff was the CEO of a for-profit charitable fundraising business and therefore could afford his own

12  counsel.  Plaintiff was an acting CEO for such an entity and this was one of several worthwhile charities

13  the plaintiff volunteers his time to.  Plaintiff does not receive nor would he accept any salary for his

14  charitable services.

15  Defense Counsel claims the plaintiff had the means to serve President Trump a subpoena therefore he

16  can certainly afford his own counsel.  Plaintiff's cost for the subpoena service was only $80.00 because

17  President Trump cooperated with the server who was representing the plaintiff.

18  Defense Counsel goes on to say that "To the extent the Court treats the Motion as a request for the

19  appointment of counsel, this action does not involve exceptional circumstances warranting an

20  appointment. While Plaintiff is an active litigant who has initiated hundreds of cases, no court has found

21  any merit to his claims, which are based on his unsubstantiated theory."

22  In claiming that the plaintiff has filed hundreds of lawsuits, defense counsel seeks to mischaracterize the

23  filing of two hundred small claims lawsuits against U.S. Senators and their Chiefs of Staff.  In a moment of

24  moral outrage, the plaintiff filed these small claims lawsuits to show the Senators that he indeed has

25  evidence that they knowingly accepted political contributions from banks involved in the alleged Ponzi

26  Scheme.   These cases were withdrawn by the plaintiff and never ruled on.  Clearly the defense counsel's

27  intent here is to mislead the court and disparage the plaintiff while seeking to deny the plaintiff legal

28  counsel.

29  The defense counsel also asserts that the plaintiff's claims are an unsubstantiated theory.  This is

30  intentionally misleading and outright perjury sanctioned by the four U.S. Attorneys seeking to deny

31  plaintiff representation.

32  At the time this motion was submitted, Defense Counsel and Defendant were in possession of House of

33  Representative Report 1049 (Exhibit One), The FOMB Investigatory Report (Exhibit Two), FOIA

34  documents (Exhibit Three) reflecting discussions about the Ponzi Scheme. The Defense Counsel was

35  aware that the SEC found the plaintiff's claims credible when he applied for and was accepted into the

36  formal whistleblower program back in 2015.  (Exhibit Four).  This is pure unadulterated perjury and a

37  major mischaracterization of the facts in pursuit of denying a U.S. citizen legal representation.  All the

38  aforementioned documents fully support the Plaintiffs claims. All the reports and documents are

39  "government documents."

1

2  The 6th Amendment is clear on this issue; "In all criminal prosecutions, the accused shall enjoy the right
3  to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have
4  been committed, which district shall have been previously ascertained by law, and to be informed of the
5  nature and cause of the accusation; to be confronted with the witnesses against him; to have
6  compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his
7  defence."

8  The fifth amendment is also clear on this issue; "The Fifth Amendment creates several rights relevant to
9  both criminal and civil legal proceedings. In criminal cases, the Fifth Amendment guarantees the right to
10  a grand jury, forbids "double jeopardy," and protects against self-incrimination. It also requires that "due
11  process of law" be part of any proceeding that denies a citizen "life, liberty or property" and requires the
12  government to compensate citizens when it takes private property for public use."

13  The Fourteenth Amendment is also clear on this issue; "All persons born or naturalized in the United
14  States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein
15  they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of
16  citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without
17  due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

18  In this document using false claims, mischaracterization, lack of candor and perjury, the DOJ and SEC was
19  seeking to deny the Plaintiff his fifth, sixth and fourteenth amendment rights.

20  Defense Counsel's violations do not end with the constitution, there are clear violations of the federal
21  rules for civil procedure and the California Bar Association code of Professional Ethics.  There are
22  unsubstantiated claims, knowingly false statements constituting serious perjury, a complete lack of
23  candor and intentional and untrue mischaracterizations seeking to deny plaintiff legal counsel.

24  Plaintiff initially claimed the SEC aided and abetted in crimes that directly caused his losses.  The
25  following documents that were in the possession of the defendant seemingly support these allegations.

26  Exhibit One, The Puerto Rico House of Representatives Summary Report known as H.R. 1049 was
27  delivered to the DOJ and the SEC in August of 2015 and submitted to this court's docket as evidence
28  exhibit 44.  This report claims that the Puerto Rico Municipal Agencies were running a Ponzi Scheme,
29  that the credit rating agencies and banks knew PREPA to be bankrupt but kept extending credit to them.
30  The report goes on to request assistance from the DOJ and the SEC to investigate and prosecute those
31  responsible.

32  In the opposition document presented by the defense counsel the defense counsel states that the
33  plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of this document for the
34  past seven years.  If you look at the plaintiffs claim (Exhibit Five and Docket Item 1) it clearly claims that
35  Puerto Rico municipal agencies were participating in a seventy-five-billion-dollar securities fraud. In the
36  HR 1049 document the government of Puerto Rico appears to agree with the plaintiff.

37  In the opposition document presented by the defense counsel the defense counsel states that the
38  plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of the FOMB
39  Investigative report also known as Exhibit Two for the past four years.  This extensive government report

1    was issued on August 20, 2018 and strongly supports the plaintiff's claims.  There is even a section within
2    the report dealing with aiding and abetting.  Because of the size of this document, the plaintiff will attach
3    a sample of its contents for purposes of this civil rights claim.

4    In the opposition document presented by the defense counsel the defense counsel states that the
5    plaintiff's claims are unsubstantiated while the DOJ and SEC were in possession of numerous internal
6    documents reflecting communication between various SEC employees seemingly discussing all aspects
7    of the plaintiff's claims.  These documents were secured through various FOIA requests by the plaintiff.
8    These documents are referred to as Exhibit Three in the attached evidence addendum.

9    This FOIA submission is just a small sample of the FOIA documents available to dispute the Defense
10   Counsel claims that Plaintiff's claims are unsubstantiated.

11   ·    A three-page letter to the Chairman of the SEC, Mary Jo White asking her to investigate all wrong-
12   doing related to the bonds.  The letter was dated June 14, 2016 and signed by Senators Menendez,
13   Warren, Schumer, Gillibrand, Sanders and Markley.

14   ·    A Subpoena and related emails from the SEC to Morgan Stanley requesting documents related to
15   Puerto Rico bonds dated 10-23-2014.

16   ·    A SEC, Treasury Department email where a senior staff member for the Treasury Secretary, Adam
17   Chepenik and a redacted senior member of the SEC apparently discuss and agree on the fraudulent
18   nature of a specific Puerto Rico bond and go on to allow the bond to be issued.  The email is dated
19   August 2, 2013.

20   In the opposition document presented by the defense counsel the defense counsel states that the
21   plaintiff's claims are unsubstantiated while the DOJ and SEC understood the Plaintiff, Richard Lawless
22   applied to the formal SEC whistleblower in July of 2015 and his claims were found to be credible.  In this
23   example the SEC itself felt the Plaintiff's claims were well founded.

24   This is how the SEC defines it whistleblower program

25   Office of the Whistleblower

26   Assistance and information from a whistleblower who knows of possible securities law violations can be
27   among the most powerful weapons in the law enforcement arsenal of the Securities and Exchange
28   Commission. Through their knowledge of the circumstances and individuals involved, whistleblowers can
29   help the Commission identify possible fraud and other violations much earlier than might otherwise
30   have been possible. That allows the Commission to minimize the harm to investors, better preserve the
31   integrity of the United States' capital markets, and more swiftly hold accountable those responsible for
32   unlawful conduct.

33   The Commission is authorized by Congress to provide monetary awards to eligible individuals who come
34   forward with high-quality original information that leads to a Commission enforcement action in which
35   over $1,000,000 in sanctions is ordered. The range for awards is between 10% and 30% of the money
36   collected.

37   The Office of the Whistleblower was established to administer the SEC's whistleblower program. We
38   understand that the decision to come forward with information about securities fraud or other

1   wrongdoing is not one taken lightly, and we are here to answer any questions you may have. You can
2   reach the Office of the Whistleblower at (202) 551-4790.

3   **The SEC Office of Market Intelligence Vets Each Tip**

4   At that point, the TCR is forwarded to the SEC's Office of Market Intelligence (OMI), which has been
5   described as a "point guard" for the entire agency. <u>Comprised of more than 40 attorneys, former traders,</u>
6   <u>accountants and other experts, the OMI is responsible for gathering and analyzing all tips and complaints</u>
7   <u>received by the SEC. The OMI conducts an initial evaluation of each tip to determine, among other</u>
8   <u>things, whether it relates to an existing investigation, whether similar information has already been</u>
9   <u>submitted to the agency, and whether it relates to possible misconduct that occurred within the SEC's</u>
10  <u>ten-year statute of limitations for enforcement actions</u>. Most importantly, the OMI determines whether
11  **the tip is sufficiently specific, significant, and credible** to be referred to an investigative team within the
12  Division of Enforcement – the division responsible for conducting investigations of possible securities
13  violations and bringing charges against wrongdoers where warranted.

14   In this example, the SEC clearly found the Plaintiffs claims "significant and credible" not unsubstantiated
15  as claimed by the DOJ and SEC in their efforts to deny plaintiff legal counsel.

16  The SEC assigned Sue Curtin, Senior Investigative Attorney for the SEC to work with the Plaintiff.  An
17  email welcoming the Plaintiff to the "program" is attached as Evidence Exhibit Four.

18  Evidence Exhibit Five is a copy of the plaintiffs docketed claim.

19  Copy of Defendant's Motion in Opposition of Pro Bono Representation – Docket Item 41

20  Case 5:21-cv-02174-JWH-SP

21  Defendant submits this response to Plaintiff's Motion to Be Included in the Pro Bono Limited Scope
22  Representation Pilot Program (Dkt. 37, the "Motion"):

23  A. Pro Se Services in the Central District

24  Under the District's Pilot Program, the Court may "appoint volunteer attorneys for limited-scope
25  engagements on non-prisoner, pro se, civil case" in order "to perform discrete, specifically defined tasks
26  such as representing a pro se litigant during a settlement conference, filing an opposition to a dispositive
27  motion, or appearing at a deposition."2

28   The Program is "especially appealing to law firms with associates desiring immediate federal litigation
29  experience." In addition to the Pilot Program, there is a federal pro se clinic in the Eastern Division that
30  offers information and guidance to pro se civil litigants. See Website for People Without Lawyers,
31  Resources for Pro Se Litigants in the Central District of California:
32  https://prose.cacd.uscourts.gov/riverside (last accessed on May 23, 2022).

33  The Court entered a Self-Representation Order on February 9, 2022 regarding proceeding pro se. (Dkt.
34  14.) The Order notes that "The Los Angeles County Bar Association Lawyer Referral and Information
35  Service may be able to refer you to a lawyer who may or may not be willing to take your case on a
36  contingency basis." (Id. at 3. n.1.) Also, the California State Bar maintains a list of numerous attorney
37  referral services in the Central District, including Riverside County.3

B. Richard Lawless Is the CEO of a "For-Profit Fundraising Service" It is not apparent that Mr. Lawless is qualified to receive pro bono counsel as he represents that he is the CEO of NEA Charitable Fundraising Services LLC ("NEA"). Declaration of Paul B. Green, Exs. A, B, C, D, and E. NEA's website states that it is a

"for-profit fundraising service that utilizes Independent Contractors to raise capital for worthy charities." Ex. B. NEA's website states that it charges a fee of $25,000 to start a foundation. Ex. C.

In promotional materials on NEA's website, Mr. Lawless represents that "[a]t this stage of my life, I am getting hammered by the highest business and personal tax rates and by utilizing a private family foundation I can take much of that money that goes to pay State and Federal taxes and set it aside to charitable cause." Ex. D at 2. He further represents that his foundation "will allow me to set aside substantial money and assets that my wife and I control." Id.; see also Ex. E at 2 (NEA YouTube page stating, "How much of my wealth do I transfer to my children and grandchildren before I am doing them a disservice?").

Aside from NEA, Plaintiff had the means to recently effectuate service through a process server on President Trump in Florida and an SEC employee in Massachusetts. Lawless v. United States, No. 5:22-cv-00148, Dkt. 39 (affidavit of service on SEC employee Curtin); Dkt. 51 (affidavit of service on Trump).

C. Legal Standard for Appointment of Counsel in Civil Cases "There is no constitutional right to appointed counsel in a civil case." Elias v. Wolf, 2020 WL 10790290, at *1 (C.D. Cal. Sept. 17, 2020) (citing Storseth v. Spellman, 654 F.2d 1349, 1353 (9th Cir. 1981) and finding that the exceptional circumstances which are necessary to grant plaintiff's request for counsel did not exist). In Pettingill v. United States of America, the Court found: "After evaluating the likelihood of success on the merits, and the ability of the Plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved, the Court finds that the 'interests of justice' do not require the appointment of counsel at this time." 2013 WL 12439664, at *1 (C.D. Cal. July 31, 2013) (citing 18 U.S.C. § 3006A(a)(2)(B) and Weygandt v. Look, 718 F.2d

952, 954 (9th Cir. 1983)).

Case 5:21-cv-02174-JWH-SP Document 41 Filed 05/26/22 Page 3 of 32 Page ID #:151 This is one of two duplicative cases that the Plaintiff has filed claiming that the U.S. Securities and Exchange Commission ("SEC") had a duty to bring civil proceedings relating to the Puerto Rico bankruptcy. On May 2, 2022, Defendant filed a motion to dismiss this case on the grounds that (i) the SEC is not a proper defendant in a claim brought under the Federal Tort Claims Act ("FTCA"), and (ii) the claims in this action are duplicative of Plaintiff's claims in his action against the United States. (Dkt. 26.)

Plaintiff did not oppose the motion.4 Even if Plaintiff had filed a timely opposition, and even if a law firm found this case to be suitable for associate development and were to take on the case as part of the Pilot Program, it is highly unlikely that Plaintiff would succeed on the merits. It is black-letter law that claims brought under the FTCA against a federal agency should be dismissed for lack of jurisdiction. See FDIC v. Craft, 157 F.3d 697, 706 (9th Cir. 1998); Kennedy v. U.S. Postal Serv., 145 F.3d 1077, 1078 (9th Cir.

1998); see Weygandt, 718 F.2d at 954 ("In deciding whether to appoint counsel . . . the district court must evaluate the likelihood of success on the merits . . . ."). To the extent the Court treats the Motion as a request for the appointment of counsel, this action does not involve exceptional circumstances warranting an appointment. While Plaintiff is an active litigant who has initiated hundreds of cases, no

1   court has found any merit to his claims, which are based on his unsubstantiated theory that all three

2   branches of the federal government are part of a criminal conspiracy that caused him to lose millions of

3   dollars in the Puerto Rico government debt crisis. See Ex. G, Ex. H; Lawless v. Mulder, No. 2021 SC3

4   000441, 2021 D.C. Super. LEXIS 26 (Oct. 4, 2021) (screening order barring Plaintiff from filing any new

5   cases and motions in the District of Columbia Civil Division); Richard R. Lawless v. United States of

6   America, Appeal No. 22-55486, Dkt. 7 (9th Cir. May 25, 2022) (dispositive order dismissing interlocutory

7   appeal for lack of jurisdiction).

8   In light of Plaintiff's failure to file an opposition, the action may be dismissed pursuant to Ghazali v.

9   Moran, 46 F.3d 52, 53-54 (9th Cir. 1995). See also L.R. 7-12 ("The failure to file any required document,

10   or the failure to file it within the deadline, may be deemed consent to the granting . . . of the motion . . .

11   ."). Case 5:21-cv-02174-JWH-SP Document 41 Filed 05/26/22 Page 4 of 32 Page ID #:152

12   For these reasons, Defendant respectfully requests the Court deny Plaintiff's

13   Motion.

14   Dated: May 26, 2022 Respectfully submitted,

15   TRACY L. WILKISON

16   United States Attorney

17   DAVID M. HARRIS

18   Assistant United States Attorney

19   Chief, Civil Division

20   JOANNE S. OSINOFF

21   Assistant United States Attorney

22   Chief, General Civil Section

23    /s/ Paul B. Green

24   PAUL B. GREEN

25   Assistant United States Attorney

26   Attorneys for Defendant

27

28                                 Evidence Submission

29                            Due Process/Civil Rights Violations

30                        Violation Number Two – Motion to Dismiss

31

32   Case 5:22-cv-01700-JWH-SP

1    On 12/29/22 Defense Counsel filed a Motion to Dismiss this case.  In two previous cases, Defense
2    Counsel submitted nearly identical motions to dismiss those cases pretrial.  The Defense Counsel
3    knowingly made false assertions, mischaracterized the plaintiff's complaints, intentionally misled the
4    court, and committed outright perjury in their pursuit to deny the plaintiff a fair trial and equal justice. In
5    two closely related previous cases (. 5:22-cv-02174-JWH-SP & 5:22-cv-00148-JWH-SP) Defense Counsel
6    knowingly made false and unjustified claims to secure pretrial dismissals.

7    When a court motion is found to contain false statements, the consequences can vary depending on the
8    jurisdiction and the specific circumstances of the case. In general, however, the discovery of false
9    statements in a court motion can have several potential effects:

10   Credibility and reputation: The party or attorney responsible for submitting the false statements may
11   suffer damage to their credibility and reputation before the court. This can impact the court's perception
12   of their overall case and may affect their future arguments.

13   Sanctions: Courts have the authority to impose sanctions on parties or attorneys who knowingly make
14   false statements or engage in other unethical conduct. Sanctions can include fines, reprimands, attorney
15   fees, or other penalties deemed appropriate by the court. The severity of the sanctions depends on the
16   jurisdiction and the seriousness of the false statements.

17   Disregard of false statements: Once false statements are identified, the court may disregard them and
18   focus on the remaining factual and legal arguments presented in the motion. The false statements may
19   not affect the entire motion, but they could undermine the credibility of the party or the specific
20   arguments based on those false statements.

21   Adverse impact on the case: False statements can harm the party or attorney responsible for them by
22   weakening their position or hindering their ability to present their case effectively. If the false statements
23   were central to the motion or crucial for establishing a legal argument, their exposure can have a
24   significant negative impact on the case's outcome.

25   Legal consequences: In some cases, knowingly making false statements or engaging in perjury can have
26   more severe legal consequences beyond the court proceedings. These can include criminal charges, civil
27   liability, or disciplinary action against the attorney involved.

28   Using the highest standard one can look to for due process violations one can rely on the requirements
29   the courts demand to consider Section 11 Sanctions.   Federal Rule of Civil Procedure 11 applies to

30   "Signed writings filed with the Court." It also requires the plaintiff to show that a court submission was
31   frivolous, legally unreasonable, or without factual foundation.

32   That is the case in regards to this document filing and the actions of the Defense Counsel and the
33   defendant clearly justify Court sanctions.

34   The Defense Counsel's Motion to Dismiss (Docket Item 22) makes the following claims;

35   1. This action is duplicative of Plaintiff's claims in the related actions, Lawless

36   v. Securities and Exchange Commission, 5:22-cv-02174-JWH-SP, and

37   Lawless v. United States, 5:22-cv-00148-JWH-SP.

25

1    2.    The discretionary function exception bars Plaintiff's claims;

2    3.    The misrepresentation and deceit exception bars Plaintiff's fraud claim;

3    4.    Plaintiff's action is time barred;

4    5.    Plaintiff lacks standing to bring his claims; and

5    6.    The complaint fails to state a plausible claim

6

7    The complaint fails to state a plausible claim

8    Plaintiff claims the SEC aided and abetted in crimes that directly caused his losses.  The following
9    documents that were in the possession of the defendant seemingly support these allegations.

10   Exhibit One, The Puerto Rico House of Representatives Summary Report known as H.R. 1049 was
11   delivered to the DOJ and the SEC in August of 2015 and submitted to this court's docket as evidence
12   exhibit 10, pages 7-29.  This report claims that the Puerto Rico Municipal Agencies were running a Ponzi
13   Scheme, that the credit rating agencies and banks knew PREPA to be bankrupt but kept extending credit
14   to them.  The report goes on to request assistance from the DOJ and the SEC to investigate and
15   prosecute those responsible.

16   In the Motion to Dismiss the document presented by the defense counsel assets there is no plausible
17   claim while the DOJ and SEC were in possession of this document for the past seven years.  If you look at
18   the plaintiff's complaint (Exhibit Five and Docket Item 1) it clearly asserts that Puerto Rico municipal
19   agencies were participating in a Ponzi Scheme. In the HR 1049 document the government of Puerto Rico
20   appears to agree with the plaintiff.

21   In the document presented by the defense counsel the defense counsel states that the plaintiff's claims
22   are unsubstantiated while the DOJ and SEC were in possession of the FOMB Investigative report
23   (evidence exhibit 45), for the past four years.  This extensive government report was issued on August
24   20, 2018 and strongly supports the plaintiff's claims.  There is even a section within the report dealing
25   with aiding and abetting.  Because of the size of this document, the plaintiff will attach a sample of its
26   contents for purposes of this civil rights claim.

27   In the document presented by the defense counsel the defense counsel states that the plaintiff's claims
28   are not plausible while the DOJ and SEC were in possession of numerous internal documents reflecting
29   communication between various SEC employees seemingly discussing all aspects of the plaintiff's claims.
30   These documents were secured through various FOIA requests by the plaintiff. These documents are
31   referred to as Exhibit Three in the attached evidence addendum. This submission is just a small sample
32   of the FOIA documents available to dispute the Defense Counsel assertions that Plaintiff's claims are not
33   plausible.

34   ·    A three-page letter to the Chairman of the SEC Chairman, Mary Jo White asking her to investigate
35   all wrong-doing related to the bonds.  The letter was dated June 14, 2016 and signed by Senators
36   Menendez, Warren, Schumer, Gillibrand, Sanders and Markley.

37

1   ·   ·A Subpoena and related emails from the SEC to Morgan Stanley requesting documents related to
2   Puerto Rico bonds dated 10-23-2014.

3   ·   A SEC, Treasury Department email where a senior staff member for the Treasury Secretary, Adam
4   Chepenik and a redacted senior member of the SEC apparently discuss and agree on the fraudulent
5   nature of a specific Puerto Rico bond and go on to allow the bond to be issued.  The email is dated
6   August 2, 2013.

7   In the Motion to Dismiss document presented by the defense counsel the defense counsel states that
8   the plaintiff's claims are not plausible while the DOJ and SEC understood the Plaintiff, Richard Lawless
9   applied to the formal SEC whistleblower in July of 2015 and his claims were found to be credible.  In this
10   example the SEC itself felt the Plaintiff's claims were well founded.

11   This is how the SEC defines it whistleblower program

12   Office of the Whistleblower

13   Assistance and information from a whistleblower who knows of possible securities law violations can be
14   among the most powerful weapons in the law enforcement arsenal of the Securities and Exchange
15   Commission. Through their knowledge of the circumstances and individuals involved, whistleblowers can
16   help the Commission identify possible fraud and other violations much earlier than might otherwise
17   have been possible. That allows the Commission to minimize the harm to investors, better preserve the
18   integrity of the United States' capital markets, and more swiftly hold accountable those responsible for
19   unlawful conduct.

20   The Commission is authorized by Congress to provide monetary awards to eligible individuals who come
21   forward with high-quality original information that leads to a Commission enforcement action in which
22   over $1,000,000 in sanctions is ordered. The range for awards is between 10% and 30% of the money
23   collected.

24   The Office of the Whistleblower was established to administer the SEC's whistleblower program. We
25   understand that the decision to come forward with information about securities fraud or other
26   wrongdoing is not one taken lightly, and we are here to answer any questions you may have. You can
27   reach the Office of the Whistleblower at (202) 551-4790.

28   **The SEC Office of Market Intelligence Vets Each Tip**

29   At that point, the TCR is forwarded to the SEC's Office of Market Intelligence (OMI), which has been
30   described as a "point guard" for the entire agency. Composed of more than 40 attorneys, former traders,
31   accountants and other experts, the OMI is responsible for gathering and analyzing all tips and complaints
32   received by the SEC. The OMI conducts an initial evaluation of each tip to determine, among other
33   things, whether it relates to an existing investigation, whether similar information has already been
34   submitted to the agency, and whether it relates to possible misconduct that occurred within the SEC's
35   ten-year statute of limitations for enforcement actions. Most importantly, the OMI determines whether
36   the **tip is sufficiently specific, significant, and credible** to be referred to an investigative team within the
37   Division of Enforcement – the division responsible for conducting investigations of possible securities
38   violations and bringing charges against wrongdoers where warranted.

1   In this example, the SEC clearly found the Plaintiffs claims "significant and credible" not implausible as
2   the Defense Counsel for the SEC is now claiming. It appears clearly the Defense Counsel through their
3   efforts is trying to deny the plaintiff not only a fair trial but any trial at all. The SEC assigned Sue Curtin,
4   Senior Investigative Attorney for the SEC to work with the Plaintiff.  An email welcoming the Plaintiff to
5   the "program" is attached as Evidence Exhibit Four.

6   Evidence Exhibit Five is a copy of the plaintiffs docketed claim.

7   The Defense Counsel knew his client, after the review of plaintiff's claims by a team of forty SEC
8   attorneys, found his claim credible. This cannot simply be considered bad lawyering.  By making the
9   assertion that the plaintiffs claims were not plausible the Defense Counsel created a duty of candor and
10  disclosure, obligations he failed to comply with.

11  Disenfranchising a plaintiff's constitutional right to a fair trial is a serious matter, made only more
12  troubling by the higher standard that a U.S. Attorney has as a law enforcement officer.

13  Plaintiff standing

14   "To establish standing, a plaintiff must show, as the irreducible constitutional minimum," that: (1) he has
15  suffered an "injury in fact – an invasion of a legally protected interest which is (a) concrete and
16  particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly
17  traceable to the challenged action of the defendant"; and (3) it is "likely as opposed to merely
18  speculative, that the injury will be redressed by a favorable decision."

19  When the plaintiff submitted his SEC whistleblower complaint it required the plaintiff to show in detail
20  the losses he incurred at that time, because of these allegations.  The SEC did not find his submission
21  partially credible, in fact, by virtue of admission into the SEC whistleblower program the following
22  requirement had to be met; "tip is sufficiently specific, significant, and credible."  By the SEC's own
23  admission and a committee of forty SEC attorneys, the plaintiff had standing.   But evidence in the hands
24  of the DOJ and SEC does not stop here.

25  In FOIA request 21-00159-FOPA, the SEC returned to the plaintiff a copy of his bankruptcy filing which
26  details the losses from the alleged crime.

27  The Plaintiff also submitted detailed financial records of his losses to his assigned investigative attorney,
28  Sue Curtin in 2016.  Those records were also returned to plaintiff in an SEC FOIA request 21-00159-FOPA.

29  Equally important, the House of Representatives Report, H.R. 1049 that the SEC had in their possession
30  since August of 2015 stated that Puerto Rico Municipalities were engaged in a Ponzi Scheme, A Scheme
31  that led to island bankruptcy and cancellation of the plaintiff's project.

32  The FOMB Investigative Report confirms all this illegal activity and goes one step further by defining the
33  SEC's obligations regarding these events.  The SEC has had these reports in their possession Since 2018.

34  The lack of candor and withholding of this critical information when attempting to deprive a plaintiff his
35  constitutional right to a fair trial is a serious matter.  The Defense may be able to shape some limited
36  arguments that they were not required to disclose this evidence.  Those arguments would conflict with
37  the Federal Rules of Civil Procedure and the California State Bar Professional Ethics Rules.  One can argue
38  about this evidence but no one can argue that knowingly making a false claim regarding the plaintiff's

1    lack of standing is anything but an egregious due process and civil rights violation.  If the Defense
2    Counsel simply remained silent on the Plaintiff's Lack of Standing, we would not be here today.  They
3    chose to knowingly make that same false claim in three different cases while sitting on evidence that
4    completely contradicts their claims. They created their own obligation for candor and disclosure by
5    making this assertion to the court and failed to comply with that obligation.

6     Plaintiff's action is time barred

7    Defense Counsel asserts "This action should also be dismissed with prejudice because Plaintiff failed to
8    timely present a valid administrative tort claim within two years of the alleged conduct in the complaint.
9    28 U.S.C. § 2401(b). Before Plaintiff may pursue an action under the Case 5:22-cv-01700-JWH-SP
10   Document 22 Filed 12/29/22 Page 16 of 19 Page ID #:948 FTCA, he must first have filed an administrative
11   claim within two years of the date his claim accrued and have received a final determination of that
12   claim from the SEC. 28 U.S.C. §§ 2401(b), 2675(a). Under the FTCA, "a tort claim accrues at the time of
13   the plaintiff's injury"

14   You simply cannot make an argument that this is just bad lawyering and not part of a long and countless
15   string of unethical and illegal efforts by the Defense Counsel and the U.S. Attorneys to deny the plaintiff
16   his right to a fair trial.

17   We all agree "a tort claim accrues at the time of the plaintiff's injury."  In two previous cases and in this
18   case, Plaintiff has made it clear that it was impossible to determine any injury at all until the bankruptcy
19   court allowed the Puerto Rico Electric Utility to cancel or void the plaintiffs contract for the twenty-
20   megawatt solar power plant.  That did not happen until the August 8th,2022.

21   Defense Counsel claims Plaintiff failed to timely present a valid administrative tort claim within two years
22   of the alleged conduct in the complaint.  Once again, this cannot possibly be attributed to bad lawyering,
23   it was an intentional false claim.

24   These crimes have been going on since 2010 and continue today.  Even as recently as this year, the New
25   York Bankruptcy Court is still arguing about and rejecting false financial filings that lack transparency and
26   candor.   The FOMB is still active and shaping new arguments based on new evidence. Statute of
27   limitations laws are clear on this argument;

28   Discovery Rule:

29   "Under the discovery rule, the statute of limitations begins to run from the time the plaintiff discovers or
30   reasonably should have discovered the injury or the basis for the claim. This rule is often applied in cases
31   where the injury or harm is not immediately apparent."

32   "Continuous Violations: For claims involving ongoing or continuous violations, the statute of limitations
33   may be tolled until the violation ceases."

34

35   "Fraud or Concealment: If the defendant fraudulently conceals facts relevant to the claim, the statute of
36   limitations may be tolled until the plaintiff discovers, or with reasonable diligence, should have
37   discovered the fraud."

1    Is it reasonable to assume that the four U.S. Attorney's that submitted this document do not understand
2    Statute of Limitations Rules, that they all failed to read docketed claims in the previous cases.  Or is it
3    reasonable to assume these four attorneys do not know that the Puerto Rico Bankruptcy litigation is on-
4    going and that the FOMB committee is still active?

5    Or, is it likely that this false claim was one of many knowingly false claims submitted to the court to
6    disenfranchise the plaintiff of his constitutional rights to a fair trial. The evidence that the U.S Attorneys
7    knew this claim was false prior to making the claim is compelling and comprehensive.

8    Once again, making this claim created a duty of candor and disclosure that the Defense team failed to
9    meet.  Is it reasonable to just assume bad lawyering by four U.S. Attorneys or would it be more
10   reasonable to assume this was done to mislead the court into dismissing the case.

11   If a simple pro se plaintiff who lacks any legal training or legal experience understood the statute of
12   limitations issue associated with this motion, is it reasonable to assume the four U.S. Attorneys did not?

13   Defense Counsel asserted that the misrepresentation and deceit exception bars Plaintiff's fraud claim

14   The Defense Counsel claims "Another exception to the FTCA's limited waiver of sovereign immunity is the
15   bar on "[a]ny claim arising out of . . . misrepresentation [or] deceit. . ." 28 U.S.C. § 2680(h).

16   Under this exception, "claims against the United States for fraud or misrepresentation by a federal officer
17   are absolutely barred"

18   This is a surprising claim for the Defense Counsel to make.  The court can likely find some reference to
19   these terms in the commentary within one the FTCA filings or a court complaint, however the Plaintiff is
20   not suing for any actions related to misrepresentation or deceit.  It is clear the plaintiff is claiming the
21   SEC outside the scope of their authority and those actions led to the plaintiff's losses.

22   But there is a bigger argument here for the court.  If the evidence indicates that the SEC likely did outside
23   any reasonable standards based on the agencies mandate and the employees "scope of employment",
24   does the FTCA exception apply at all?  The FTCA is very clear in that it can only address authorized and
25   legal activities of government agencies and employees.  You will find similar limitations to the use of the
26   DAE later in this document and the Westfall Act.

27   Defense Counsel and his three peers are all aware of the evidence, especially the FOIA email where a
28   treasury department employee and a senior SEC employee acknowledge that certain bonds are
29   fraudulent but allow them to be issued.  Everyone in this litigation knows about the H.R. 1049 Report
30   and the FOMB Investigative Report, all of which confirm illegal activity.  If the Defense Counsel remained
31   silent on this assertion, there would be no argument about what evidence he had in his possession and
32   what he knew while he was claiming this exception, but once he claimed this, he had a duty of candor
33   and disclosure to the court.  The Defense Counsel failed in those duties and created a due process
34   violation in the process.

35   The four U.S. Attorney's that submitted this document have extensive experience in identifying illegal
36   activity. They were in possession of a confession, a government report detailing the crimes, internal
37   emails describing the crimes with SEC employees then possibly participating in the crimes by allowing
38   the bonds to be issued. Yet, they made a claim to the court to dismiss this case, a claim that required an

1   absence of illegal activity to be viable.  Again, are they bad lawyers or is this part of a wide-ranging effort
2   to deny the plaintiff his civil right to a fair trial?

3   The discretionary function exception bars Plaintiff's claims

4   The Defendant has wrongfully relied on the Discretionary Authority Exemption, claiming that their
5   actions fall within the scope of permissible discretion. However, such reliance is misplaced, as the
6   Defendant's actions exceeded the reasonable bounds of discretion and amounted to an abuse of
7   authority.

8   Discretionary Authority is not absolute.  It is a sliding scale where jurors and judges need to render an
9   opinion on whether the use of that authority was abused. If a police officer were to see a man or woman
10   jaywalking and were to give them a warning rather than a ticket, most Americans would consider that a
11   reasonable use of "discretionary authority."  But what if an FBI agent ran into a multi-state serial killer
12   and refused to arrest that person and what if the U.S. Attorney General refused to prosecute that
13   person.  In this extreme case, most Americans would consider that an abuse of the "discretionary
14   authority exemption" entrusted to them.  Reasonable people can agree there are boundaries to the
15   government's use of discretion. The following case law examples make it clear that the SEC exceeded its
16   DAE authority.

17   Harlow v. Fitzgerald, 457 U.S. 800 (1982)

18   Discretionary immunity applies unless a plaintiff can show that a reasonable person in the official's
19   position would have known that the action was illegal or beyond the scope of that official's legal
20   authority. Harlow v. Fitzgerald, 457 U.S. 800 (1982).

21   Would a reasonable person repeatedly allow the issuance of knowingly fraudulent bonds that would
22   ultimately result in the largest municipal bankruptcy in American history?

23   Myers & Myers, Inc. v. United States Postal Service

24   Here the appellants' argument is that the Postal Service has acted in contravention of its own
25   regulations, if not unconstitutionally, in denying appellants a hearing prior to debarment from
26   government contracting. It is, of course, a tautology that a federal official cannot have discretion to
27   behave unconstitutionally or outside the scope of his delegated authority.

28   Are SEC employees allowed to let entities issue fraudulent bonds?

29   A motion to dismiss was similarly denied in Cruikshank v. United States

30   The district court reasoned: if this country has learned nothing else in the past decade, it has learned
31   that no man, nor any man acting on behalf of our government, is above the law. The Government should
32   not have the "discretion" to commit illegal acts whenever it pleases. In this area, there should be no
33   policy option.

34   Avery, Myers, and Hatahley

35   Relying on Avery, Myers, and Hatahley in its decision granting judgment to the plaintiffs, the court in
36   Birnbaum u. The United States concluded: The decision to conduct an intelligence operation by methods
37   which violate the Constitution of the United States and which also probably violate several federal

1   statutes is not discretionary. There is no discretion under our system to conceive, plan and execute an
2   illegal program.

3   From 2012 through 2020, the SEC failed to prevent the issuance of knowingly fraudulent bonds.  They
4   hid that information from the public because the Congress could never have passed the PROMESA
5   legislation if the public had known about these crimes.  This ten-year effort has all the hallmarks of an
6   "illegal program." Illegal programs are not allowed under the DAE.

7                                                    ----------

8   Under the analysis of these cases, the discretionary function exception does not apply unless a decision
9   both meets the planning level-operational level test or a variant and does not violate any regulation,
10  statute, or constitutional provision. Discretionary immunity, then, would automatically be waived
11  whenever a government decision violated the law.

12  The Defense Counsel and his three peers were all aware of the illegal activity and if they remained silent
13  on this claim or we would not be discussing their lack of candor and disclosure on this matter.  The
14  Defense Counsel is making this claim when he (they) knew SEC employees were knowingly allowing
15  fraudulent bonds to be issued. That there was a confession of the crimes that the SEC failed to act on
16  and much more.  Any reasonable argument that SEC employees were acting within their job
17  responsibilities and authority would very clearly fail.  The Defense Counsel must have known this when
18  he made the DAE assertion to the court.  Was this bad lawyering or part of a larger effort to deny the
19  plaintiff a fair trial?

20  The Defendant, in their actions, has violated the Plaintiff's due process and civil rights guaranteed by the
21  fifth amendment, sixth amendment, the fourteenth amendment, the defense counsel violated federal
22  rules of civil procedure and the professional rules of conduct by the California State Bar Association. The
23  defendant's conduct was arbitrary, capricious, and lacked any reasonable justification.

24          This action is duplicative of Plaintiff's claims in the related actions

25  With this argument the plaintiff is simply trying to bypass any fresh look at this case.  Through the
26  Defense Counsel's lack of candor, misrepresentations, false statements, and perjury he successfully got
27  two previous cases dismissed and if his luck holds, he hopes it will happen again.

28   Unfortunately, there are similarities about the cases but there are significant differences in the plaintiff's
29  complaints, defendants, cause of action, due process violations, civil rights violations and much more.

30  One lawsuit was against a single individual Gary Gensler, one lawsuit was mistakenly filed against the SEC
31  when it should have been filed against the United States Government. The cause of actions and evidence
32  are different in each case.  Yes, the lawsuits share some similarities but they different in many aspects.

33  Given all the new disclosures of evidence it would be unreasonable to argue that case 5:22-cv-01700-
34  JWh-SP is not a much more material piece of litigation then the previously related cases.  There are
35  significant constitutional questions and due process concerns that were absent in the previous cases that
36  must be considered. The absence of this evidence in previous cases and the earlier filing relates not
37  exclusively but in large part to the defense counsels lack of candor and disclosure about what they knew
38  while they were making these decisions.

It would be reasonable to assume that if the court and the plaintiff were told up-front what evidence the SEC had had in their possession for years, any argument about reasonableness would be harder to defend.

-----

This evidence submission is the second is what will likely be a larger pool of due process and civil rights violation claims.  I ask the court to consider the following;

The Defendant, in their actions, has violated the Plaintiff's rights to due process as guaranteed by the fifth amendment, sixth amendment, the fourteenth amendment, the federal rules of civil procedure and the professional rules of conduct by the California State Bar Association. The Defendant's conduct was arbitrary, capricious, and lacked any reasonable justification.

Fifth Amendment

The Fifth Amendment creates several rights relevant to both criminal and civil legal proceedings. In criminal cases, the Fifth Amendment guarantees the right to a grand jury, forbids "double jeopardy," and protects against self-incrimination. It also requires that "due process of law" be part of any proceeding that denies a citizen "life, liberty or property" and requires the government to compensate citizens when it takes private property for public use.

Sixth Amendment

The Sixth Amendment guarantees the rights of criminal defendants, including the right to a public trial without unnecessary delay, the right to a lawyer, the right to an impartial jury, and the right to know who your accusers are and the nature of the charges and evidence against you. It has been most visibly tested in a series of cases involving terrorism, but much more often figures in cases that involve (for example) jury selection or the protection of witnesses, including victims of sex crimes as well as witnesses in need of protection from retaliation.

Fourteenth Amendment

 All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Federal Rules of Civil Procedure

Rule 8. General Rules of Pleading - (e) Construing Pleadings. Pleadings must be construed so as to do justice

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper— whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

1   Rule 11. (4) the denials of factual contentions are warranted on the evidence or, if specifically so

2   identified, are reasonably based on belief or a lack of information.

3   (c) Sanctions. (1) In General. If, after notice and a reasonable opportunity to respond, the court

4   determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any

5   attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional

6   circumstances, a law firm must be held jointly responsible for a violation committed by its partner,

7   associate, or employee.

8   Professional Conduct of the State Bar of California

9    Rule 3.3 Candor Toward the Tribunal*

10  (a) A lawyer shall not:

11  (1) knowingly make a false statement of fact or law to a tribunal* or fail to correct a false statement

12  of material fact or law previously made to the tribunal* by the lawyer;

13  (2) fail to disclose to the tribunal* legal authority in the controlling jurisdiction known* to the

14  lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel,

15  or knowingly misquote to a tribunal* the language of a book, statute, decision or other

16  authority; or (3) offer evidence that the lawyer knows* to be false. If a lawyer, the lawyer's client, or a

17  witness called by the lawyer, has offered material evidence, and the lawyer comes to know* of its

18  falsity, the lawyer shall take reasonable* remedial measures, including, if necessary, disclosure

19  to the tribunal,* unless disclosure is prohibited by Business and Professions Code section 6068,

20  subdivision (e) and rule 1.6. A lawyer may refuse to offer evidence, other than the testimony of

21  a defendant in a criminal matter, that the lawyer reasonably believes* is false.

22  (b) A lawyer who represents a client in a proceeding before a tribunal* and who knows* that a person*

23  intends to engage, is engaging or has engaged in criminal or fraudulent* conduct related to the

24  proceeding shall take reasonable* remedial measures to the extent permitted by Business and

25

26  Profession Rule 3.4 Fairness to Opposing Party and Counsel

27  A lawyer shall not: (a) unlawfully obstruct another party's access to evidence, including a witness, or

28  unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A

29  lawyer shall not counsel or assist another person* to do any such act; (b) suppress any evidence that the

30  lawyer or the lawyer's client has a legal obligation to reveal or to produce; (c) falsify evidence, counsel or

31  assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;s Code

32  section 6068, subdivision (e) and rule 1.6.

33  Rule 4.1 Truthfulness in Statements to Others

In the course of representing a client a lawyer shall not knowingly:* (a) make a false statement of material fact or law to a third person;* or (b) fail to disclose a material fact to a third person* when disclosure is necessary to avoid assisting a criminal or fraudulent* act by a client, unless disclosure is prohibited by Business and Professions.

Rule 8.4 Misconduct

It is professional misconduct for a lawyer to:

(a) violate these rules or the State Bar Act, knowingly* assist, solicit, or induce another to do so, or do so

through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a

lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud,* deceit, or reckless or intentional misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) state or imply an ability to influence improperly a government agency or official, or to achieve results

by means that violate these rules, the State Bar Act, or other law; or

(f) knowingly* assist, solicit, or induce a judge or judicial officer in conduct that is a violation of an

applicable code of judicial ethics or code of judicial conduct, or other law. For purposes of this rule,

"judge" and "judicial officer" have the same meaning as in rule 3.5(c)


How Due Process Violation's Become Civil Rights Violations

Withholding Evidence: If evidence is intentionally concealed or withheld by a government official or law enforcement agency in a manner that violates a person's right to due process, it can be considered a civil rights violation. This is because due process guarantees individuals the right to a fair and impartial trial, which includes access to all relevant evidence. If evidence is improperly suppressed, it may infringe upon the accused person's ability to defend themselves and undermine their right to a fair trial.

Perjury: Perjury refers to knowingly making false statements under oath. While perjury itself is a serious offense, it does not directly constitute a civil rights violation. However, if perjury is committed by a government official or law enforcement officer as part of a deliberate effort to violate an individual's civil rights, such as providing false testimony to secure an unjust conviction based on discriminatory motives, it may contribute to a civil rights violation.

In summary, withholding evidence and perjury can play a role in civil rights violations if they are carried out in a manner that deprives individuals of their right to due process, equal protection, or fair treatment under the law.

In this litigation both the Defense Counsel (DOJ) and the Defendant (SEC) are law enforcement agencies. One due process violation may be insufficient to rise to the standard for it to be considered a civil rights

1  violation but dozens of serious violations leave little doubt that both the defendant and their defense
2  counsel intended to use any means possible to deny a fair trial to the plaintiff(s).  Both the defense
3  counsel and the plaintiff were sent a request by the plaintiff and a copy of that email was sent to Court
4  Chambers reminding the defendant and defense counsel of their obligation to correct earlier false and
5  misleading submissions to this court. That request was ignored.

6  Case Law Examples

7  United States v. Bagley (1985): Although this case originated in a criminal context, it established the
8  standard for evaluating the withholding of evidence by the government. The Supreme Court held that
9  the prosecution has a duty to disclose evidence that is favorable to the accused and material to guilt or
10  punishment. Failure to disclose such evidence violates the accused's due process rights.

11  Hynix Semiconductor Inc. v. Rambus Inc. (2006): This case involved a civil dispute regarding patent
12  infringement. The court held that a party's failure to produce documents or disclose relevant evidence
13  can lead to adverse inferences against that party. In other words, the court may draw a negative
14  inference from the failure to produce evidence and treat it as unfavorable to the party withholding it.

15  United States v. City of New York (2013): This case involved a civil trial against the City of New York
16  alleging discriminatory hiring practices. During the trial, it was discovered that a high-ranking city official
17  had provided false testimony. The court found that the false testimony undermined the integrity of the
18  trial and ordered a new trial on liability issues.

19  Williams v. City of Antioch (2005): In this civil rights lawsuit, the court found that a police officer had
20  committed perjury during his testimony. The court concluded that the perjured testimony had a
21  significant impact on the jury's decision and ordered a new trial.

22  Santiago v. City of Philadelphia (2017): This civil rights case involved allegations of police misconduct.
23  During the trial, it was revealed that several police officers had provided false testimony. The court held
24  that the officers' false testimony undermined the fairness of the trial and granted a new trial on liability
25  issues.

26  The SEC and DOJ are both Law Enforcement Agencies.

27  **Plaintiff would like to reserve the right to add additional due process violations/civil rights violations**
28  **to this litigation at a future date.**

29

30                                      PRAYER FOR RELIEF

31  WHEREFORE, Plaintiff requests that the Court enter an order or judgment against Defendants including
32  the following:

33  A. Damages in the amount of Plaintiff's investment in Commercial Solar Power, Inc. and future income
34  and capital gains he would have received pursuant to the Power Purchase and Operating Agreement
35  with PREPA for forty-five million dollars;

36  B. Actual damages, statutory damages, punitive or treble damages, and such other relief as provided
37  under law and the statutes cited herein;

Plaintiff is specifically asking the court for immediate compensatory damages related to the Civil Rights violations and punitive damages on par with the size of this seventy-five-billion-dollar criminal scheme which caused the death of thousands of people. Plaintiff prays the court will strongly consider the law enforcement status of the defense counsel and the defendant and send a clear and undeniable message in accessing the punitive damages.

C. Pre-judgment and post-judgment interest on such monetary relief;

D. Other appropriate injunctive or declaratory relief;

F.  All other relief to which Plaintiff may be entitled at law or in equity.

<u>Original Complaint</u>

Plaintiff, Richard Lawless is alleging that the United States Government through acts of

intentional negligence while seeking to aid and abet in on-going crimes contributed

directly to Plaintiffs financial losses. And although this is not a cause of action for this

lawsuit, the United States Government acted as an accessory after the fact to hide and

mislead the victims of these crimes. Plaintiff is seeking damages of forty-five million

dollars for his personal losses.


Plaintiff is alleging that the Department of Justice and the Securities and Exchange

 Commission participated in a "protection racket" and in doing so, hid critical

 information from the American public while the leadership of the DOJ and SEC

 prevented the rank and file from investigating and prosecuting these crimes. These

 actions allowed that "protection" to be passed into law by the Congress, the Senate and

 the Administration. Without the coordinated participation of the DOJ and SEC, these

 crimes would not have been possible.


Plaintiff was the founder and CEO of Commercial Solar Power, Inc (CSP). CSP secured a

contract with the Puerto Rico Electric Power Authority (PREPA) to engineer and build a

twenty-megawatt solar power plant for the utility. The fraud allowed the utility to

reflect strong credit worthiness with credit ratings of BBB+. When Puerto Rico

defaulted on their bonds and moved for bankruptcy protection the project stopped

moving forward. These actions caused CSP to cease active operations. CSP is

1    represented by legal counsel in the Puerto Rico bankruptcy hearings. CSP has an active

2    claim in the bankruptcy case for one hundred and sixty million dollars, the corporate

3    damages.

4

5    The Plaintiff personal losses of forty-five million dollars are seeking to be recovered in

6    this legal action. The bond default and PROMESA legislation has caused the Plaintiff to

7    became indigent. The Plaintiff lost his home, his retirement savings, his savings, savings

8    for his children's college expenses and left him unable to pay the personal loan

9    guarantees needed to build the project. Plaintiff had to file bankruptcy.

10

11    In seeking legal representation on a contingency basis, the smaller law firms could not

12    afford to take on this case and the larger law firms feared retaliation by the federal

13    government that could put as much as one-third of their revenue at risk. That is why

14    the Plaintiff is representing himself in this lawsuit. Because of the passage of the

15    PROMESA legislation and the slow grind of the bankruptcy court cases regarding Puerto

16    Rico, the Plaintiff did not have any idea what his actual losses might look like until very

17    recently.

18

19    Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 2 of 8 Page ID #:2

20

21    The legislation known as PROMESA, prevented and delayed lawsuits from victims of a

22    decades long, seventy-four-billion-dollar Ponzi Scheme. Huge amounts of money, jobs

23    and stock options, changed hands between members of the DOJ leadership team,

24    members of the SEC leadership team and important senior Senators. If the American

25    people were informed about these now "undisputed crimes" that legislation could not

26    have been passed and the protection money from major Wall Street banks, Investment

27    banks and their law firms would not have been paid. These payments are all tracked

28    through the Federal Election Commission (FEC).

29

1    Plaintiff filed a FTCA against the Securities and Exchange Commission. The FTCA claim

2    was denied and Plaintiff filed suit in Federal District Court against the Securities and

3    Exchange Commission. Federal District case 5:21-cv-02174-JWH. The lawsuit was

4    dismissed, in part, because the Plaintiff failed to name the United States Government as

5    the Defendant. This filing seeks to correct that legal failing.

6

7    In the earlier dismissed case, the Defense Counsel withheld critical evidence from the

8    court and based on that evidence, misled the Judge and the Plaintiff by making

9    knowingly false claims to both parties. The evidence was material and would likely have

10    changed the judge's verdict in the case. The document that was withheld was the

11    Puerto Rico House of Representatives document known as H.R. 1049. In that document

12    the Puerto Rico Government admits to running a Ponzi Scheme, received sworn

13    testimony from municipal executives that the banks were aware of the Ponzi Scheme

14    but participated anyway and the Bond Rating Agencies knew them to be technically

15    bankrupt but issued good credit ratings anyway. The document requested help from

16    the DOJ and the SEC to investigate and prosecute those responsible. That document

17    was delivered to the United States Attorney General and the SEC on June 30th, 2015.

18    Below is a sample of some of the admissions made by the government of Puerto Rico in

19    this document;

20

21    "PREPA's current economic insolvency was the product of, among other factors,

22    negligent acts on the part of its creditors, who despite knowing that PREPA's financial

23    and competitive situation was weak, and knowing that its infrastructure was obsolete,

24    they negligently granted PREPA a good credit rating; disregarding that by 2010, PREPA

25    was technically bankrupt."

26    "This Commission realized that PREPA paid previous bondholders with capital received

27    from new investors, to the point that owed interests were capitalized and re-grouped

28    whenever a new debt was issued."

29    "Investors allowed PREPA to issue bonds, then, PREPA borrowed from private banks to

1    pay the bond's interests; then, borrowed from the Government Development Bank (from

2    Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 3 of 8 Page ID #:3

3

4    herein "GDB") to pay back the private bank loans, and the GDB, in turn, issued more

5    bonds to refinance all. Afterwards, PREPA would issue a new debt to pay GDB's

6    outstanding interests, pay principal and pre-pay the new bonds' interests for several

7    years -a cycle that is repeated over and over- and in which the original debt is never

8    paid."

9    "This practice could constitute a fraud scheme for which the federal agencies that

10   regulate financial instruments and the Security Exchange Commission could take action

11   against and/or pursue civil suits against these institutions. That is the reason why we P a

12   g e | 18 are referring this Report and its findings to those entities, so that they may

13   assume the appropriate jurisdiction over these acts."

14   "That this Report be forwarded to the Justice Department of the Commonwealth of

15   Puerto Rico and the United States of America for their corresponding actions;"

16   It is undeniable that the DOJ and the SEC were fully aware of these crimes since June of

17   2015 and acted as a fully informed participant in the cover-up that was required for the

18   PROMESA legislation. This conflict should dictate the removal of the DOJ as Defense

19   Counsel.

20

21   In the earlier case, the Defense Counsel (DOJ) claimed the Plaintiffs allegations to be

22   farfetched, nonsensical, and impossible to prove, knowing all along that they were lying

23   to the court and the plaintiff. Both the SEC and the Defense Counsel withheld this

24   critical information from the court in case #2174 and other related cases, making near

25   identical claims to the courts. Clearly showing coordination to the point of committing

26   near identical acts of perjury in numerous court cases.

27

28   The illegal actions by the SEC and the DOJ creates any number of possible procedural

29   and legal defenses that the DOJ and SEC are now likely to claim. If those defenses are a

1    direct result of the withheld evidence, the perjury, and the misleading statements that

2    contributed to the earlier case dismissal, they should not be allowed. The government

3    cannot engage in illegal activity to create grounds to deny the Plaintiffs right to a jury

4    trial and legal recourse for the taking of their property protected under both the fourth

5    and seventh amendments.

6

7    This is a unique case in which the government will be filing for pre-trial dismissal

8    because the Plaintiff believes that the government cannot survive any further discovery.

9    In earlier cases, the court would not allow any discovery or witness testimony to defend

10   against these pre-trial motions. This filing seeks to correct those failings if the court

11   deems the Defense Counsels pre-trial dismissal requests to be credible.

12

13   Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 4 of 8 Page ID #:4

14

15   In earlier cases the court claimed documents received through Freedom of Information

16   requests that indicate strongly that the SEC knew about these crimes as early as 2012

17   and had over one million pages of internal documents related to these crimes, as flawed

18   or nonsensical evidence. With these new discoveries this filing seeks to have the court

19   recognize these government documents as credible evidence.

20

21   In a related FOIA case (5:21-cv-01637-JWH), Judge W. Holcomb, at the request of the

22   Plaintiff, took on the role of Special Master and ordered the unredacted FOIA

23   documents that were either completely withheld or heavily redacted. These new

24   discoveries by the court will likely have a material impact in this case. Leaving no

25   question that we are looking at some coordinated criminal activity by the federal

26   government.

27

28   In earlier cases the court deemed the Plaintiffs acknowledged role as a formal SEC

29   Whistleblower with the SEC of little to no value regarding his allegations. This filing

1    seeks to correct that failing.

2

3    In the earlier case, a videotape PowerPoint presentation made by the Plaintiff to the

4    SEC, DOJ, Treasury Department, and the Federal Reserve Bank was seen as more

5    nonsensible evidence by the court and or little value. Document 1049 now confirms that

6    the 2016 video presentation was fully supported by the claims in the withheld House of

7    Representatives document 1049. This filing seeks to have the court recognize that video

8    as material evidence in this case.

9

10   In the earlier case the court deemed the relationships between the criminals and the

11   Chairmen of the SEC and the U.S. Attorney's in the Southern District Office as more

12   nonsense. Evidence was provided that showed these parties failed to act on the crimes

13   and then went to work for firms directly tied to the crimes when they left their

14   positions. This filing seeks to correct that failing.

15

16    In earlier cases, the Plaintiff pointed out repeatedly that Senator Chuck Schumer

17   appointed all these key individuals and received more money from the criminal

18   participants then any politician in the history of this country, including any Presidential

19   candidates. Indicating that Senator Schumer played a leading role in this racketeering.

20   Again, the court initially saw this as nonsensical and this filing seeks to correct that

21    mistake.

22

23   In earlier cases, the court did not appear to believe the Plaintiffs claim that the CIA

24   captured ten years of recorded conversations coming out of Puerto Rico identifying

25   payoffs to Politicians and DOJ Officials to prevent investigations and prosecutions

26   related to these crimes. A FOIA document where the CIA claimed Executive Privilege

27   Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 5 of 8 Page ID #:5

28

29   and newspaper articles written in the first person where at least two newspaper editors

1    and the Plaintiff were able to verify the existence of these recordings were considered

2    garbage evidence. This filing seeks to correct that failing.

3

4    The Plaintiff interviewed President Trump in 2016 in preparation for his up-coming book

5    Capitol Hills Criminal Underground. In the twitter interview the President claimed he

6    could do nothing about the Puerto Rico bond fraud because "everyone was involved."

7    That twitter quote appears in the Plaintiffs book. When submitted as evidence, it was

8    also considered non-sense by the court. This filing seeks to correct that failing.

9

10   The Plaintiff had twenty-eight years of experience as a Senior and Executive Corporate

11   Banker involved with Commercial Lending. He worked for Wells Fargo Bank for eighteen

12   years. Wells Fargo Bank is a criminal participate in these crimes. Lending millions or

13   tens of millions of dollars to business entities, municipal entities and others involves

14   extensive forensic accounting skills as well as the ability to buy and sell bonds. It was

15   these skills along with the Plaintiffs Master's Degree in Business and Finance that made

16   the Plaintiff a valued whistleblower for the SEC. All of this was ignored by the court and

17   this filing seeks to correct that failing.

18   Defense Counsel will argue discretionary authority. However, it will be obvious to the

19   court that the discretionary authority exemption only applies to legal activities within

20   the scope of the SEC's mandates. Clearly, withholding key evidence, perjury and

21   intentional false statements made to the courts far exceed anything allowed under the

22   discretionary authority exemption. This is now a case about criminal activity engaged in

23   by the SEC and their Defense Counsel.

24

25   The evidence in this case is overwhelming, over one million pages of internal

26   government documents, a clear audit trail of the legal and illegal payments for this

27   protection provided by the Federal Election Commission, a videotape detailing some of

28   the crimes prepared with the help of the SEC and DOJ prior to the protection payments,

29   a book, Capitol Hills Criminal Underground that acts as a daily diary of the new

1    discoveries regarding the crimes and the payoffs, witness testimony from SEC and DOJ

2    employees and three government reports confirming the crimes. Yet, in some

3    inexplicable way the courts deemed all this nonsense in earlier cases. This filing seeks to

4    correct all that.

5

6    Attached as part of this initial litigation is the following evidence;

7

8    Evidence Exhibit One: Puerto Rico House of Representative Report 1049

9    Evidence Exhibit Two: FOMB final Investigative Report

10   Evidence Exhibit Three: Forbes Article and 189,000 Page FOIA Response

11   Case 5:22-cv-01700-JWH-SP Document 1 Filed 09/27/22 Page 6 of 8 Page ID #:6

12

13   Evidence Exhibit Four: YouTube Link for Sixty Minute Power Point Presentation

14   Evidence Exhibit Five: Thirteen Minute Video Describing Plaintiffs Company, CSP

15   Evidence Exhibit Six: Copy of the book, Capitol Hills Criminal Underground

16   Evidence Exhibit Seven: FOIA Searches Reflecting Over One Million Pages of Documents

17   Evidence Exhibit Eight: CIA Recorded Telephone Calls of DOJ Payoffs

18                              Proof of Service

19

20                         Case No. CV-01700-JWH-SP

21

22   I am over the age of 18 years and not a party to this action. My address is:

23   30279 Redding Avenue, Murrieta, CA  92563, Telephone No. (951) 440-5230

24    On July 25, 2023, I caused to be served the document entitled Motion to Amend Plaintiff's Complaint.
25   This response was sent to Paul B. Green, Assistant United States Attorney.

26   ☐ OFFICE MAIL: By placing in sealed envelope(s), which I placed for collection and mailing today
27   following ordinary business practices. I am readily familiar with this agency's practice for collection and
28   processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal
29   Service on the same day in the ordinary course of business.

1   ☐ PERSONAL DEPOSIT IN MAIL: By placing in sealed envelope(s), which I personally deposited with the
2   U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles,
3   California, with first class postage thereon fully prepaid.

4   ☐ EXPRESS U.S. MAIL: Each such envelope was deposited in a facility regularly maintained at the U.S.
5   Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

6   ☐ HAND DELIVERY: I caused to be hand delivered each such envelope to the office of the addressee as
7   stated on the attached service list.

8   ☒ UNITED PARCEL SERVICE: By placing in sealed envelope(s) designated by United Parcel Service ("UPS")
9   with delivery fees paid or provided for, which

10   deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Buffalo, New York.

11   ☐ ELECTRONIC MAIL: By transmitting the document by electronic mail to the electronic mail address as
12   stated on the attached service list.

13   ☐ E-FILING: By causing the document to be electronically filed via the Court's CM/ECF system, which
14   effects electronic service on counsel who are registered with the CM/ECF system.

15   ☐ FAX: By transmitting the document by facsimile transmission. The transmission was reported as
16   complete and without error.

17   I declare under penalty of perjury that the foregoing is true and correct.

18   Date: July 25, 2023 /s/ Vicki Medlen